1

**SUSAN MARTIN (AZ#014226)**
**DANIEL BONNETT (AZ#014127)**
**JENNIFER KROLL (AZ#019859)**
**MARK BRACKEN (AZ#026532)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinebonnett.com
jkroll@martinbonnett.com
mbracken@martinbonnett.com

2

3

4

5

6

7

Attorneys for Plaintiff

8

9

10

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| DAVID COLLINGE, MELONIE PRIESTLY, and HEATHER ARRAS on behalf of themselves and all others similarly situated, <br><br>         Plaintiffs, <br><br> vs. <br><br> INTELLIQUICK DELIVERY, INC., an Arizona corporation; KEITH SPIZZIRRI and MIRIAM SPIZZIRRI, husband and wife; TRANSPORTATION AUTHORITY, LLC, a Nevada corporation; ROBERT F. LORGEREE, JR; MAJIK LEASING, LLC, an Arizona corporation, FELICIA TAVISON; JASON MITTENDORF; JEFFREY LIEBER, <br><br>         Defendants. | CASE NO.: <br><br> **COMPLAINT** <br><br> **(JURY TRIAL DEMANDED)** |

Plaintiffs allege:

1.     This action is to recover wages, benefits and damages owed under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Arizona wage statute, A.R.S. § 23-350, *et seq.*; and the Arizona minimum wage law, A.R.S. §§ 23-363 *et seq.*

2.     This action is brought as a collective action under the FLSA, 29 U.S.C. § 216(b), to recover minimum wages, overtime wages, liquidated damages, and other statutory penalties resulting from Defendants' violations of the FLSA.  This lawsuit is also brought as a class action under Federal Rule of Civil Procedure 23, to recover unpaid minimum and overtime wages, unlawful deductions from wages, benefits compensatory, treble damages, and any other statutory penalty resulting from Defendants' violations of the Arizona wage statutes and FMLA.

3.     For at least three years prior to filing this action, Defendants have knowingly misclassified Plaintiffs and Class Members, as defined below (collectively referred to hereinafter as "Drivers," "Plaintiffs," and/or "Class Members"), as independent contractors and failed to pay them the statutorily required minimum wages and overtime wages and made unlawful deductions from their earned compensation.

4.     Even though Defendants act as Plaintiff's employers, Defendants benefit greatly by misclassifying the Drivers as independent contractors.  Defendants operate a scheme to treat the Drivers as independent contracts and shift Defendants' business expenses to their employees.  Defendants require Plaintiffs to pay them a weekly fee for use of Defendants' scanners, secondary insurance and mandatory uniform laundry fees.  Defendants also require Plaintiffs to pay for gas, repairs and maintenance of their own vehicles that are used to make deliveries for Defendants.  Defendants also charge each Plaintiff and Class Member over a thousand dollars per year to issue their weekly paychecks.

5.     By treating the drivers as independent contractors instead of employees, Defendants have engaged and continue to engage in a scheme to avoid worker's

compensation and unemployment payments, social security, other payroll taxes owed by employers, and other benefits otherwise owed to employees. Defendants have attempted and continue to attempt to avoid liability under wage protection statutes, federal labor laws, Title VII of the Civil Rights Act of 1964 (Title VII),the Equal Pay Act (EPA), the Age Discrimination in Employment Act (ADEA), Americans with Disabilities Act (ADA), Americans with Disabilities Act Amendments Act (ADAAA) and other statutes. Defendants have shifted and continue to shift the cost of their business expenses to their employees. Defendants are able to obtain a vast competitive advantage over competitor services that treat employees in compliance with the law. As a result, Defendants' pay practices drive down wages and undercut fair labor practices across the industry. In addition, Defendants have been unjustly enriched by these practices.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. Specifically, this action is brought under 29 U.S.C. § 216(b) and 29 U.S.C. § 2617(a)(2).

7. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). The state law claims are sufficiently related and/or part of the same case or controversy as the FLSA and FMLA claims.

8. This Court has personal jurisdiction over Defendants because they regularly transact business in and have significant and continuous contact with Arizona.

9. Venue is proper under 28 U.S.C. § 1391(b). Defendants Keith Spizzirri, Jason Mittendorf, Jeffrey Lieber, Felicia Tavison and Robert Lorgeree reside in Maricopa County, Arizona. The principal place of business for Defendants IntelliQuick Deliveries, Inc., Majik Leasing LLC and Transportation Authority LLC is in Maricopa County, Arizona. A substantial part of the acts and/or omissions giving rise to the claims occurred in this district.

## PARTIES

10. Plaintiff, David Collinge, is a citizen and resident of Maricopa County,

Arizona.  He currently works and at all relevant times has worked for IntelliQuick and/or other Defendants in Phoenix, Arizona as a Freight Driver, Route Driver, and On-Demand Driver.  At all relevant times, he has been an "employee" of Defendant IntelliQuick and/or other Defendants within the meaning of A.R.S. § 23-350 and 29 U.S.C. § 203(e)(1).  Defendants have unlawfully classified him as an independent contractor.

11.    Plaintiff, Melonie Priestly, is a citizen and resident of Phoenix, Arizona.  She currently works and at all relevant times has worked for IntelliQuick and/or other Defendants in Phoenix, Arizona as a Route Driver and On-Demand Driver.   At all relevant times, she has been an "employee" of Defendant IntelliQuick and/or other Defendants within the meaning of A.R.S. § 23-350 and 29 U.S.C. § 203(e)(1).  Defendants have unlawfully classified her as an independent contractor.

12.    Plaintiff, Heather Arras, is a citizen and resident of Maricopa, Arizona.  She currently works and at all relevant times has worked for IntelliQuick and/or other Defendants in Phoenix, Arizona as a Route Driver.  At all relevant times, she has been an "employee" of Defendant IntelliQuick and/or other Defendants within the meaning of A.R.S. § 23-350 and 29 U.S.C. § 203(e)(1).

13.    As of December, 2011 Plaintiff Arras had worked for IntelliQuick for more than 12 months and for at least 1,250 hours during the previous 12- month period. In December 2011, Ms. Arras suffered a serious health condition yet was unable to take leave and was instead forced to work while on crutches or be penalized for missing work.  At all relevant times it was and is Defendants' policy and practice to penalize drivers for missing work, even on account of the serious health conditions of the employee or their family member.

14.    Defendant, IntelliQuick Deliveries, Inc is an Arizona corporation which is authorized to and does transact business in the State of Arizona, including in Maricopa County.  IntelliQuick is one of the largest delivery/courier services in the Southwest.  IntelliQuick's principal place of business is located at 4022 S. 20th Street, Phoenix, AZ 85040.  At all relevant times, IntelliQuick has employed Drivers and been engaged in

providing small package information, transportation and delivery services in the States of Arizona, Nevada, Utah, Colorado, New Mexico, and Illinois.

15.     At all relevant times, IntelliQuick has employed Drivers and has had operations, offices, and/or warehouses in Tucson, Arizona, Yuma, Arizona, Lake Havasu, Arizona, Las Vegas, Nevada, Reno, Nevada, Salt Lake City, Utah, Denver, Colorado, Albuquerque, New Mexico, and Chicago, Illinois.

16.     At all times material, Defendant IntelliQuick was, and continues to be, engaged in interstate commerce as defined by the FLSA, 29 U.S.C. § 203 and FMLA, 29 U.S.C. § 2611(1).

17.     At all relevant times, Defendant, Keith Spizzirri ("Spizzirri"), was and is the President and an Owner of IntelliQuick.  Mr. Spizzirri resides in Scottsdale, Arizona. Mr. Spizzirri works at 4022 S. 20th Street, Phoenix, AZ 85040.  At all relevant times, Mr. Spizzirri has exercised and continues to exercise direct and/or indirect supervisory authority over Plaintiffs.  Upon information, Mr. Spizzirri has been directly involved in decisions affecting the terms and conditions of employment for Plaintiffs at IntelliQuick, including, but not limited to, decisions regarding hiring, termination, hours worked, wages paid, deductions made to wages, and discipline.  Upon information, Mr. Spizzirri was responsible for establishing the wages of Plaintiffs and other Class members at IntelliQuick.  At all relevant times, Mr. Spizzirri has been and continues to be Plaintiffs' "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d).

18.     Upon information, Miriam Spizzirri is the wife of Keith Spizzirri and is named as a Defendant solely for the purpose of Arizona's community property laws.

19.     At all relevant times, Defendant, Felicia Tavison ("Tavison"), was and is a Driver Supervisor for IntelliQuick.  Ms. Tavison resides and works in Maricopa County, Arizona.  At all relevant times, Ms. Tavison has exercised and continues to exercise direct and/or indirect supervisory authority over Plaintiffs.  Upon information, Ms. Tavison  has been directly involved in decisions affecting the terms and conditions of employment for Plaintiffs at IntelliQuick, including, but not limited to, decisions

5

regarding hiring, termination, hours worked, wages paid, deductions made to wages, and discipline.  Upon information, Ms. Tavison was responsible for establishing the wages of Plaintiffs and other Class members at IntelliQuick.  At all relevant times, Ms. Tavison has been and continues to be Plaintiffs' "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d).

20.    At all relevant times, Defendant Jeffrey Lieber ("Lieber"), was and is a Driver Supervisor for IntelliQuick.  Mr. Lieber resides and works in Maricopa County, Arizona.  At all relevant times, Mr. Lieber has exercised and continues to exercise direct and/or indirect supervisory authority over Plaintiffs.  Upon information, Mr. Lieber has been directly involved in decisions affecting the terms and conditions of employment for Plaintiffs at IntelliQuick, including, but not limited to, decisions regarding hiring, termination, hours worked, wages paid, deductions made to wages, and discipline.  Upon information, Mr. Lieber was responsible for establishing the wages of Plaintiffs and other Class members at IntelliQuick.  At all relevant times, Mr. Lieber has been and continues to be Plaintiffs' "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d).

21.    At all relevant times, Defendant Jason Mittendorf ("Mittendorf"), was and is a Driver Recruiter for IntelliQuick.  Mr. Mittendorf resides and works in Maricopa County, Arizona.  At all relevant times, Mr. Mittendorf has exercised and continues to exercise direct and/or indirect supervisory authority over Plaintiffs.  Upon information, Mr. Mittendorf has been directly involved in decisions affecting the terms and conditions of employment for Plaintiffs at IntelliQuick, including, but not limited to, decisions regarding hiring, termination, hours worked, wages paid, deductions made to wages, and discipline.  Upon information, Mr. Mittendorf was responsible for establishing the wages of Plaintiffs and other Class members at IntelliQuick.  At all relevant times, Mr. Mittendorf has been and continues to be Plaintiffs' "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d).

22.    Defendant, Majik Leasing, LLC ("Majik") is an Arizona corporation that is owned and operated by Defendant Keith Spizzirri.  Majik's principal place of business is

the same location as IntelliQuick's principal place of business, at 4022 S. 20th Street, Phoenix, AZ 85040.  Upon information, Majik owns multiple vehicles that are used by IntelliQuick, its employees, and Drivers.  IntelliQuick requires some Drivers to use vehicles owned by Majik.  Majik often requires Drivers to sign a Vehicle Rental Agreement before the Driver may use the vehicle.

23.    Defendant, Transportation Authority, LLC ("TA") is a Nevada corporation authorized to, and does, transact business in the State of Arizona, including in Maricopa County.  TA's principal place of business is the same location as IntelliQuick's principal place of business at 4022 S. 20th Street, Phoenix, AZ 85040.

24.    TA is a joint employer with IntelliQuick and an "employer" within the meaning of 29 U.S.C. § 203(d) and A.R.S. § 23-350. In the alternative, TA is an alter ego of IntelliQuick.

25.    Robert "Bob" Lorgeree is the owner and President of TA.  Mr. Lorgeree resides and works in Maricopa County, Arizona.  Upon information, at all relevant times, Mr. Lorgeree has exercised and continues to exercise direct and/or indirect supervisory authority over Plaintiffs.  Upon information, Mr. Lorgeree has been directly involved in decisions affecting the terms and conditions of employment for Plaintiffs at IntelliQuick, including, but not limited to, decisions regarding hiring, termination, hours worked, wages paid, deductions made to wages, and discipline.  Upon information, Mr. Lorgeree was responsible for establishing the wages of Plaintiffs and other Class members at IntelliQuick.  At all relevant times, Mr. Lorgeree has been and continues to be Plaintiffs' "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d).

26.    Defendant IntelliQuick is Plaintiffs' "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d), FMLA, 29 U.S.C. § 2611(4)(A), and Arizona wage statutes, A.R.S. § 23-350.  In the alternative, IntelliQuick is a joint employer with one or more of the other named Defendants, and/or alter ego of one or more of the other named Defendants.

**CLASS ACTION ALLEGATIONS**

27.     Counts I and II asserted below are properly maintainable as a collective action under 29 U.S.C. § 216(b).

28.     Counts III through VIII asserted below are properly maintainable as a class action under Federal Rule of Civil Procedure 23

29.     For both collective and class action purposes, the proposed collective action and class includes:   All current and former drivers or couriers, who performed transportation and delivery services for IntelliQuick Deliveries, Inc. and were or are classified as independent contractors and/or not classified as employees within three (3) years of the date this action commenced, (collectively referred to hereinafter as "Drivers," "Plaintiffs," and/or "Class Members").   The proposed Class includes the following subclasses of Drivers:

a)     <u>Freight Drivers</u>:  All Drivers who use vehicles or vans that are owned or leased by IntelliQuick or Majik to make deliveries and pick-ups for IntelliQuick.  (Hereinafter referred to as "Freight Drivers.")

b)     <u>Route Drivers</u>:  All Drivers who generally use their own vehicles to make deliveries and pick-ups on an assigned route for IntelliQuick. (Hereinafter referred to as "Route Drivers.")

c)     <u>On-Demand Drivers</u>: All Drivers who generally use their own vehicles to make specific deliveries and pick-ups for IntelliQuick that are not included in an assigned route. (Hereinafter referred to as "On-Demand Drivers.")

d)     <u>FMLA Covered Drivers</u>:  All persons who worked in excess of 1,250 hours during any 12-month period of time period who were eligible for FMLA leave and were penalized or did not take eligible FMLA leave because of Defendants' policy and practice of penalizing drivers for taking leave for family and/or medical reasons.   (Hereinafter referred to as "FMLA Covered Drivers.")

30.     Excluded from any class or collective action are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who at any time during the class period has a controlling interest in any Defendants.

31.     The proposed Class Members are so numerous that joinder of all members is impracticable. Upon information and belief there are several hundred members of the proposed Class of each subclass.

32.     There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members of the Class, including but not limited to:

    a.  Whether  one, more or all of Defendants are or were Plaintiffs' employers;

    b.  Whether one, more or all of Defendants are required to and failed to pay Plaintiffs' statutory minimum wages;

    c.  Whether Defendants are required to and failed to pay Plaintiffs' overtime for all hours worked in excess of over forty hours per  week;

    d.  Whether Defendants failure to pay wages violates state and common law;

    e.  Whether Drivers are entitled to a declaratory judgment and other equitable and legal relief for Defendants' failure to classify and treat Drivers as employees and not as independent contractors;

    f.  Whether Defendants were unjustly enriched by the acts and omissions complained of herein;

    g.  Whether Defendants made unlawful deductions from Plaintiffs' wages or unlawfully required Drivers Plaintiffs to bear Defendants' business expenses for vehicles, equipment, gas, bonds, insurance, and other costs and expenses of the employer's business;

    h.  Whether Defendants wrongfully required Plaintiffs to expend money on Defendants' behalf;

i.   Whether the "Vehicle Rental Agreement" and "Membership Application and Agreement" contracts some Drivers were required to sign are unconscionable in whole or in part;

j.   Whether such contracts are void and/or voidable in whole or in part; and

k.   The nature and extent of Class and subclass injury and the appropriate measure of damages for the Classes;

33.   The claims of Plaintiffs are typical of the claims of the Class they seek to represent.  Plaintiffs and Class Members work or have worked for Defendants and have been subjected to common policies and practices of failing to pay all wages and overtime owed, making unlawful and excessive deductions from their wages.

34.   Defendants acted or refused to act on grounds generally applicable to the Class Members as a whole by engaging in the same violations of law with respect to the Classes, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Classes as a whole.

35.   Plaintiffs will fairly and adequately represent and protect the interests of the Class and each subclass.

36.   Plaintiffs have retained counsel competent and experienced in complex class action employment litigation.

37.   The Class Members have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures.

38.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of wage litigation like the present action, where individual Plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against one of the largest delivery services in the Southwest.  In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

## GENERAL ALLEGATIONS

**I.    Defendants' Control over Drivers' Daily Activities**

39.    Defendants control the majority, if not all, of the Drivers' work for IntelliQuick.

40.    Drivers do not and may not exercise independent judgment regarding their work for IntelliQuick.

41.    Defendants IntelliQuick independently or jointly with the other Defendants controls the Drivers' work.

42.    Defendants control the method, manner and time that Plaintiffs deliver packages.

43.    Defendants control virtually every aspect of Plaintiffs' performance of IntelliQuick's work and the equipment that Plaintiffs use for that work.

44.    IntelliQuick instructs Drivers when to be at the office, when they can leave, what deliveries and pickups to make, when to make the deliveries and pickups and how to make the deliveries and pickups.

45.    By way of example, IntelliQuick has gone so far as to order a Driver not to wait for police to arrive at the scene of an accident when the Driver observed the accident.

46.    If Drivers fail to follow IntelliQuick's directions, instructions, rules, policies or procedures they are penalized and have money deducted from their weekly compensation under what is called "chargebacks."

47.    Drivers cannot delegate their work to assistants, associates or others without first obtaining approval from IntelliQuick.

48.    Drivers cannot hire other assistants or associates to assist with their routes or deliveries.

49.    All Drivers report to IntelliQuick Supervisors, including Defendants Mittendorf, Leiber, and Tavison ("IntelliQuick Supervisors").

50.    IntelliQuick Supervisors direct the daily activities of the Drivers.

51.    IntelliQuick Supervisors assign all routes, deliveries, and pick-ups to the Drivers.

**A.    Drivers' Daily Work Assignments.**

52.    Drivers are given a "manifest" each day from IntelliQuick which tells them what deliveries or pick-ups to make and when to make each delivery or pick-up.

53.    The manifest is obtained from and printed from an IntelliQuick computer and can only be obtained at IntelliQuick's offices.

54.    Drivers cannot reject or negotiate the routes or deliveries that they have been assigned.

55.    Drivers are required to keep IntelliQuick scanners with them at all times so that they can, among other things, receive instructions and messages throughout their workday from IntelliQuick.  Drivers often receive messages sent directly to the IntelliQuick scanners, which will modify their daily routes and schedules, and/or direct them to make extra pick-ups or deliveries.  Drivers do not receive any extra payment for these extra deliveries or pick-ups.

56.    Drivers cannot deviate from instructions given to them by IntelliQuick on their manifests or as modified by messages throughout the day.  If the Drivers fail to follow the directions from IntelliQuick they are given a "chargeback" or deduction from their compensation.

57.    IntelliQuick Supervisors regularly tell Drivers that "we [IntelliQuick] have you [the Driver] from 7:00 am until 5:00 pm" and "you [the Driver] work for us [IntelliQuick]."

58.    Defendants instruct the Drivers to report to work no later than 7:00 am. Drivers report to work at IntelliQuick's offices and/or warehouses.  For example, Drivers in the Phoenix, Arizona area are told to report to IntelliQuick's headquarters at 4022 S. 20th Street, Phoenix, AZ 85040.

59.    Drivers are then given their daily routes and/or assignments, through the IntelliQuick manifests.

60.    Before leaving on their morning routes, deliveries, or pick-ups, Drivers must first load their vehicles or vehicles owned or leased by Defendants that are used for deliveries and pick-ups.

61.    Drivers are often instructed by Defendants to perform extra work in the IntelliQuick warehouses or offices, before leaving on their routes including sorting, logging packages, checking in drivers, loading vehicles and other administrative tasks. Drivers regularly spend between 30 minutes and two hours performing this extra work. Drivers are not paid for performing any of this extra work.

62.    Defendants instruct Drivers to report back from their morning routes, deliveries, or pick-ups to IntelliQuick's warehouses or offices by 1:00 pm.

63.    Drivers are then given any new or additional routes, pick-ups or deliveries. Drivers are also often given additional work, including sorting, logging packages, checking in drivers, loading vehicles and other administrative tasks, which they must complete before leaving on their afternoon routes, deliveries, or pick-ups.    Drivers regularly spend between 30 minutes and two hours performing this extra work.  Drivers are not paid for performing any of this extra work.

64.    Defendants instruct Drivers to report back from their afternoon routes, deliveries, or pick-ups to by 5:00 pm.

65.    Because of the extra work that Defendants assign to the Drivers in IntelliQuick's warehouses and offices, Drivers are forced to leave on their routes later and accordingly are expected to complete their routes in less time or work later to complete their routes.

**B.    Defendants' Treat Drivers Like Employees.**

66.    Although Defendants tell the Drivers they are "Independent Contractors" or "ICs," Defendants treat Drivers like employees.

67.    Drivers make deliveries to and pick-ups from businesses or individuals that are clients of IntelliQuick; not customers or clients of the Drivers.

68.    Drivers are required to get pre-approval from an IntelliQuick Supervisor

1    before they can take any time-off or personal leave.

2        69.    As previously noted, IntelliQuick Supervisors tell the Drivers when they

3    have to arrive at work and when they can leave work.  IntelliQuick Supervisors regularly

4    assign Drivers to do work in the IntelliQuick warehouse or office that is outside the

5    Drivers' normal routes, deliveries, and pick-ups.

6        70.    Defendants are aware that Drivers regularly perform work in the

7    IntelliQuick warehouse without any extra compensation.

8        71.    Upon information and belief, Drivers currently are being assigned to do the

9    same work while classified as independent contractors that was formerly performed by

10   regular, non-exempt fulltime IntelliQuick employees without any additional wages.

11       72.    On IntelliQuick's website, Defendants refer to the Drivers as "our drivers,"

12   "our legal couriers," "IntelliQuick Medical Courier Specialists," "our medical delivery

13   specialists," "IntelliQuick's financial couriers," and "IntelliQuick delivery drivers."

14       73.    IntelliQuick's website asserts, "IntelliQuick has more than 250 uniformed

15   and credentialed local couriers for pick-up and local delivery."

16       74.    IntelliQuick's website states, "Our delivery drivers are sharp, seasoned

17   professionals who understand that they are making an impression on your customers and

18   business associates every time they make a delivery for you."

19       75.    IntelliQuick's website also states, "All IntelliQuick delivery drivers are

20   insured for cargo damage, reconstruction and criminal liability. Since most bonds don't

21   cover independent delivery drivers, our clients are assured proper coverage in the event

22   of a loss."

23       76.    IntelliQuick includes pictures of the Drivers, wearing IntelliQuick

24   uniforms, on their website.

25       77.    Drivers are required to wear IntelliQuick uniforms and meet specific

26   grooming requirements, established by IntelliQuick.  Drivers cannot wear their own

27   uniforms.

28       78.    When Drivers perform work in IntelliQuick's offices and warehouses, there

14

is no way to distinguish between the Drivers and other IntelliQuick employees.

79.    Drivers are given IntelliQuick Identification Badges (IDs). Drivers are required to wear the IDs somewhere that is in sight when they make deliveries or pick-ups.  The IDs include the Driver's name, the IntelliQuick logo and company name, and an IntelliQuick identification number.

80.    Job openings for Drivers are posted on the IntelliQuick website and are advertised as positions with IntelliQuick.  Drivers apply for the positions at IntelliQuick's headquarters or other offices.

81.    Drivers are interviewed and hired by IntelliQuick supervisors, including but not limited to Defendants Spizzirri, Mittendorf, Lieber, and Tavison.

82.    Drivers are terminated by IntelliQuick supervisors, including but not limited to Defendants Spizzirri, Mittendorf, Lieber, and Tavison.

83.    Drivers are required to use equipment provided by IntelliQuick, including scanners and computers.

84.    Drivers cannot purchase or use their own scanners.

**C.    Payment of Wages.**

85.    Drivers are paid each week.  The pay statements can be viewed through IntelliQuick's website or internal server.

86.    Defendants provide Drivers with IntelliQuick identification numbers that Drivers can use to access their pay statements or "settlements" online through IntelliQuick's website or internal server.  These ID numbers are also used by Drivers to log into IntelliQuick computers.

87.    Drivers are paid by Defendants either per route, delivery, or pick-up.  Route and Freight Drivers are told that they will be paid a set amount per route (or per day).  On-Demand Drivers are told that they will be paid a set amount per delivery or pick-up.

88.    Drivers cannot negotiate with Defendants regarding the amount paid for a particular delivery or pick-up.

89.    If Drivers refuse a route, pick-up, or delivery that has been assigned to

them, Defendants issue the Drivers a chargeback fee for refusing the assignment or threaten them with termination and/or a chargeback.

90.   Defendants often refer to or explain the Drivers' wages or compensation in terms of their hourly rate.  For example, Defendants explain to Drivers that a route will pay the Driver "$10 an hour," and refer to routes as "$10 an hour routes,"  "$15 an hour routes," "8 hour route," "10 hour route," or "13 hour route."

91.   Defendants often fail or refuse to pay the Drivers the amount they originally quoted for a particular route, delivery or pick-up, after the Driver completes the assignment.  For example, a Driver was quoted $140 to make a late night delivery from Phoenix to Lake Havasu, Arizona, but only received $90 for the delivery.

92.   The Drivers' paychecks are generally issued by a third-party service, including TA.  However, there have been occasions when the checks were issued directly from IntelliQuick and signed by Defendant Spizzirri.

93.   Although IntelliQuick clients or customers are regularly charged an extra "fuel surcharge," Defendants do not pay anything to the Route Drivers or On-Demand Drivers for fuel in their own vehicles.

94.   Defendants have decreased the compensation paid to Drivers while increasing the costs and fees to the IntelliQuick clients and customers for delivery and pick-up services.

95.   Although Route Drivers and On-Demand Drivers are expected and required to use their own vehicles for the benefit of Defendants, Route Drivers and On-Demand Drivers do not receive any additional compensation for gas or maintenance of their vehicles.

**D.   Trainings and Meetings**

96.   IntelliQuick regularly provides training for and trains the Drivers.

97.   Drivers are required to attend and participate in an initial orientation or training with IntelliQuick.  Defendants Spizzirri, Mittendorf, Leiber, and Tavison, regularly conduct or participate in the initial orientation.  After completion of the

orientation, Drivers receive an employee identification number and certificates stating IntelliQuick's "Policies and Procedures to help promote employee teamwork and increase customer satisfaction."

98.    Defendants require Drivers to complete HIPAA training at IntelliQuick's offices.  After the completion of the training, the Drivers receive certificates stating, "IntelliQuick Delivery completed HCSI Compliance Training for Employees, In Employee HIPAA Privacy Training" and "IntelliQuick Delivery Employee Acknowledgement for [Name of Driver]."

99.    Defendants require Drivers to complete client specific training for certain IntelliQuick clients, including Saliba.  These trainings are taught by IntelliQuick supervisors, including Defendants Mittendorf, Leiber, and Tavison and are held on IntelliQuick property.

100.    Route Drivers receive one to two week trainings on their routes, where they ride along with an IntelliQuick Trainer, Supervisor, or other Driver to observe how to conduct deliveries.

101.    Drivers do not receive any extra compensation for attending these orientations, trainings or meetings.

**II.    Defendants' Failure to Pay Overtime.**

102.    Defendants classified and continue to classify Plaintiffs and Class Members as independent contractors.

103.    At all relevant times, Drivers regularly worked for IntelliQuick's benefit for periods of time without compensation or for less than the minimum wage as required by law, pursuant to IntelliQuick's policies and standard practices.  IntelliQuick did not pay Plaintiffs or the Class Members overtime compensation for hours worked for IntelliQuick's benefit in excess of 40 hours in a workweek despite being legally obligated to do so.

104.    At all relevant times, Drivers have regularly worked and continue to work more than forty (40) hours in a workweek.

105.   At all relevant times, Drivers have regularly worked and continue to work on average 10 hours per day and between 45 to 60 hours per week for the benefit of Defendants.

106.   Drivers are required to work until their route, delivery, or pick-up is complete or until they have completed all work required of them in IntelliQuick's warehouse or route room.

107.   Many Drivers must report to work by 6:00 am in order to have time to complete their routes, deliveries, and pick-ups plus any other assigned work assigned by IntelliQuick by 5:00 pm.

108.   Defendants have refused and continue to refuse to pay Drivers for any hours worked in excess of forty hours in a week.

109.   Defendants regularly assign Drivers additional routes, deliveries, or pick-ups for which they receive no extra compensation.

110.   Defendants regularly send messages to Drivers throughout the day via scanners or by phone call directing them to make extra pick-ups or deliveries.  Drivers are often required to double-back to make a delivery or pick-up if they have already passed a certain location or time.  Drivers receive no extra compensation for the additional time or fuel required for the new delivery or pick-up.  If the Driver refuses to make the delivery or pick-up they are penalized with a "chargeback," or deduction from their compensation, for "driver refusal to pickup customer package."

**III.   Defendants' Failure to Pay Minimum Wages.**

111.   Defendants often require or knowingly permit Drivers to regularly work without any compensation or for less than the statutory minimum wages.

112.    As a result of the additional work assigned to the Drivers for which they do not receive any extra compensation, Drivers often perform work for the benefit of Defendants and receive less than the statutory minimum wages for their work.

///

///

**IV.     Defendants' Unlawful Deductions from Drivers' Paychecks.**

     **A.     Defendants Illegally Deduct "Chargebacks."**

113.   Defendants regularly deduct fees or fines from the Drivers' weekly compensation without consent or approval from the Drivers.  These deductions are referred to as "chargebacks."

114.   Defendants penalize Plaintiffs and reap windfall profits for all chargebacks deducted

115.   IntelliQuick Supervisors impose the chargebacks on the Drivers.

116.   IntelliQuick regularly fails to notify the Drivers before imposing a chargeback and often fails to provide any explanation for the chargeback.

117.   Drivers regularly first learn about the chargebacks when they receive their weekly pay.

118.   Upon information and belief, the chargebacks are paid directly to IntelliQuick.

119.   If Drivers want to challenge a chargeback they are required to submit a dispute to TA, which then forwards the dispute to IntelliQuick.  Only IntelliQuick Supervisors can decide whether to refund an improperly imposed chargeback.

120.   IntelliQuick claims that chargebacks are imposed for "service failures," but does not explain the date, location, or nature of any alleged failure.  Drivers are not notified what can be done to avoid future chargebacks.

121.   Drivers are not given any extra compensation if it is found that the alleged service failure was the result of a mistake made by an IntelliQuick dispatcher or the IntelliQuick client.

122.   Drivers are faced with the impossible dilemma if they are given an extra pick-up or delivery during their regular route.  If a Driver does not perform the extra pick-up or delivery, he or she must do it at their own time, expense, and fuel without any reimbursement from IntelliQuick.  If the Driver does not perform the extra pick-up or delivery they are given a chargeback.

123.    If a Route Driver does not perform an extra pick-up or delivery it is then assigned to an On-Demand Driver.  The On-Demand Driver is paid less than the Route Driver is docked for the same route for which the Route Driver incurs a chargeback.

**B.    Defendants Illegally Deduct Chargebacks for Family or Medical Leave.**

124.    Drivers receive chargebacks if they fail to obtain IntelliQuick Supervisor approval for time off.  Drivers receive chargebacks if they are unable to complete their work because of serious health conditions.

125.    Drivers are also penalized for taking days off or calling in sick including for their own or family members' serious health conditions. Drivers receive a "chargeback" or deduction from their regular compensation. Drivers receive these "chargebacks" even if they notify IntelliQuick in advance of the schedule conflict. Drivers receive these penalties even if another Driver is found to complete the Driver's regular route or delivery.

126.    Drivers are also penalized for serious health conditions that make it impossible for them to complete their regular route or delivery.  Drivers receive a "chargeback" or deduction from their regular compensation, even if another Driver is found to complete the route or delivery.

**C.    Defendants Illegally Deduct Other Fees.**

127.    Drivers are required to pay IntelliQuick an initial fee to obtain a scanner from IntelliQuick, plus they have to pay IntelliQuick a weekly service fee for the use of the scanners.

128.    IntelliQuick makes several mandatory deductions from every Driver's weekly paycheck.

129.    Upon information and belief, these deductions are made by and paid directly to Defendants.  Drivers are charged the following weekly "fees":

       a.  Paycheck processing fee of approximately $22;

       b.  Scanner or device fee of approximately $24;

       c.  Uniform laundry fee of $7.50; and

d.  Secondary insurance of $9.50.

130.   Drivers are not given any information or an invoice regarding the processing fee that they must pay every week.

131.   Drivers are required to use the IntelliQuick scanners and devices and cannot use other scanners or devices that they may find that would meet their needs.

132.   Drivers must pay the weekly laundry fee whether or not they want to use the service and whether or not they actually use the service.

133.   Drivers are not given any information regarding the secondary insurance that they allegedly receive for the extra fee.

134.   Upon information, Defendants are unjustly enriched from these charges.

135.   Drivers who are not provided vehicles from Defendants also have to pay for the gas, repair and maintenance of their own vehicles used to make deliveries for and on behalf of Defendants.

136.   Drivers are also required to obtain a motor carriers permit at an annual cost of approximately $64.

**V.    Transportation Authority and Other Related Entities**

137.   IntelliQuick attempts to distance itself from the Drivers themselves through the use of other companies, such as Defendant Transportation Authority.

138.   TA is owned and operated by Defendant Lorgeree.

139.   Lorgeree has worked with IntelliQuick and Spizzirri for between ten to twelve years.

140.   Lorgeree has worked as the President of three different companies that alleged to manage the Drivers, including TA, Transportation Resource Group ("TRG"), and Contractor Management Services ("CMS").

141.   TA maintains offices within IntelliQuick's principal place of business. IntelliQuick and TA employees regularly transfer between positions within the alleged separate companies.  Upon information, IntelliQuick employees often perform work for TA and alleged TA employees regularly perform work for IntelliQuick.

142.   TA has never offered Drivers any work for any other companies, except for IntelliQuick.

143.   Upon information and belief, TA works primarily with IntelliQuick Drivers.

144.   Most, if not all meetings called by TA, TA employees, or Lorgeree are held at IntelliQuick's offices, buildings or warehouses.

**A.     The Agreement**

145.   Many Drivers are required to sign a "Membership Application and Agreement" (the "Agreement") before they begin working.

146.   This Agreement is an unenforceable contract between the Driver and Transportation Authority, LLC ("TA").

147.   Drivers are told that if they do not sign the Agreement then they cannot work for IntelliQuick.

148.   Drivers are hired by IntelliQuick supervisors then told that they will work as independent contractors and are given a copy of the Agreement they are then directed to sign.

149.   Plaintiffs are told that they work for IntelliQuick from 7:00 am to 5:00 pm, are given additional work beyond their original deliveries, and are threatened with pay deductions if they refuse the additional work.

150.   The Agreements purport to be with another company that operates out of IntelliQuick's headquarters and other offices.  This company has gone by many different names in recent years.  The Company was originally called CMS, then it was called TRG, and now it is called TA.  Although the names of the company have changed, the employees of each company have remained primarily the same.  Defendant Lorgeree has been the President of all three companies.  The only apparent change to the Agreement was the change in the company name.

151.   Drivers have no ability to bargain or negotiate over the terms of the Agreement.

152.   Drivers are recruited by Defendant Mittendorf, who is an IntelliQuick Supervisor, who maintains a desk within the TA office within IntelliQuick's headquarters.

153.   There is nothing in the Agreement regarding work performed by the Drivers, other than the delivery of packages.  The Agreement mentions nothing about work performed in the IntelliQuick warehouse or route room, including but not limited to sorting packages, scanning packages, or loading packages.

154.   Although the Agreement states that the Drivers will not receive training, e Drivers regularly receive mandatory training from IntelliQuick.

155.   The Agreement is a contract of adhesion.

156.   The Agreement is unconscionable.

157.   Although Defendants tell Plaintiffs and Class Members (the "Drivers") that they are independent contractors and direct them to a Membership Application and Agreement, which labels the Drivers as "independent contractors," Defendants treat Plaintiffs and Class Members like employees.

**B.     Majik Leasing, LLC**

158.   IntelliQuick maintains a fleet of vans or vehicles that are used primarily by Freight Drivers for delivery.  Upon information, many of these vehicles are owned or leased by IntelliQuick and/or Majik Leasing, LLC.

159.   Drivers are often asked to sign a Vehicle Rental Agreement with Majik Leasing, LLC when they use one of these vehicles.  IntelliQuick leads Drivers to believe that these form contracts are provided on a take it or leave it basis that must be signed at the time they are provided to Plaintiffs, so that Plaintiffs are precluded from seeking legal advice before signing.

160.   Drivers are occasionally asked to sign a daily Vehicle Rental Agreement with Majik that are given to the Drivers by IntelliQuick employees, including but limited to Defendants Mittendorf, Leiber, and Tavison, before they can use the vehicles.  Freight Drivers are not charged for the use of these vehicles.

## COUNT I

## FAILURE TO PAY OVERTIME AND MINIMUM WAGES IN VIOLATION OF FLSA
### (29 U.S.C. § 201 *et. seq*)

161.   Plaintiffs reallege and incorporate by reference all allegations in all paragraphs as if fully set forth herein.

162.   The FLSA, 29 U.S.C. § 206 provides in relevant part:

Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
(**1**) except as otherwise provided in this section, not less than--
(**A**) $5.85 an hour, beginning on the 60th day after May 25, 2007;
(**B**) $6.55 an hour, beginning 12 months after that 60th day; and
(**C**) $7.25 an hour, beginning 24 months after that 60th day;

163.   The FLSA, 29 U.S.C. § 207(a)(2) provides in relevant part:

no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

164.   By the acts and omissions complained of above, including, *inter alia*, by failing  to pay minimum wages and by failing to pay overtime wages for work in excess of 40 hours per week,  Defendants violated the FFLSA.

165.   Plaintiffs and Class Members are entitled to be paid minimum wages and are entitled to receive compensation at the rate of one and one-half times their hourly rate for each hour worked in excess of forty hours per workweek.

166.   Defendants' violations of the FLSA were willful and accordingly, a three year statute of limitations applies, pursuant to 29 U.S.C. § 255.

167.   Each improperly paid Plaintiff and Class Member, who performed or continues to perform services for Defendants for any time during the three years preceding

this lawsuit, is entitled to notification of the pendency of this action and of his/her right to consent to becoming a party to this action.  Notice should be sent to all Class Members, as defined above, pursuant to 29 U.S.C. § 216(b).

168.    Defendants have intentionally, willfully and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA.

169.    Plaintiffs and Class Members have been harmed and suffered damages by being denied overtime wages in accordance with the FLSA, plus incurred costs and reasonable attorneys' fees.

170.    As a result of Defendants' unlawful acts and violations of the FLSA, Plaintiffs and Class Members have been damaged and pursuant to 29 U.S.C. § 216(b) are entitled to recovery of overtime wages, liquidated damages in an amount equal to the wages they are owed as unpaid overtime, prejudgment interest, attorneys' fees, costs and other compensation, declaratory and injunctive relief.

## COUNT II

### VIOLATION OF ARIZONA'S WAGE ACT
### (A.R.S. § 23-350 *et seq.*)

171.    Plaintiffs reallege and incorporate by reference all allegations in all paragraphs as if fully set forth herein.

172.    Ariz. Rev. Stat.  § 23-351 provides in relevant part:

> A. Each employer in this State shall designate two or more days in each month, not more than sixteen days apart, as fixed paydays for payment of wages to the employees . . .
> ***
> C.  Each employer shall, on each of the regular paydays, pay to the employees . . . all wages due the employee up to such date, except
> ***
> (3) Overtime or exception pay shall be paid no later than sixteen days after the end of the most recent pay period.

173.    Ariz. Rev. Stat. § 23-355(A) provides in relevant part:

> if an employer, in violation of this chapter, fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages.

174.    Arizona Rev. Stat. § 23-352 provides in relevant part:

No employer may withhold or divert any portion of an employee's wages unless one of the following applies:
1. The employer is required or empowered to do so by state or federal law.
2. The employer has prior written authorization from the employee. An employer shall not withhold wages under a written authorization from the employee past the date specified by the employee in a written revocation of the authorization, unless the withholding is to resolve a debt or obligation to the employer or a court orders otherwise.
3. There is a reasonable good faith dispute as to the amount of wages due, including the amount of any counterclaim or any claim of debt, reimbursement, recoupment or set-off asserted by the employer against the employee.

175.    By the acts and omissions set forth above, including by failing to pay all wages due to Plaintiffs and Class Members, including minimum wages and overtime wages and by improperly deducting portions of Plaintiffs' and Class Members' wages without authorization, Defendants violated Arizona's Wage Act.

176.    As a result of Defendants' violations of Ariz. Rev. Stat. § 23-351, Plaintiffs and Class Members have been harmed, have suffered substantial losses and have been deprived of compensation to which they were entitled are entitled to an award of the unpaid wages, with prejudgment interest thereon, and treble the amount of such wages, together with attorneys' fees and costs pursuant to A.R.S. §23-355.

## COUNT III
## RESTITUTION/UNJUST ENRICHMENT

177.    Plaintiffs reallege and incorporate by reference all allegations in all paragraphs as if fully set forth herein.

178.    Defendants' Membership Application and Agreement and Vehicle Lease Agreement are unconscionable.

179.    Defendants' unconscionable agreements are void, or alternatively, voidable by Plaintiffs under the common law.

180.    Defendants have been unjustly enriched by the unconscionable terms of the contracts they imposed on the Plaintiffs and Class Members.

181.   Defendants have been unjustly enriched by the work performed by Plaintiffs and Class Members without any compensation for the work performed.

182.   Plaintiffs are entitled to restitution and/or damages in quantum meruit for the value of Defendants' unconscionable contracts conferred upon Defendants.

**COUNT IV**
**DECLARATORY JUDGMENT**

183.  Plaintiffs reallege and incorporate by reference all allegations in all paragraphs as if fully set forth herein.

184.  The Membership Application and Agreement and Vehicle Lease Agreement that some Drivers are requested to sign are unconscionable.

185.  Plaintiffs and Class Members are entitled to declaratory judgment that Defendants' lease and Vehicle Rental Agreement are unconscionable.

**COUNT V**
**VIOLATIONS OF FMLA**
**(29 U.S.C. § 2601 *et seq.*)**

186.   Plaintiffs reallege and incorporate by reference all allegations in all paragraphs as if fully set forth herein.

187.     The FMLA, 29 U.S.C. § 2612, provides in relevant part that:
an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
(**A**) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
(**B**) Because of the placement of a son or daughter with the employee for adoption or foster care.
(**C**) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
(**D**) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.
(**E**) Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

188.   The FMLA, 29 U.S.C. § 2615, further provides:

**Exercise of rights**
It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

189.   The FMLA provides that an employer who violates § 2615 shall be liable to any eligible employee affected:

**(A)** for damages equal to--
**(i)** the amount of--
**(I)** any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
**(II)** in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;
**(ii)** the interest on the amount described in clause (i) calculated at the prevailing rate; and
**(iii)** an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and
**(B)** for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

190.   By the acts and omissions set forth above, including by failing to provide FMLA leave and by penalizing employees who take unpaid leave, Defendants violated the FMLA.  As a result of Defendants' violations of the FMLA, Plaintiffs have been damaged and, *inter alia,* are entitled to damages equal to the amount of wages and benefits lost and monetary losses, interest and liquidated damages together with appropriate declaratory and other equitable relief, together with attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of Class Members, pray that judgment be entered against Defendants and that the Court award the following relief including, but not limited to:

A.  A declaration that Defendants have violated and are violating the FLSA;

B. A declaration that Defendants have violated and are violating Arizona's Wage Act;

C. A declaration that Defendants have violated and are violating the FMLA;

D. A declaration that Defendants' violations of the FLSA and FMLA are willful;

E. Enjoining Defendants from violating the FLSA, the FMLA and Arizona's Wage Act;

F. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not limited to, an order declaring that the Membership Application and Agreement and Vehicle Lease Agreement are void or voidable or alternatively, severing any unconscionable clauses and enjoining Defendants from continuing their unlawful practices as described herein;

G. Awarding Plaintiffs and Class Members wages and overtime payments due them for the hours worked by them for Defendants without proper compensation;

H. Awarding Plaintiffs and Class Members statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, treble damages and restitution to be paid by Defendants;

I. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest;

J. Awarding Plaintiffs and Class Members attorneys' fees and costs of suit; and

K. Awarding Plaintiffs and Class Members such other and further relief as the Court deems just and proper.

///

1

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

2

Dated this 19th day of April, 2012.

3

**MARTIN & BONNETT, P.L.L.C.**

4

By: s/Daniel Bonnett

5

Susan Martin
Daniel Bonnett
Jennifer Kroll

6

Mark Bracken
1850 N. Central Avenue, Suite 2010

7

Phoenix, Arizona 85004
Telephone:   (602) 240-6900

8

*Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28