1
2
3
4
5
6
7
8
9
10
11

**UNITED STATES DISTRICT COURT**

12

**DISTRICT OF ARIZONA**

13
14

**David Collinge, *et al*.,**

15

   **Plaintiffs,**

16

  **vs.**

17

**IntelliQuick Delivery, Inc., an Arizona corporation, *et al*.,**

18

   **Defendants.**

19
20

**2:12-cv-00824 JWS**

**ORDER AND OPINION**

**[Re: Motions at docs. 303 and 310]**

## I.  MOTIONS PRESENTED

21
22

  At docket 59 the court conditionally certified a collective action brought by

23

plaintiffs David Collinge, *et al*. (collectively "plaintiffs") to enforce the Fair Labor

Standards Act ("FLSA").[1]  At docket 310 defendants IntelliQuick Delivery, Inc., *et al*.

24

(collectively, "defendants") move for decertification of the FLSA class pursuant to 29

25

U.S.C. § 216(b).  Plaintiffs oppose at docket 318.  Defendants reply at 326.

26

Additionally, at docket 303 plaintiffs move for class action certification on their non-

27

FLSA claims (Counts II-V of the Second Amended Complaint ("the Complaint"))

28

---

[1]29 U.S.C. § 201 *et seq*.

pursuant to Federal Rule of Civil Procedure 23.  Defendants oppose at docket 319.
Plaintiffs reply at docket 325.  Oral argument was heard on March 17, 2015.

## II.  BACKGROUND

Plaintiffs and the proposed class currently work or have worked for IntelliQuick
Delivery, Inc. ("IntelliQuick") as delivery drivers.  Plaintiffs maintain that they have been
misclassified as independent contractors when they are actually employees, and as a
result defendants have violated their rights under various wage and hour laws.  Count I
of the Complaint alleges FLSA violations and is the subject of defendants' present
motion for decertification.  The FLSA class that was conditionally certified consists of
"All current and former drivers or couriers, who made pick-ups or deliveries for or on
behalf of IntelliQuick Deliveries, Inc. as a Freight Driver, Route Driver, or On-Demand
Driver within the State of Arizona and who were or are classified or paid as independent
contractors or not classified or paid as employees at any time on or after April 9, 2009."[2]

Plaintiffs non-FLSA claims allege violations of Arizona's Wage Act (Count II),
restitution and unjust enrichment (Count III), violations of the Family and Medical Leave
Act ("FMLA") (Count V), and seek a declaratory judgment that several of defendants'
contracts are unenforceable (Count IV).  Plaintiffs now seek class certification on these
non-FLSA claims as well as certification of the following four subclasses of drivers:

**Subclass A - Freight Drivers:** All Drivers who use vehicles or vans that
are owned or leased by IntelliQuick or [Majik Leasing, LLC] to make
deliveries and pick-ups for or on behalf of IntelliQuick or its customers.

**Subclass B - Route Drivers:** All Drivers who generally use their own
vehicles to make deliveries and pick-ups on an assigned route for or on
behalf of IntelliQuick or its customers.

**Subclass C - On-Demand Drivers:** All Drivers who generally use their
own vehicles to make specific deliveries and pick-ups for or on behalf of
IntelliQuick or its customers and who have not been assigned a regular
route.

---

[2]Doc. 59 at 6.

1
2
**Subclass D - FMLA Covered Drivers:** All Drivers who have worked in excess of 1,250 hours during any 12-month period of time and are or were eligible for FMLA leave.[3]

3
### III.  DISCUSSION

4
**A.    FLSA decertification**

5      Section 207(a) of Title 29 requires employers to pay their nonexempt employees

6 who work more than forty hours a week overtime compensation, and Section 206

7 requires employers to pay their employees a minimum wage.  Section 216(b) states

8 that actions to recover unpaid overtime or minimum wages "may be maintained against

9 any employer . . . by any one or more employees for and in behalf of himself or

10 themselves and other employees similarly situated."  Section 216(b) requires that

11 employees file consent in writing in order to become plaintiffs.  A class may include any

12 employee who is "similarly situated" to the named plaintiff employees.  Although the

13 Ninth Circuit has not yet sanctioned a procedure for district courts to use when

14 determining whether workers are similarly situated, a majority of courts employ an ad

15 hoc two-step approach.[4]

16      At the first step, plaintiffs must make a "modest factual showing" that they and

17 the potential opt-in plaintiffs were victims of a common policy or plan that violated the

18 law.  If they can do so, as plaintiffs have here, the court will send notice to the potential

19 opt-in plaintiffs who may be similarly situated to the named plaintiffs.[5]  This first step is

20 referred to as "conditional certification" because "the decision may be reexamined once

21 the case is ready for trial."[6]

22      The second stage occurs after discovery and is triggered by an employer's

23 motion for decertification.  "At the second stage, the district court will, on a fuller record,

24

25      [3]Doc. 303 at 6.

26      [4]*See, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008).

27      [5]*Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).

28      [6]*Morgan*, 551 F.3d at 1261.

determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."[7]  "This second stage is less lenient, and the plaintiff bears a heavier burden."[8] To determine whether plaintiffs are similarly situated at the second stage, courts review several factors, including (1) the "disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff;" and (3) "fairness and procedural considerations."[9]  The ultimate decision whether to decertify the class "rests largely within the district court's discretion."[10]

**1.      The individual plaintiffs' factual and employment settings are similar**

Plaintiffs claim that the opt-in class members are similarly situated to the named plaintiffs because they are victims of a common policy or plan that mischaracterizes them as independent contractors when in fact they are employees.  The parties agree that the test for determining whether the drivers are employees is the "economic realities" test, which utilizes a non-exhaustive list of six factors set forth by the Ninth Circuit in *Real v. Driscoll Strawberry Associates, Inc.*[11]  The ultimate focus of the economic realities test is whether "as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'"[12]  The court's task at this

---

[7]*Myers*, 624 F.3d at 555.

[8]*Morgan*, 551 F.3d at 1261.

[9]*Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001).  *See also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014).

[10]*Morgan*, 551 F.3d at 1261 (internal quotation omitted).

[11]603 F.2d 748, 754 (9th Cir. 1979).

[12]*Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (quoting *Bartels v. Birmingham*, 332 U.S. 126 (1947)).  *See also Doty v. Elias*, 733 F.2d 720, 722-23 (10th Cir. 1984) ("The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service, or is, as a matter of economic fact, in business for himself.") (citations omitted).

-4-

stage of the litigation is not to consider the merits whether the economic realities test is satisfied, but rather to decide whether the factual and employment settings of the opt-in plaintiffs and the named plaintiffs are similar.  The factual and employment "settings" at issue in this case are those that relate to the economic-realities-test factors.  These six factors are:

(1) "the degree of the alleged employer's right to control the manner in which the work is to be performed;"

(2) "the alleged employee's opportunity for profit or loss depending upon his managerial skill;"

(3) "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;"

(4) "whether the service rendered requires a special skill;"

(5) "the degree of permanence of the working relationship;" and

(6) "whether the service rendered is an integral part of the alleged employer's business."[13]

According to defendants, numerous factual differences in the drivers' work settings render them disparately situated for Section 216(b) purposes.  Although defendants do not separate them out as such, these alleged differences appear to relate to the first three economic-realities-test factors.  Thus, defendants effectively concede that the individual plaintiffs are similarly situated with regard to factors four, five, and six.

[13]*Real*, 603 F.2d at 754.

-5-

1

2

### a.   Plaintiffs are similarly situated with regard to the degree of control that IntelliQuick exercises over their work performance

All IntelliQuick drivers are subject to the same work contract that, according to defendants, "sets forth the parameters of the working relationship."[14]  More importantly, once hired, the drivers are trained by defendants[15] and subject to a series of "uniform standard operating procedures" ("SOPs")[16] that tell them what they are required to do,[17]

---

[14]Doc. 321 at 19 ¶ 2.

[15]*See* Doc. 32-3 at 4 ¶ 10; 32-4 at 6 ¶ 16; 305-1 at 168 (stating that all drivers were expected to attend a "drivers' meeting"); Doc. 305-3 at 2-6, 38-39; Doc. 305-5 at 24-26; 50-52, 54-58.  Although defendants dispute that they provide training to their drivers, the basis for this dispute is that they contend they provide their drivers "orientation" and not "training."  Doc. 321 at 9 ¶ 41.  This distinction is without a difference.  Further, at oral argument defense counsel argued that even if IntelliQuick has the hypothetical right to train the drivers, it does not actually train all of them, and the training it does provide does not extend "beyond simple instruction on the operation of communication devices and the physical location of where deliveries would be made."  This argument's flawed premise is that only formal training provided at the beginning of a driver's tenure is "training."  The record shows that, in addition to initial orientation training, IntelliQuick trains its drivers on an ongoing basis.  *See, e.g.*, Doc. 307 at 105 rows 269 ("[T]his is a training issue the stop was not closed out by the driver"), 277 ("[H]e was having issues scanning to his route but did not let anyone know of this.  Please retrain agent again on Salibas procedures."), and 278 ("[D]river did not follow delivery procedures, please print out attached and educate driver"); Doc. 307 at 110 rows 263, 269, 270, 271 ("All drivers have been advised not to leave pkg with autho"), 272 ("[R]etrained driver on the absolute necessity for verifying ab#s and pc count always"), and 275 ("I will let him know this could of been a chargeback"); Doc. 307 at 130 at rows 383 ("[H]e should of been trained on this I will speak to both him and utility"), 390 ("[T]his was his 1st day training and reggie instructed him improperly he is now aware of sop"), and 395 ("[D]river was charged for the special and has been educated"); and Doc. 307 at 141 row 442 ("[T]raining alert sent out to all drivers and TA.").

[16]Doc. 305 at 7-9; Doc. 305-3 at 8; Doc. 305-5 at 2-10, 28-29, 46-48, 60-61, 139-40, 147-48; Doc. 305-6 at 78, 80, 95-96, 98-108, 110-26, 128, 130-31, 133, 135, 137, 139, 141-42, 144, 146, 158-59.  Defendants object to plaintiffs' reliance on Exhibit 40 to Jeffrey Lieber's deposition, claiming that plaintiffs did not attach a copy of that exhibit to their statement of facts.  Doc. 321 at 7 ¶ 39.  Defendants are mistaken.  Doc. 305-3 at 38-39.  It does not appear that plaintiffs attached a copy of deposition Exhibit 235 to their statement of facts, however.  The court is unable to consider that evidence.

[17]*See* Doc. 305-1 at 201-03 (stating that the purpose of the SOPs was to inform drivers of "what they needed to do" with the packages); Doc. 305-5 at 24-25.

-6-

within which "time frame" they must do it,[18] what they are required to wear,[19] and which equipment they must use.[20]  Further, IntelliQuick monitors its drivers' work using its "CXT system," which allows IntelliQuick to know where its drivers are at all times and to communicate with them.[21]

If drivers commit what IntelliQuick refers to as "service failures," such as late or missed deliveries or violations of IntelliQuick policy, IntelliQuick may sanction them with "chargebacks" (i.e., financial penalties).[22]  IntelliQuick maintains a "care ticket system" to, among other things, document customer complaints and service failures.[23]  This care ticket system shows that IntelliQuick closely monitors the details of its drivers' activities[24] and routinely metes out chargebacks or other discipline when a driver's performance falls below expectations.[25]  The evidence does not show some drivers are subject to these policies and procedures and others are not; to the contrary, it shows that all of IntelliQuick's drivers are similarly situated with regard to the level of control that IntelliQuick exercises over their work.

Despite this evidence, defendants assert that IntelliQuick exercises a disparate degree of control over its individual drivers' work performance for numerous reasons. They first argue that "individual supervisors could variously affect" the degree of control

---

[18]Doc. 305-1 at 205.

[19]Doc. 305-5 at 135.

[20]*See, e.g.,* Doc. 305-1 at 23.

[21]Doc. 305-1 at 221.

[22]Doc. 305-1 at 166, 251; Doc. 305-2 at 198; Doc. 305-6 at 158.

[23]Doc. 305-2 at 94, 106-08.

[24]Doc. 307 at 16, 26, 35, 45, 55, 65, 75, 84, 94, 99, 105, 116, 125, 136, 147, 158.

[25]Doc. 307 at 20, 30, 39, 49, 59, 69, 79, 88, 99, 110, 121, 130, 141, 152, 163.  Column BN of these spreadsheets indicates the resolution of the care ticket.  Doc. 305-2 at 106.  These spreadsheets refute despite defendants' contention that IntelliQuick only occasionally issued chargebacks.  Doc. 326 at 8.

that IntelliQuick exercises over its drivers.[26]  Defendants rely on the deposition testimony of former IntelliQuick representative Jason Ortiz ("Ortiz"), who stated that he had the words "direction and control" "drilled into [his] head" in training.  Ortiz testified that after that training "the whole direction and control thing" continued in his interactions with IntelliQuick drivers, which meant, "you do not give them direction, you're not giving control."[27]  Defendants contrast this with Ortiz's testimony that he witnessed other IntelliQuick "managers, dispatchers, and supervisors" exercising "direction and control over the drivers."[28]  This testimony is far too vague to be informative.

Defendants also point to Ortiz's testimony that he had discretionary power to reassign drivers' stops and to issue chargebacks,[29] but defendants offer no evidence that different supervisors exercised these two powers differently.  The fact that IntelliQuick's supervisors have discretion to reassign drivers' stops or issue chargebacks, without more, does not establish disparate work conditions.  If the opposite were true, no two workers could be similarly situated if they are overseen by supervisors who possess discretionary power, as almost all supervisors do.

Second, defendants argue that the court should discount the weight of IntelliQuick's standardized work policies because deposition testimony from various drivers shows that these policies "were either not actually applied at all or, at a minimum, not applied with any consistency."[30]  The testimony that defendants offer does not show disparate treatment, however.  Among other things, defendants highlight numerous aspects of opt-in plaintiff Eliseo Castillo, Jr.'s ("Castillo") deposition

---

[26]Doc. 310 at 7.

[27]Doc. 310-1 at 6.

[28]Doc. 310-1 at 7 lines 10-19.

[29]Doc. 310-1 at 3-4.

[30]Doc. 310 at 12.

testimony, including that he only spoke with IntelliQuick dispatchers, that he selected his own vehicle, that he was able to go "somewhere else" if he let dispatch know where he was going, that he was able to choose which of two non-urgent packages to deliver first, and that he responded "I don't recall anything anymore" when asked if IntelliQuick gave him any instructions other than what he should wear.[31]  Defendants also point to opt-in plaintiff Eddie Miller's ("Miller") testimony that he received only minor instructions from IntelliQuick on a typical day, and plaintiff Melonie Priestly's ("Priestly") testimony that she remembered that IntelliQuick instructed her to wear her uniform, keep her uniform clean, get signatures, get into the warehouse early, and get her route done and back on time, but did not remember all of the other instructions IntelliQuick gave her. The only evidence with which defendants contrast any of this testimony, however, is plaintiff David Collinge's ("Collinge") declaration that IntelliQuick "controlled almost all aspects of his daily work."  Collinge's vague declaration is not inherently inconsistent with the testimony upon which defendants rely, and therefore is insufficient to show disparate conditions.

Defendants also argue that IntelliQuick's vehicle inspection policy was applied inconsistently.  Pursuant to that policy, all drivers are expected to regularly maintain and self-inspect their vehicles.[32]  Defendants contrast opt-in plaintiff Susan Little's ("Little") testimony that IntelliQuick inspected her vehicle before she started her deliveries with the testimony from other drivers that IntelliQuick never inspected their vehicles.[33]  But Little's testimony does not show that IntelliQuick inspected her vehicle at all, let alone in

---

[31]Doc. 310 at 12-3.

[32]Doc. 305-5 at 142.

[33]Doc. 310 at 18.  *See also* 310-2 at 5 (Priestly testified that IntelliQuick never inspected her vehicle); *id*. at 59 (Campagna testified that IntelliQuick never inspected his vehicle); Doc. 310-1 at 40 (Collinge testified that he did not recall anyone at IntelliQuick ever inspecting his vehicle).

the manner described in IntelliQuick's policy.  Little merely testified that defendant Bill Cocchia told her that she needed to clean out the back of her truck.[34]

Third, defendants contrast Castillo's testimony that he was not able to reject assignments with opt-in plaintiff Yvonne Trevino's ("Trevino") testimony that she had declined work between 2 and 5 times and Miller's testimony that he could reject work and come and go as he pleased.  The significance of Castillo's testimony is negated by his later admission that he did not know what would have happened if he had tried to reject an assignment.[35]  Further, Miller's testimony actually weighs in favor of similarity because he stated that the reason he believed he could reject work was because "[t]he contract that we signed said we were independent contractors."[36]  This is the same contract that all drivers signed.

Fourth, defendants argue that the drivers are not similarly situated with regard to their ability to modify the order of their routed deliveries.  Defendants contrast Little's testimony[37] with that of plaintiffs Heather Arras ("Arras") and Brian Black ("Black").  On one hand, Little testified that she was trained to follow the order of deliveries listed on her manifest and if she needed to make a "slight change" she had to ask for permission from management.  "[I]f it says an order is due at this time," Little stated, "you have to get it there at that time."[38]  On the other hand, Arras testified that it was possible to reorder her non-time-sensitive deliveries, but she had never done so.[39]  Further, Black

---

[34]Doc. 310-2 at 26.

[35]Doc. 310-1 at 13 (Q.  "Do you know what would happen if you told the person on the radio that you didn't have time?  A.  No.").

[36]Doc. 310-1 at 66.

[37]Defendants also rely on Collinge's testimony that he did not believe he had the ability to change the order of his deliveries.  Doc. 310-1 at 50.  Because defendants do not provide any foundation for Collinge's belief, the court accords this testimony little weight.

[38]Doc. 310-2 at 25.

[39]Doc. 310-2 at 33-34.

1   testified that he would manually put his routed deliveries "in order by address in the

2   area that [he] thought would be the best way."[40]  At first blush this testimony appears to

3   establish that Little was prohibited from changing the order of her routes whereas Arras

4   and Black were not.  Two considerations militate against such a finding, however.  First,

5   defendants do not appear to be comparing apples to apples.  Little was testifying about

6   reordering her time-sensitive deliveries, whereas Arras was not.[41]  It is unclear about

7   which type Black was testifying.  Second, defendants offer no explanation as to *why*

8   this disparity might exist.  Based on these uncertainties, the court is unable to make a

9   determination regarding whether the drivers are similarly situated in this regard.

10       Fifth, defendants argue that IntelliQuick required only some drivers to purchase a

11  specific vehicle.[42]  On one hand, defendants point to Campagna's testimony that

12  defendant Jeff Lieber told him he had to "get a truck with a cab on it" to replace the car

13  he was driving at the time,[43] and Little's testimony that IntelliQuick told her that she

14  could perform a specific route because she had "a big enough vehicle."[44]  On the other

15  hand, defendants note that Priestly testified that IntelliQuick did not instruct her on

16  which vehicle she could or could not drive while completing a route.[45]  Defendants'

17  argument is not supported by the testimony upon which it relies.  Neither Campagna

18  nor Little testified that IntelliQuick actually required them to purchase a vehicle or alter

19

20

21       [40]Doc. 310-2 at 45.

22
23       [41]*See* 310-2 at 33 (Arras testified that "time-sensitive things, like pharmaceuticals, had
    to be delivered first.  Everything else kind of just falls into place, so you just continue about your
24   route.").

25       [42]Doc. 310 at 18.

26       [43]Doc. 310-2 at 58-59.

27       [44]Doc. 310-2 at 19.

28       [45]Doc. 310-2 at 6.

1  their conduct in any way.  This testimony does not show that IntelliQuick exercised

2  varying degrees of control over its drivers' vehicle choices.

3      Sixth, defendants argue that the drivers are not similarly situated with regard to

4  their "potential for negotiating their rate of pay."  According to defendants, deposition

5  testimony establishes three distinct groups of drivers: (1) those who were "unaware that

6  they had the ability to negotiate their rate of pay;" (2) those who "tried to negotiate their

7  rate of pay but could not do so;" and (3) those "who did in fact negotiate their rate of

8  pay."[46]  They assert that Priestly,[47] Collinge,[48] and plaintiff Robert Campagna

9  ("Campagna")[49] belong in the first group because they testified that they were not able

10  to negotiate their pay rate and instead were told to take it or leave it; those exact same

11  plaintiffs—Priestly, Collinge, and Campagna—also belong in the third group because

12  they were able to negotiate their pay rates;[50] and Black belongs in the second group

13  because he requested a raise and "was allegedly rebuffed."[51]

14      Defendants' argument lacks merit.  The fact that the exact same three drivers

15  comprise two of defendants' three groups casts considerable doubt on defendants'

16

17  ─────────────

        [46]Doc. 310 at 20.

18

19      [47]Doc. 310-2 at 11-12 ("I didn't determine [my pay rate].  I was told it was this amount of
    money, and I could take it or not.").

20

21      [48]Doc. 310-1 at 48 (Collinge testified that after his pay rate changed in January 2012 he
    neither requested nor received a different rate, and he did not recall being asked to or informed
    that he could request a higher rate).

22

23      [49]Doc. 310-2 at 64 (Campagna testified that when he was first offered his route he was
    told that it would start off paying $150 per day.  When asked if he negotiated this amount with
24  IntelliQuick, Campagna replied, "No.  That's what [IntelliQuick] told me it paid.  And so, 'Okay.'
    No discussion, no nothing.  Just 'okay.'").

25      [50]Doc. 310 at 20-21; Doc. 326 at 7.

26

27      [51]Doc. 310-2 at 43 (Black testified that he asked for a pay raise for his "p.m. route due to
    increase of covered area," but was told by the IntelliQuick employee he asked that she "doesn't
    make those decisions" and "would have to speak with somebody upstairs with IntelliQuick."
28  That was the last Black heard about this request.).

1    claim of disparate treatment.  Defendants do not contend that only some drivers were

2    eligible for pay raises and others were not.  Based on the evidence before the court, all

3    drivers appear to be united in their "potential for negotiating their rate of pay," even if

4    not all drivers know they can request a pay raise and IntelliQuick does not grant all such

5    requests.

6                    **b.    Plaintiffs are similarly situated with regard to their opportunity
                            for profit or loss depending upon their managerial skills**

7            The second economic realities test factor measures "the alleged employee's

8    opportunity for profit or loss depending upon his managerial skill."[52]  In *Real*, the Ninth

9    Circuit found that this factor weighed in favor of finding that the strawberry grower

10   plaintiffs were employees because their opportunity for profit or loss appeared "to

11   depend more upon the managerial skills of [their alleged employers] in developing

12   fruitful varieties of strawberries, in analyzing soil and pest conditions, and in marketing

13   than it does upon the [growers'] own judgment and industry in weeding, dusting,

14   pruning and picking."[53]

15           Defendants argue that the drivers are not similarly situated with regard to the

16   degree with which their managerial skills affect their opportunity for profit or loss.  They

17   point out that Collinge was able to increase his profits by requesting more on-demand

18   work beyond his regular routed delivery work;[54] Black was able to "order his deliveries to

19   achieve maximum efficiency";[55] and Castillo was able to reduce his operating costs by

20   investing in a vehicle with good gas mileage.[56]  Defendants' argument fails because

21

22   _____

23           [52]*Real*, 603 F.2d at 754.

24           [53]*Id.* at 755.

25           [54]Doc. 310 at 13-14.  Collinge testified that on "very few" occasions he asked
26   dispatchers for on-demand work after he completed his routed deliveries.  Doc. 310-1 at 44-45.

27           [55]Doc. 310 at 16.

28           [56]Doc. 310 at 18.

they do not establish that IntelliQuick deprived other drivers of these same

opportunities.

    c.    **Plaintiffs are similarly situated with regard to their employment of helpers but not completely similarly situated with regard to their investment in equipment or materials required for their task**.

The third economic realities test factor measures "the alleged employee's

investment in equipment or materials required for his task, or his employment of

helpers."[57]   In *Real*, for example, the Ninth Circuit held that the strawberry growers'

"investment in light equipment hoes, shovels and picking carts [was] minimal in

comparison with the total investment in land, heavy machinery and supplies necessary

for growing the strawberries."[58]   In *Spellman v. Am. Eagle Express, Inc.*, the District

Court for the Eastern District of Pennsylvania held that the proposed FLSA class

members were not similarly situated with regard to the third economic realities factor.

Although almost all class members "had to invest in a vehicle, cell phone, cargo

scanner, and accident insurance," some used cars they already owned while others

purchased cargo vans; many purchased hand trucks and locks while others did not; and

only some invested in home offices while others did not.[59]

Defendants argue that the drivers are not similarly situated with regard to the

degree with which they invest in their own equipment or materials.  Defendants cite

Collinge's testimony that he mostly used his own vehicle, but sometimes used an

IntelliQuick vehicle,[60] whereas Little testified that she used her own vehicle except for

one incident where she used an IntelliQuick vehicle and Priestly testified that she used

---

[57]*Real*, 603 F.2d at 754.

[58]*Id.* at 755.

[59]No. 10-1764, 2013 U.S. Dist. LEXIS 35032, *16-17 (E.D. Pa. Mar. 14, 2013).

[60]Doc. 310-1 at 40.

her own vehicle.  This testimony does not support defendants' argument; each plaintiff is similarly situated in that none was required to purchase a vehicle for the job.

Defendants also point out that various plaintiffs purchased their own cargo scanners and other communication devices, whereas others did not.[61]  Plaintiffs do not dispute that some drivers purchase their own communication devices, while others do not.[62]  Further, Arras was required to buy a dolly and a camper shell for her truck,[63] whereas Little did not have to buy a dolly or other equipment.[64]  This evidence establishes that, at least with respect to these items, the plaintiffs invested in equipment required for the job to varying degrees, which weighs in favor of decertification.

Defendants next assert that the drivers are not similarly situated because while "many individuals who have provided testimony in this matter were aware of their ability to hire helpers,"[65] Castillo was not.[66]  Castillo testified that IntelliQuick did not tell him whether he could or could not hire employees.[67]  Whether a worker is aware of his or her ability to employ helpers is not the relevant inquiry; the extent to which the workers

---

[61]Doc. 310 at 19.

[62]Doc. 318 at 12.

[63]Doc. 310-2 at 36.

[64]Doc. 310-2 at 27.

[65]Doc. 310-2 at 46 (Black testified in response to an apparent question about his ability to hire helpers that, "I would, if I would hire them under my name and subcontract them. But then I would have to get into more—more permits, more fees, more licenses."); Doc. 310-2 at 21-22 (Little testified that she never hired helpers, but was told by IntelliQuick that if she "were ever to hire anybody, they had to go through the whole process, like background and CMS and all that."); Doc. 310-1 at 68 (Miller testified that "[i]t was known that you could [hire helpers], but you had to pay for them.").

[66]Doc. 310 at 22.

[67]Doc. 310-1 at 24.

1  actually employ helpers is what matters.[68]  Defendants' only evidence that some drivers

2  employ helpers comes from Miller's deposition testimony that he "put together a crew"

3  of drivers for a large, two-month job.[69]  Defendants argue that this establishes that Miller

4  employed his own helpers, but Miller's testimony later in his deposition proves

5  otherwise.  When Miller was specifically asked whether drivers could employ helpers he

6  testified that it was possible, but he did not know "that anybody ever did it."[70]

7       In sum, the drivers are similarly situated with regard to at least five of the six

8  economic realities test factors.  This is sufficient to defeat defendants' decertification

9  motion.  Further, it bears noting that despite IntelliQuick's contention that it exerts

10  disparate control over its drivers, IntelliQuick uniformly treats all of its drivers as

11  independent contractors, and this decision does not turn on a single individualized

12  factor.  "There is nothing unfair about litigating a single corporate decision in a single

13  collective action, especially where there is robust evidence that [the workers] perform

14  uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual."[71]

15

16

17

18

19  [68]*See Real*, 603 F.2d at 754 (citing *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 301 (5th Cir. 1975)); *Donovan*, 656 F.2d at 1372; *Martin v. Selker Bros.*, 949 F.2d 1286, 1294

20  (3d Cir. 1991); *Mednick*, 508 F.2d at 300 ("[T]he court below and the parties placed too great reliance on the bare legal powers which each of the parties had under their informal working

21  agreement.  The result was to permit potential powers of little or no effective significance in the actual operation of the working arrangement to overweigh the actual operation, the 'economic

22  reality' of the situation."); *Moba v. Total Transp. Servs. Inc.*, No. C13-138 MJP, 2014 WL 1671587, at *1264-65 (W.D. Wash. Apr. 25, 2014); *Perez v. Oak Grove Cinemas, Inc.*, No.

23  03:13-CV-00728-HZ, 2014 WL 7228983, at *5 (D. Or. Dec. 17, 2014).  *But see Solis v. Velocity Exp., Inc.*, No. CV 09-864-MO, 2010 WL 3259917, at *7 (D. Or. Aug. 12, 2010) ("Because the

24  undisputed facts show that the delivery drivers were *allowed* to employ substitutes and other helpers . . . [this factor weighs] in favor of [the company].") (emphasis added).

25

26  [69]Doc. 310-1 at 55.

27  [70]Doc. 321-1 at 17.

28  [71]*Morgan*, 551 F.3d at 1264.

-16-

1

### 2.   Individual defenses

2    "'[T]he similarities necessary to maintain a collective action under § 216(b) must

3    extend beyond the mere facts of job duties and pay provisions' and encompass the

4    defenses to some extent."[72]  Thus, the second factor that courts consider at the

5    decertification stage is whether the various defenses available to the alleged employer

6    appear to be individual to each plaintiff.  Defendants argue that even if the drivers are

7    found to be employees, their entitlement to overtime pay would be subject to

8    defendants' individualized Motor Carrier Act Exemption ("MCAE") defenses.[73]  That

9    defense is based on Section 13(b)(1) of the FLSA, which exempts from the FLSA's

10   overtime pay requirements "any employee with respect to whom the Secretary of

11   Transportation has power to establish qualifications and maximum hours of service

12   pursuant to the provisions of section 204 of the Motor Carrier Act of 1935" ("MCA").[74]  In

13   order for the MCAE to apply the employer must prove that (1) it is either a "motor

14   carrier" or a "motor private carrier" subject to the Secretary of Transportation's

15   jurisdiction;[75] and (2) the employee engaged "in activities of a character directly

16   affecting the safety of operation of motor vehicles in the transportation on the public

17   highways of passengers or property in interstate or foreign commerce."[76]  Accordingly,

18

19

20

21       [72]*Id.* at 1262 (quoting *Anderson*, 488 F.3d at 953).

22
         [73]Doc. 310 at 23.
23
         [74]29 C.F.R. §§ 782.1(a), 782.2(a)(1).
24

25       [75]49 U.S.C. § 31502(b).  A "motor carrier" is "a person providing motor vehicle
     transportation for compensation."  49 U.S.C. § 13102(14).  A "motor private carrier" is "generally
26   a person who transports his own property 'for sale, lease, rent, or bailment or to further a
     commercial enterprise.'"  *Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 292 (5th Cir. 2014)
27   (Dennis, J., dissenting) (quoting 49 U.S.C. § 13102(15)).

28       [76]29 C.F.R. § 782.2(a)(2).

the MCAE "depends both on the class to which his employer belongs and on the class of work involved in the employee's job."[77]

To satisfy the first MCAE element, the carrier/employer must be engaged in more than de minimus interstate commerce.[78]  The caselaw suggests that "a company's interstate business is de minimus if it constitutes less than one percent of the overall trips taken by the company."[79]  Interstate business has been defined to include not only the actual transport of goods across state lines, but also "the intrastate transport of goods in the flow of interstate commerce."[80]  To satisfy the second MCAE element, the employer must prove that the employee's bona fide job duties require him "to be called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities" on the public highways in interstate or foreign commerce.[81] The employer can satisfy this burden by showing either that the driver drove in interstate commerce or "could 'reasonably have been expected to make one of the carrier's interstate runs.'"[82]

Defendants argue that the first element of the MCAE defense requires an individualized showing that "the particular individual at issue was involved in the interstate movement of goods."[83]  They assert that the Ninth Circuit in *Reich v.*

---

[77]29 C.F.R. § 782.2(a).

[78]*Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1213 (11th Cir. 2011).

[79]*Walters v. Am. Coach Lines Of Miami, Inc.*, 575 F.3d 1221, 1228 (11th Cir. 2009).

[80]*Allen*, 755 F.3d at 283 (quoting *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir.2010)).

[81]*Id.*

[82]*Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1157 (9th Cir. 1994) (quoting 46 Fed. Reg. 37,902, 37,903 (1981)).

[83]Doc. 310 at 23.

-18-

1  *American Drier Service*,[84] suggested that, in order to establish that the MCAE applies to

2  a driver who only engages in intermittent interstate travel, defendants must present

3  "concrete evidence such as an actual trip in interstate commerce."[85]  Defendants are

4  confusing the two MCAE elements and misreading *Reich*.  The first MCAE element

5  depends on the class to which IntelliQuick belongs—not its drivers.[86]

6      Even if the court construes defendants' argument as directed toward the second

7  MCAE element, it still fails.  Under that element, a defendant need not establish that

8  every driver was engaged in the interstate transportation of goods, as defendants claim.

9  Rather, an employer can satisfy the second MCAE element merely by showing that

10  each driver "could reasonably have been expected to make one of the carrier's

11  interstate runs."[87]  This does not necessarily require an individualized showing.  For

12  example, in *Songer*, the Fifth Circuit held that the defendants had satisfied the second

13  MCAE element with regard to all drivers based on testimony of several drivers that they

14  understood that they might have to make out-of-state trips when they took the job and

15  evidence that dispatchers assigned such routes indiscriminately.  This evidence

16  established that "any driver *could have been* assigned to an interstate trip."[88]

17

18

19

20      [84]33 F.3d 1153, 1156 (9th Cir. 1994).

21

22      [85]Doc. 310 at 24 (quoting *Reich*, 33 F.3d at 1156).

23      [86]*See Songer*, 618 F.3d at 473 (explaining that the first requirement for jurisdiction under
the MCA is establishing that the plaintiffs "work for *carriers* engaged in interstate commerce.")
(emphasis added); *id*. at 475 (interpreting the same DOT Notice at issue in *Reich* as meaning
24  that "if the Secretary claims jurisdiction over a driver who has not driven in interstate commerce,
evidence must be presented that the *carrier* has engaged in interstate commerce and that the
25  driver could reasonably have been expected to make one of the carrier's interstate runs.")
(emphasis added).
26

27      [87]*Id*. at 475.

28      [88]*Id*. (emphasis added).

-19-

1    The evidence here shows that none of the drivers own their routes and

2 IntelliQuick can assign any driver to any job indiscriminately.[89]  The question before the

3 court is not whether these drivers could reasonably have been expected to transport

4 goods in the flow of interstate commerce; it is merely whether they appear to be

5 similarly situated in this regard.  Because defendants do not contend that any subset of

6 drivers is more or less likely than any other subset of drivers to be assigned interstate

7 trips, defendants' argument fails.

8    Finally, in what is effectively an exception to the MCAE, employees covered by

9 § 306 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act

10 ("SAFETEA–LU") Technical Corrections Act ("TCA") are entitled to FLSA overtime pay

11 regardless whether they would otherwise be excluded from such pay by the MCAE.[90]

12 Because the TCA only covers drivers of motor vehicles with a gross vehicle weight

13 rating ("GVWR") of 10,000 pounds or less,[91] defendants argue that they will be required

14 to show that each driver drove a vehicle that weighs more than 10,000 pounds.

15 Although defendants note that Campagna testified at his deposition that he and Miller

16 drove a 25-foot box truck to perform a job[92] and plaintiffs assert that Freight Drivers

17 "require larger vehicles for delivery,"[93] neither party has submitted any evidence

18 regarding the GVWR of any vehicle driven by an IntelliQuick driver.  The court is

19 therefore unable to make a determination regarding whether the drivers are similarly

20

21

22    [89]See, e.g., Doc. 32-3 at 4  9, 8 ¶ 19; Doc. 32-4 at 5 ¶ 13; Doc. 32-5 at 4 ¶ 14; Doc. 303-1 at 3-4 ¶ 11.

23    [90]See Pub.L. No. 110–244, Title III, § 306, 122 Stat. 1572, 1620 (2008) (in relevant part
24 defining "covered employee" as an individual who (1) is employed by a motor carrier or motor
private carrier; (2) works as a driver; and (3) affects "the safety of operation of motor vehicles
25 weighing 10,000 pounds or less" in interstate commerce).

26    [91]McCall v. Disabled Am. Veterans, 723 F.3d 962, 966 (8th Cir. 2013).

27    [92]Doc. 310-2 at 60.

28    [93]Doc. 305 at 18 ¶ 117.

situated with regard to the weight of the vehicles they drove.  This uncertainty weighs in favor of decertification.  But the negative weight given to this uncertainty is lessened somewhat by the fact that the weight of the drivers' vehicles will not be relevant unless two contingencies occur: (1) plaintiffs establish that they are employees and (2) defendants establish that the MCAE applies.  Further, even if both contingencies occur and further discovery reveals that Freight Drivers are not similarly situated to other drivers because their vehicles weigh more than 10,000 pounds, identifying those drivers would likely be a simple, ministerial task.

### 3.    Fairness and procedural considerations

The final factor that courts consider at the decertification stage is whether fairness and procedural considerations support collective action.[94]  This requires the court to analyze the case with an eye toward the twin purposes of § 216(b): "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct."[95]  The court must also determine "whether it can coherently manage the class in a manner that will not prejudice any party."[96]

Defendants argue that the three main types of drivers at issue in this case—Route Drivers, Freight Drivers, and On-Demand Drivers—renders representative litigation unmanageable even if the plaintiffs are divided into subclasses.  Defendants assert that subclasses "would not be able to adequately account for those who frequently switched between delivery roles nor would it account for the limited specialized work that some drivers accepted," nor would they "adequately address the various combinations of the different classes of delivery work that some drivers

---

[94]*Thiessen*, 267 F.3d at 1103.

[95]*Morgan*, 551 F.3d at 1264.

[96]*Reed v. Cnty. of Orange*, 266 F.R.D. 446, 462 (C.D. Cal. 2010) (internal quotation omitted).

1  performed concurrently."[97]  These assertions are premised on the notion that the three

2  types of drivers are not similarly situated with regard to the economic realities test

3  factors, a premise this court rejects for the reasons set forth above.  Even if there are

4  some differences among the drivers' work conditions, these differences do not appear

5  to be so great that they would render a collective action unmanageable.  Allowing the

6  drivers to proceed as a class would satisfy the twin purposes of § 216(b) because it

7  would reduce the burden on the plaintiffs by allowing them to pool their resources and

8  would likely lead to the resolution of common issues of law and fact that arise from the

9  same allegedly illegal conduct.  After carefully considering the record as a whole in light

10  of each of the above-identified factors, the court finds a collective action would

11  maximize efficiency and would be reasonably manageable.

12  **B.   Rule 23 Class Action**

13       Class certification is governed by Rule 23.  A party seeking class certification

14  bears the burden of satisfying Rule 23(a)'s four requirements: (1) numerosity;

15  (2) commonality; (3) typicality; and (4) adequacy of representation.[98]  Additionally, the

16  party must satisfy at least one of the requirements of Rule 23(b), which defines the

17  three different types of class actions.  Although the decision to grant or deny class

18  certification is within the trial court's discretion,[99] the court must undertake a "rigorous

19  analysis" to determine whether the party seeking class certification has done more than

20  plead compliance with Rule 23, but instead has affirmatively demonstrated his or her

21  compliance with the Rule.[100]

[97]Doc. 310 at 11.

[98]*See Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014).

[99]*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).

[100]*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

-22-

1      **1.**    **Rule 23(a)**

2           **a.**    **Numerosity**

3      Rule 23(a)(1) provides that a class action may be maintained only if "the class is

4 so numerous that joinder of all members is impracticable." "'[I]mpracticability' does not

5 mean 'impossibility,' but only the difficulty or inconvenience of joining all members of

6 the class."[101]  There is no bright-line rule regarding how many class members it takes to

7 render joinder impracticable; the specific facts of each case must be considered.[102]

8 "When class size reaches substantial proportions, however, the impracticability

9 requirement is usually satisfied by the numbers alone."[103]  It is generally accepted that

10 "the numerosity factor is satisfied if the class comprises 40 or more members and . . .

11 not satisfied when the class comprises 21 or fewer."[104]

12      Plaintiffs assert that the proposed class consists of approximately 981 current

13 and former drivers.[105]  Plaintiffs point to the deposition testimony of former IntelliQuick

14 executive Timothy Cocchia, who stated that IntelliQuick likely employs and contracts

15 over 200 drivers,[106] and a list of approximately 781 former drivers that they obtained

16

17

18

---

19    [101]*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting *Advertising Specialty Nat. Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir. 1956)).

20

21    [102]*General Tel. Co. of Northwest, Inc. v. E.E.O.C.*, 446 U.S. 318, 330 (1980).

22    [103]*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

23    [104]*See Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008) (citing *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995); *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y.1998)); *Newberg on Class Actions* § 3:12 (5th ed. 2014) ("As a general guideline . . . a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder, while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.").

24

25

26

27    [105]Doc. 303 at 6; Doc. 305 at 6 ¶ 28.

28    [106]Doc. 327-1 at 13 lines 6-16.

1  through discovery.[107]  Defendants do not dispute these numbers.[108]  Instead, they

2  counter that under *Thiebes v. Wal-Mart Stores, Inc.*,[109] the court should base its

3  numerosity analysis on only the number of individuals who have opted-into the FLSA

4  collective action, instead of the proposed Rule 23 class as a whole.  Joinder of the 89

5  collective action opt-ins in this case, they argue, "is not inherently impracticable."[110]

6      *Thiebes* represents a minority view[111] and is unpersuasive.  *Thiebes* found that

7  numerosity was not satisfied because only 425 of the over 15,000 potential class

8  members opted into the FLSA collective action, which the court interpreted to mean that

9  certification of the proposed Rule 23 class "would bring in many more employees than

10  those who believe they were actually aggrieved by Wal-Mart's alleged conduct."[112]  A

11  court's task under Rule 23(a)(1) is to determine whether joinder of "all members" of the

12  proposed class would be impracticable—not merely those members who believe they

13  were aggrieved.  Further, it does not necessarily follow that employees who do not opt-

14  in do not believe they were aggrieved.  Fear of retaliation may deter potential plaintiffs

15

16

17

18

19

20

------

21      [107]Doc. 303-2 at 13-68.

22      [108]Doc. 321 at 7 ¶¶ 27-28.

23      [109]No. CIV. 98-802-KI, 2002 WL 479840, at *3 (D. Or. Jan. 9, 2002).

24      [110]Doc. 319 at 7.

25      [111]*See Meyers v. Crouse Health Sys., Inc.*, 274 F.R.D. 404, 414 (N.D.N.Y. 2011)
26  ("Courts in the Second Circuit have rejected *Thiebes* and continue to assess numerosity based
27  on the number of proposed class members rather than the number of opt-ins.") (citations
   omitted).

28      [112]2002 WL 479840, at *3.

1   from opting-into a FLSA collective action or from suing individually.[113] This factor

2   weighs in favor of class certification, not against it.[114]

3           Plaintiffs have sufficiently demonstrated that the proposed class consists of close

4   to 1,000 members. The court finds that joinder of all members would be impracticable

5   and numerosity is satisfied.

6                   **b.    Commonality**

7           Rule 23(a)(2) provides that a class action may be maintained only if "there are

8   questions of law or fact common to the class." "[F]or purposes of Rule 23(a)(2) even a

9   single common question will do."[115] To assess whether the putative class members

10  share a common question, courts must identify the elements of the class members'

11  case-in-chief.[116] In *Wal-Mart*, the Supreme Court held that the plaintiffs' claims must

12  share a common contention such that a determination of that contention "will resolve an

13  issue that is central to the validity of each one of the claims in one stroke."[117] Despite

14  Rule 23(a)(2)'s ostensible focus on common "questions," the Supreme Court declared

15

16          [113]*See Newberg on Class Actions* § 3:12 ("Fear of retaliation—in, for example, civil rights
17  or employment cases—is an additional factor that occasionally argues for relaxing the
    numerosity requirement generally (not just in terms of sheer numbers of class members), as
18  such a fear might deter potential plaintiffs from suing individually, making a representative
    action especially pertinent."); Ellen C. Kearns, *et al.*, *Employment Litigation: Emerging Trends in*
19  *Wage & Hour Litigation After Dukes v. Wal-Mart*, 9 J.L. Econ. & Pol'y 347, 370-71 (2013)
    ("[F]rankly, employees are terrified of opting in. The opt-in rates in FLSA actions are varied but
20  they range from below 10% (in the worst cases) to 15 to 20% (in the typical case) because
    people are worried that if they step forward, they'll be fired. On the other hand, when people
21  have a chance to be an absent class member (such is the case in an 'opting-out' class), opt-out
    rates are far lower than their opt-in rates.").
22

23          [114]*See Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006)
    ("The numerosity requirement is more readily met where a class contains employees suing their
24  present employer. This is because class members may be unwilling to sue their employer
    individually out of fear of retaliation."); *Newberg on Class Actions* § 3:12.
25

26          [115]*Wal-Mart*, 131 S.Ct. at 2556 (quotation marks and alteration omitted).

27          [116]*Parsons*, 754 F.3d at 676.

28          [117]*Wal-Mart*, 131 S.Ct. at 2556.

                                    -25-

1  that "what matters to class certification . . . is not the raising of common

2  'questions'—even in droves—but, rather the capacity of a classwide proceeding to

3  generate common *answers* apt to drive the resolution of the litigation."[118]

4  Where a defendant's allegedly injurious conduct differs from plaintiff to plaintiff, as it did

5  among the 3,400 stores involved in *Wal-Mart*, common answers are unlikely to be

6  found.[119]  But where "the same conduct or practice by the same defendant gives rise to

7  the same kind of claims from all class members," there is a common question.[120]

8                    **(1)    Counts II and V**

9           The primary common question that plaintiffs identify is whether defendants had a

10  uniform policy that mis-characterized the proposed class members as independent

11  contractors.[121]   The answer to this question will drive resolution of whether the proposed

12  class is protected by Arizona's Wage Act (Count II)[122] and the FMLA (Count V).[123]  With

13  regard to plaintiffs' Arizona Wage Act claim, the distinction between an employee and

14  an independent contractor is determined by the objective nature of the parties'

15  relationship, "upon an analysis of the totality of the facts and circumstances of each

16

17

18

19     [118]*Id.* (emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 132 (2009)).

20     [119]*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

21
22     [120]*Id. See also* 1 *McLaughlin on Class Actions* § 4:7 (11th ed. 2014) ("Commonality . . . is satisfied where the district court makes a factually supported finding that key elements of proof required for the claims of the proposed class may be productively adjudicated for all class members at once, and the common answers yielded by that adjudication will drive the resolution of the litigation.").
23

24
25     [121]Doc. 303 at 9.

26     [122]Plaintiffs allege violations of A.R.S. §§ 23-351, 23-352, 23-355(A), and 23-363. These provisions protect the rights of employees, not independent contractors.
27
       [123]Plaintiffs allege violations of 29 U.S.C. §§ 2612, and 2615.  These provisions protect
28  the rights of eligible employees, not independent contractors.

1   case."[124]  This analysis "usually rests on the extent of control the employer may exercise

2   over the details of the work."[125]  With regard to plaintiffs' FMLA claim, the Ninth Circuit

3   has not yet addressed which test courts should use when determining whether an

4   individual is an employee for FMLA purposes.  Most courts utilize the economic realities

5   test discussed above.[126]  Despite utilizing different terminology, the Ninth Circuit has

6   observed that "there is no functional difference" between the economic realities test and

7   the common law agency test.[127]

8       Defendants argue that analyzing whether the putative class was mis-

9   characterized will require the court to conduct a fact-specific inquiry into "the particular

10  interactions, instructions, and training (or lack thereof) experienced by each potential

11  class member."[128]  Plaintiffs disagree, claiming that the evidence shows that defendants

12  have established uniform policies that treat all drivers as employees.  At this stage of

13  the litigation, the court's task is not to determine the merits of plaintiffs' claims;[129] rather,

14  it is to determine whether plaintiffs have sufficiently demonstrated that it will be possible

15  to determine whether the proposed class members were employees in one stroke.

16  Defendants argue that mini-trials will be required to determine whether each driver had

17  discretion over his or her vehicle and equipment, was able to hire other drivers to work

18

19       [124]*Anton v. Indus. Comm'n of Arizona*, 688 P.2d 192, 194 (Ariz. Ct. App. 1984).

20
21       [125]*Munoz v. Indus. Comm'n of Arizona*, 318 P.3d 439, 444 (Ariz. Ct. App. 2014) (quoting
    *Cent. Mgmt. Co. v. Indus. Comm'n*, 781 P.2d 1374, 1376 (Ariz. Ct. App.1989)).

22       [126]*See Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir.
23  2012) (compiling cases).  *But see Alexander v. Avera St. Luke's Hosp.*, 768 F.3d 756, 764 (8th
    Cir. 2014) (adopting the common law hybrid test).

24       [127]*Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010).

25       [128]Doc. 319 at 8.

26
27       [129]*See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195
    (2013) ("Merits questions may be considered to the extent—but only to the extent—that they
28  are relevant to determining whether the Rule 23 prerequisites for class certification are
    satisfied.").

1  under him or her, was able to negotiate his or her rate or pay, was able to reject work,

2  or was subject to discipline.[130]  But the evidence that defendants point to (discussed at

3  length above) does not suggest that these factors vary from driver to driver on an ad

4  hoc basis, as if they were committed to the degree of managerial discretion seen in

5  *Wal-Mart.*  To the contrary, the record reflects that the drivers' working relationship with

6  defendants is primarily governed by uniform policies.  Commonality is satisfied with

7  respect to Counts II and V.

8                              **(2)    Count IV**

9          Count IV of the Complaint seeks a declaratory judgment that the "Membership

10  Application and Agreement" ("MAA"), the "Vehicle Lease Agreement" ("VLA") (which

11  plaintiffs sometimes refer to as the "Vehicle Rental Agreement"), and the "Independent

12  Contractor Owner/Operator Agreement" ("ICOOA") between defendants and the drivers

13  are unconscionable.[131]  The Complaint asserts that "many" drivers are required to sign

14  the MAA, which is a contract between the driver and defendant Transportation

15  Authority, LLC;[132] "some" drivers are required to use vehicles owned by defendant Majik

16  Leasing, LLC ("Majik") and Majik "often" required those drivers to sign the VLA;[133] and

17  IntelliQuick approached all drivers in April 2013 and forced each to sign the ICOOA.[134]

18  Plaintiffs assert that the drivers have no ability to negotiate the terms or conditions of

19

20

21

22

23          [130]Doc. 319 at 9.

24          [131]Doc. 187 at 40.  Plaintiffs describe Count IV as seeking "declaratory and injunctive
    relief that the independent contractor and other related agreements are unenforceable."
25  Doc. 303 at 21.

26          [132]Doc. 187 at 27 ¶¶ 173, 175.

27          [133]Doc. 187 at 9 ¶ 31, 28 ¶ 186-88.

28          [134]Doc. 187 at 35 ¶ 222.

these agreements.[135]  The only common question that plaintiffs identify with regard to Count IV is whether these three contracts are unconscionable.[136]

Arizona law recognizes two forms of unconscionability: procedural unconscionability ("something wrong in the bargaining process") and substantive unconscionability ("the contract terms per se").[137]  Procedural unconscionability is primarily concerned with remedying "unfair surprises" caused by bargaining that did not proceed as it should because of, among other things, fine print clauses and ignorance of important facts.[138]  Although a contract may exhibit both forms of unconscionability, "a claim of unconscionability can be established with a showing of substantive unconscionability alone."[139]

Defendants argue that plaintiffs' unconscionability claims are overly fact-specific because the procedural unconscionability analysis requires the court to determine the individual circumstances under which each class member entered into the agreements.[140]  To the extent that Count IV alleges procedural unconscionability, which requires the court to determine the individual circumstances under which each class member entered into the ICOOA, commonality is lacking.  As defendants correctly observe, this claim depends on individualized facts regarding the bargaining process,

---

[135]Doc. 305 at 19 ¶¶ 132-33; Doc. 305-2 at 71, 75.

[136]Doc. 303 at 9.

[137]*Nelson v. Rice*, 12 P.3d 238, 242 (Ariz. Ct. App. 2000).

[138]*Steinberger v. McVey ex rel. Cnty. of Maricopa*, 318 P.3d 419, 436 (Ariz. Ct. App. 2014).

[139]*Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 947 (D. Ariz. 2011) (quoting *Maxwell v. Fid. Fin. Servs., Inc.*, 907 P.2d 51, 59 (Ariz. 1995)).

[140]Doc. 319 at 12.

1   including, among other things, the individual driver's age, education, intelligence, and

2   business acumen.[141]

3       Plaintiffs argue that such individualized inquiries are unnecessary because the

4   drivers were unable to negotiate the terms of the agreement.[142]  In essence, plaintiffs'

5   argument is that contracts of adhesion are per se procedurally unconscionable.  This is

6   incorrect.  Under Arizona law, contracts of adhesion are not necessarily

7   unenforceable.[143]  Instead, to determine whether such contracts are enforceable courts

8   "look to two factors: the reasonable expectations of the adhering party and whether the

9   contract is unconscionable."[144]  The former factor is substantively identical to the

10  procedural unconscionability test; each seek to prevent unfair surprise.  In other words,

11  even if the ICOOA is a contract of adhesion, determining whether its terms exceed the

12  range of the drivers' reasonable expectations relies on individualized inquiries

13  unsuitable for class-wide resolution.[145]

14      Plaintiffs' substantive unconscionability claim, however, does not present any

15  individualized questions.  Defendants do not contend, nor could they, that whether the

16  contracts are substantively unconscionable presents a question of law common to a

17

18

19

─────────────

20      [141]Doc. 319 at 12 (quoting *Steinberger*, 318 P.3d at 437).

21

22      [142]Doc. 325 at 12.

23      [143]*Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 840 P.2d 1013, 1016 (Ariz. 1992) ("Our
    conclusion that the contract was one of adhesion is not, of itself, determinative of its
    enforceability.").

24

25      [144]*Id.*

26      [145]*See id.* at 1017 ("Plaintiff was under a great deal of emotional stress, had only a high
    school education, was not experienced in commercial matters, and is still not sure 'what
27  arbitration is.'  Given the circumstances under which the agreement was signed and the nature
    of the terms included therein . . . [we conclude] that the contract fell outside plaintiff's
28  reasonable expectations.").

-30-

1   significant number of putative class members.[146]  This is all that is required at the

2   commonality stage.

3                           **(3)    Count III**

4           Count III alleges unjust enrichment and seeks restitution for defendants'

5   allegedly unconscionable contracts and for defendants' policies that require drivers to

6   work without any compensation, allow IntelliQuick to illegally deduct money from the

7   drivers' paychecks, and impose on the drivers' various illegal fees.[147]  Under Arizona

8   law unjust enrichment claims require proof of five elements: "(1) an enrichment, (2) an

9   impoverishment, (3) a connection between the enrichment and impoverishment, (4) the

10  absence of justification for the enrichment and impoverishment, and (5) the absence of

11  a remedy provided by law."[148]  "In short, unjust enrichment provides a remedy when a

12  party has received a benefit at another's expense and, in good conscience, the

13  benefitted party should compensate the other."[149]

14          Because a class-wide proceeding will not be able to generate common answers

15  apt to drive the resolution of plaintiffs' unjust enrichment claims, commonality is lacking.

16  Such claims are inherently unsuitable for class certification because, before a court can

17  grant unjust enrichment relief it "must examine the particular circumstances of an

18  individual case and assure itself that, without a remedy, inequity would result or

19  persist."[150]  Thus, even if plaintiffs could establish that a particular driver was

20  impoverished by the challenged conduct, whether that impoverishment was unjust

21

22

23          [146]*See* Newberg on Class Actions § 3:23 (5th ed. 2014).

24          [147]Doc. 187 at 39.

25          [148]*Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011).

26          [149]*Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 283 P.3d 45, 49 (Ariz. Ct. App. 2012).

27          [150]*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009).  *See also Osuna v.
    Wal-Mart Stores, Inc.*, No. C20014319, 2004 WL 3255430, at *6 (Ariz. Super. Ct. Dec. 23,
28  2004).

                                        -31-

1   depends on equitable considerations surrounding that driver's unique understanding
2   and expectations.  The individualized nature of this "fairness" inquiry renders class
3   certification inappropriate.

            **c.    Typicality**

5       Rule 23(a)(3) provides that a class action may be maintained only if "the claims
6   or defenses of the representative parties are typical of the claims or defenses of the
7   class."  "The inherent logic of the typicality requirement is that a class representative will
8   adequately pursue her own claims, and if those claims are 'typical' of those of the rest
9   of the class, then her pursuit of her own interest will necessarily benefit the class as
10  well."[151]  "Under the rule's permissive standards, representative claims are 'typical' if
11  they are reasonably coextensive with those of absent class members; they need not be
12  substantially identical."[152]  "The test of typicality is 'whether other members have the
13  same or similar injury, whether the action is based on conduct which is not unique to
14  the named plaintiffs, and whether other class members have been injured by the same
15  course of conduct.'"[153]

16      The named plaintiffs here currently hold, or have held, positions identical to
17  those of the members of each proposed subclass.[154]  They allege many injuries that are
18  a result of defendants' course of conduct that is not unique to any of them.  Specifically,
19  they allege that they were each subjected to defendants' uniform policies regarding

---

[151]*Newberg on Class Actions* § 3:28.

[152]*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998).

[153]*Parsons*, 754 F.3d at 685 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992)).

[154]Brian Black currently works, and David Collinge and Robert Campagna formerly worked, for defendants as a Freight Driver, Route Driver, and On-Demand Driver.  Doc. 187 at 3-5 ¶¶ 10, 14, 16; Doc. 325 at 9.  Melonie Priestly formerly worked for defendants as a Route Driver and On-Demand Driver.  Doc. 187 at 4 ¶ 11; Doc. 325 at 9.  John Morena and Brian Kingman currently work, and Heather Arras formerly worked, for defendants as a Route Driver. Doc. 187 at 4-5 ¶¶ 12, 15, 17; Doc. 325 at 9.  Heather Arras alleges that she was eligible for FMLA leave but not allowed to take it.  Doc. 187 at 4 ¶ 13.

-32-

1  overtime pay, minimum wages, "chargebacks" and other fees, FMLA leave, and control
2  over their work.  Further, plaintiffs allege that all class members who were drivers in
3  April 2013 are parties to the ICOOA.  This includes Brian Black, Brian Kingman, and
4  John Morena.[155]  This establishes typicality with respect to these claims.

5      The named plaintiffs have failed to establish typicality, however, with respect to
6  their MAA- and VLA-based claims (Count IV and a portion of Count III).  Not all
7  members of the proposed class are parties to these two contracts.  Rather, "many" are
8  parties to the MAA and "some" are parties to the VLA.  The plaintiffs do not contend
9  that any of the named plaintiffs are parties to either of these two contracts; this is fatal
10  to their typicality argument.[156]

11              **d.    Adequacy**

12      Rule 23(a)(4) provides that a class action may be maintained only if the named
13  plaintiffs "will fairly and adequately protect the interests of the class."  The purpose of
14  the adequacy inquiry is "to uncover conflicts of interest between named parties and the
15  class they seek to represent."[157]  Defendants do not contend that any of the named
16  plaintiffs have a conflict of interest or that class counsel is not competent.  Adequacy is
17  satisfied.

18          **2.    Rule 23(b)**

19      Having concluded that the requirements of Rule 23(a) are satisfied, the court
20  must now determine whether plaintiffs have met their burden of showing that the

21
22
_____

23      [155]Doc. 305 at 5-6.

24      [156]*See Vega*, 564 F.3d at 1276 ("Without a common contract, it is impossible for [the
25  named plaintiff] to bring a case typical of all other class members."); *Newberg on Class Actions*
   § 3:37 (5th ed. 2014) ("[W]hen the class suit is predicated on more individualized contracts, and
26  differences exist among the relevant provisions in different class members' contracts, the
   representative's claim may not be typical of the claims of class members with different
27  contracts.").

28      [157]*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

1  proposed class satisfies one of the Rule 23(b) categories.  Plaintiffs argue that the

2  proposed class meets the requirements of Rules 23(b)(1)-(3).

3          **a.     Rule 23(b)(1)**

4          A Rule 23(b)(1) class action may be maintained if requiring individual class

5  members to prosecute separate actions would create a risk of either "(A) inconsistent or

6  varying adjudications with respect to individual class members that would establish

7  incompatible standards of conduct for the party opposing the class" or

8  "(B) adjudications with respect to individual class members that, as a practical matter,

9  would be dispositive of the interests of the other members not parties to the individual

10  adjudications or would substantially impair or impede their ability to protect their

11  interests."[158]  Plaintiffs request certification under Rule 23(b)(1)(A) because, if

12  certification is not granted, a different court may issue a different ruling than this court

13  with regard to whether a particular driver has been mis-characterized as an

14  independent contractor, whether the agreements are unconscionable, or whether

15  defendants are liable for their allegedly unlawful policies and practices.[159]  None of

16  these hypothetical inconsistent adjudications would establish incompatible standards of

17  conduct for IntelliQuick, however.[160]

18          Plaintiffs also seek certification under Rule 23(b)(1)(B), arguing that "a

19  determination that IntelliQuick has not misclassified Plaintiffs, that the agreements

20  Defendants forced Plaintiffs to sign . . . are enforceable, and that mandatory deductions

21  taken from Plaintiffs pay are not unlawful will be dispositive of or substantially impair the

22  ability of other Drivers to make similar claims."[161]  Plaintiffs do not explain why, exactly,

23  this might be.  But presumably plaintiffs are arguing that future actions would be

24

25          [158]Fed. R. Civ. P. 23(b)(1).

26          [159]Doc. 303 at 13.

27          [160]*See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001).

28          [161]Doc. 303 at 15.

-34-

1   thwarted by the stare decisis consequences of this action.  This is insufficient to sustain

2   class certification under Rule 23(b)(1)(B).[162]

3            **b.    Rule 23(b)(2)**

4            Plaintiffs seek class certification of Counts III and IV of the Complaint under

5   Rule 23(b)(2).  A Rule 23(b)(2) class action may be maintained if defendants have

6   "acted or refused to act on grounds that apply generally to the class, so that final

7   injunctive relief or corresponding declaratory relief is appropriate respecting the class as

8   a whole."[163]  As the Supreme Court held in *Wal-Mart*:

9            The key to the (b)(2) class is "the indivisible nature of the injunctive or
         declaratory remedy warranted—the notion that the conduct is such that it
10           can be enjoined or declared unlawful only as to all of the class members
         or as to none of them."  In other words, Rule 23(b)(2) applies only when a
11           single injunction or declaratory judgment would provide relief to each
         member of the class.[164]

12   "These requirements are unquestionably satisfied when members of a putative class

13   seek uniform injunctive or declaratory relief from policies or practices that are generally

14   applicable to the class as a whole."[165]

15           Count III alleges that defendants have been unjustly enriched by various

16   unconscionable contracts, uncompensated work, and allegedly unlawful fees and

17   deductions.[166]  But because Count III does not primarily seek declaratory or injunctive

18

19

20   ————————————————

21           [162]*La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 467 (9th Cir. 1973) ("Neither the
    stare decisis consequences of an individual action nor the possibility of false reliance upon the
22   improper initiation of a class action can supply either the practical disposition of the rights of the
    class, or the substantial impairment of those rights, at least one of which is required by
23   Rule 23(b)(1)(B).").

24           [163]Fed. R. Civ. P. 23(b)(2).

25           [164]*Wal-Mart*, 131 S.Ct. at 2557 (quoting Nagareda, *Class Certification in the Age of
26   Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)).

27           [165]*Parsons*, 754 F.3d at 687-88.

28           [166]Doc. 187 at 39-40.

1 relief, Rule 23(b)(2) does not apply.[167]  Count IV of the Complaint seeks a declaratory
2 judgment that the ICOOA is unconscionable.  To the extent that Count IV alleges that
3 the ICOOA is substantively unconscionable, a declaratory judgment would provide relief
4 to each member of the subclass who signed the ICOOA.  The court therefore certifies
5 the substantive unconscionability claims in Count IV to proceed under Rule 23(b)(2).

### c.    Rule 23(b)(3)

7      In *Wal-Mart*, the Supreme Court held that class actions that are predominantly to
8 recover individualized money damages "belong in Rule 23(b)(3)."[168]  Rule 23(b)(3)
9 requires the court to find that "the questions of law or fact common to class members
10 predominate over any questions affecting only individual members, and that a class
11 action is superior to other available methods for fairly and efficiently adjudicating the
12 controversy."  This inquiry "tests whether proposed classes are sufficiently cohesive to
13 warrant adjudication by representation."[169]

### (1)    Predominance

15      "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded
16 by, the more stringent Rule 23(b)(3) requirement that questions common to the class
17 'predominate over' other questions."[170]  The primary concern of the predominance
18 inquiry is "the balance between individual and common issues."[171]  On one hand, where
19 "common questions present a significant aspect of the case and they can be resolved
20 for all members of the class in a single adjudication, there is clear justification for

---

[167]*Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1314 (9th Cir. 1977) ("[T]he action seeks as a major portion of the claimed relief, monetary restitution.  To the extent that such relief predominates over the injunctive relief, section (b)(2) of Rule 23 is inappropriate.").

[168]*Wal-Mart*, 131 S. Ct. at 2558.

[169]*Amchem*, 521 U.S. at 623.

[170]*Id*. at 609.

[171]*In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir.2009).

-36-

1   handling the dispute on a representative rather than on an individual basis."[172] On the

2   other hand, where "claims require a fact-intensive, individual analysis," class

3   certification is inappropriate.[173]  "Under the predominance inquiry, a district court must

4   formulate some prediction as to how specific issues will play out in order to determine

5   whether common or individual issues predominate in a given case."[174]

6                          **(I)     A.R.S. § 23-351 claims**

7         Plaintiffs' minimum wage and overtime claims arise under A.R.S. § 23-351.  As

8   noted above, the threshold question whether the drivers are employees, and therefore

9   covered by A.R.S. § 23-351, is amenable to class-wide resolution.  After analyzing the

10  remainder of these claims, the court concludes that predominance is satisfied.  With

11  respect to their minimum wage claim, plaintiffs allege that the drivers are paid less than

12  the statutory minimum wage[175] as a result of IntelliQuick's policies of (1) assigning them

13  "additional work" without any additional compensation and (2) deducting standard,

14  weekly fees and discretionary chargebacks from their pay.[176]  Whether these policies

15  exist and, if so, whether they permit the drivers' hourly wages to fall below the statutory

16  minimum are questions of fact common to all putative class members.  The same can

17  be said about the question whether IntelliQuick's policies permit the drivers to regularly

18  work in excess of 40 hours per week without overtime compensation.  Although the

19  putative class members would be entitled to different damages based on the amount

20  below the minimum wage they were actually paid or how much uncompensated

21

22

23        [172]*Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary
    Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed.1986)).

24
          [173]*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir.2009).
25
          [174]*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)
26  (internal quotation omitted).

27        [175]A.R.S. § 23-363.

28        [176]Doc. 187 at 21-22.

                                            -37-

overtime work they actually performed, such "individual issues do not overcome the fact that common questions present a significant aspect of the case and can be resolved on a representative rather than individual basis."[177]

### (ii)    A.R.S. § 23-352 claims

The Complaint also alleges that IntelliQuick's deductions from the drivers' paychecks referenced above violate A.R.S. § 23-352, which prohibits employers from withholding any portion of an employee's wages unless (1) the employer is "required or empowered to do so" by law, (2) the employer has written authorization from the employee, or (3) "[t]here is a reasonable good faith dispute as to the amount of wages due, including . . . any claim of . . . set-off asserted by the employer against the employee."[178]  Defendants argue that plaintiffs' unlawful deduction claim will require the court to conduct an individualized analysis of each deduction to determine whether each was based on a good faith dispute over the amount of wages due.[179]  With regard to chargebacks, the court agrees.[180]  The evidence shows that IntelliQuick supervisors exercise discretion when deciding whether to issue chargebacks, and chargebacks may be levied for myriad reasons.[181]  The fact-intensive, individual analysis, required to determine whether each chargeback was levied in good faith defeats class certification on that claim.

---

[177]*Juvera v. Salcido*, 294 F.R.D. 516, 522 (D. Ariz. 2013).

[178]A.R.S. § 23-352.

[179]Doc. 319 at 10.

[180]*See Baughman v. Roadrunner Commc'ns, LLC*, No. CV-12-565-PHX-SMM, 2014 WL 4259468, at *7 (D. Ariz. Aug. 29, 2014) ("The Court finds that based on the validity of the variety of individual charge backs assessed against the putative class, and in application, whether they violated A.R.S. § 23-352, it is clear that the putative class members' claims do not depend upon a common contention whose truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

[181]*See, e.g.*, Doc. 305-1 at 255-56; Doc. 305-2 at 198-99; Doc. 307 at 16.

Whether IntelliQuick deducts its standardized fees from its drivers' paychecks in good faith, however, is amenable for class-wide resolution.  A weekly scanning device fee is deducted from the paychecks of all drivers who use IntelliQuick's scanners,[182] a weekly secondary insurance fee is deducted from the paychecks of all drivers who do not have their own secondary insurance policy,[183] and weekly uniform and paycheck processing fees are deducted from all drivers' paychecks.[184]  Because these deductions are standardized, the question whether they comply with A.R.S. § 23-352 can be resolved for all members of the class in a single adjudication.  Predominance is satisfied with regard to these claims.

### (iii)    FMLA claims

Plaintiffs seek class certification under Rule 23(b)(3) on their claims that defendants are violating the FMLA by failing to provide FMLA leave[185] and by penalizing employees who take unpaid leave.[186]  As defendants observe, however, the drivers will have to prove the following five elements to establish a violation of the FMLA: (1) "the driver was eligible for the FMLA's protections (in other words, an employee)," (2) IntelliQuick was covered by the FMLA, (3) the driver was entitled to FMLA leave, (4) the driver provided IntelliQuick sufficient notice of his or her intent to take leave, and (5) IntelliQuick denied the driver FMLA benefits.[187]  Defendants argue that elements three through five present individual questions that will predominate.  At oral argument plaintiffs' counsel conceded that this claim is ill-suited for class treatment to the extent it

---

[182]Doc. 305-1 at 122.

[183]Doc. 305-1 at 124.

[184]Doc. 305-1 at 124-26.

[185]*See* 29 U.S.C. § 2612.

[186]*See* 29 U.S.C. § 2615.

[187]*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 283 F.R.D. 427, 460 (N.D. Ind. 2012).

seeks monetary damages for FLMA violations.  Alternatively, however, plaintiffs'

counsel argued that plaintiffs have alleged that IntelliQuick has a policy of requiring a

driver to find a replacement driver before he or she may take leave, and that the court

should certify their claim for declaratory relief that this policy violates the FMLA.  But

because the Complaint does not mention any such policy or request such declaratory

relief, plaintiffs' argument lacks merit.

### (2)   Superiority

When assessing whether a class action is superior to other methods of

adjudicating the controversy, courts should consider:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.[188]

Plaintiffs argue that a class action is a superior method of adjudication because the

individual class members have little interest in controlling the prosecution of the case,

"significant discovery on major factual and legal issues" has already been completed in

this action, and concentrating the litigation in the District of Arizona is desirable because

that is where "the vast majority, if not all, of class members and all witnesses are

located."[189]

---

[188]Fed. R. Civ. P. 23(b)(3).  *See also Zinser v. Accufix Research Ins., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

[189]Doc. 303 at 23.

-40-

Defendants respond by citing *Epenscheid v. DirectSat USA, LLC*,[190] and arguing that the individualized damages calculations defeat superiority.[191] In *Epenscheid*, the defendant employer allegedly concealed its wage and hour violations by forbidding its workers from recording time spent on certain tasks.[192] The Seventh Circuit found that the lack of records of the time these workers worked but did not report on their time sheets, and class counsel's inability to propose a feasible litigation plan to address this evidentiary deficiency, rendered class action treatment inferior to a complaint filed with the Department of Labor.[193]

Defendants' argument fails for several reasons. First, defendants do not contend that the situation in this case is akin to *Epenscheid*. That is, that the drivers failed to record the time for which they now wish to be compensated. To the contrary, it appears from the record here that calculating damages would be reasonably feasible.[194] Second, defendants do not suggest any alternatives to class action litigation that would be a superior method of adjudicating these claims.

## IV.  CONCLUSION

For the reasons above, the motion at docket 310 is DENIED, and the motion at docket 303 is GRANTED IN PART and DENIED IN PART as follows:

- IT IS ORDERED certifying a class action that includes all current and former drivers or couriers who made pick-ups or deliveries for or on behalf of IntelliQuick Deliveries, Inc. as a Freight Driver, Route Driver, or On-Demand Driver within the State of Arizona and who were or are classified

---

[190]705 F.3d 770, 773 (7th Cir. 2013).

[191]Doc. 319 at 16-17.

[192]*Espenscheid*, 705 F.3d at 773-74.

[193]*Id*. at 775-76.

[194]*See, e.g.*, Doc. 305-1 at 204, 221.  *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 515 (9th Cir. 2013).

or paid as independent contractors or not classified or paid as employees at any time on or after April 9, 2009;

• IT IS FURTHER ORDERED certifying the following subclasses of plaintiffs:

   • Subclass A - Freight Drivers: All drivers who use vehicles or vans that are owned or leased by IntelliQuick or Majik Leasing, LLC to make deliveries and pick-ups for or on behalf of IntelliQuick or its customers.

   • Subclass B - Route Drivers: All drivers who generally use their own vehicles to make deliveries and pick-ups on an assigned route for or on behalf of IntelliQuick or its customers.

   • Subclass C - On-Demand Drivers: All drivers who generally use their own vehicles to make specific deliveries and pick-ups for or on behalf of IntelliQuick or its customers and who have not been assigned a regular route.

   • Subclass D - All drivers who are parties to the "Independent Contractor Owner/Operator Agreement."

• IT IS FURTHER ORDERED permitting the named plaintiffs and class of similarly situated individuals to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) with respect to the plaintiffs' claim that the "Independent Contractor Owner/Operator Agreement" is substantively unconscionable;

• IT IS FURTHER ORDERED permitting the named plaintiffs and class of similarly situated individuals to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) with respect to the plaintiffs' claims for minimum wage and overtime violations under A.R.S. § 23-351 and plaintiffs' claims that the defendants' standardized payroll deductions violate A.R.S. § 23-352;

- IT IS FURTHER ORDERED appointing plaintiffs' counsel as class counsel under Rule 23(g);
- IT IS FURTHER ORDERED that defendants shall provide to plaintiffs' counsel the last-known contact information for the class members within 21 days of this order; and
- IT IS FURTHER ORDERED that plaintiffs shall submit a proposed class notice within 14 days of this order.

DATED this 23rd day of March 2015.


/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE