1
2
3
4
5
6          **UNITED STATES DISTRICT COURT**
7              **DISTRICT OF ARIZONA**
8
9    **David Collinge, *et al*.,**
10              **Plaintiffs,**                    **2:12-cv-00824 JWS**
11          **vs.**
12   **IntelliQuick Delivery, Inc., an Arizona**    **ORDER AND OPINION**
     **corporation, *et al*.,**
13              **Defendants.**                    **[Re: Motion at Docket 304]**
14
15
16              **I.  MOTION PRESENTED**
17          At docket 59 the court conditionally certified a collective action brought by
18   plaintiffs David Collinge, *et al*. (collectively "plaintiffs") to enforce the Fair Labor
19   Standards Act ("FLSA").[1]  At docket 304 plaintiffs move for partial summary judgment
20   pursuant to Federal Rule of Civil Procedure 56 on two questions: (1) whether they have
21   been misclassified as independent contractors when in fact they are employees; and
22   (2) whether defendants IntelliQuick Delivery, Inc. ("IntelliQuick"), Transportation
23   Authority, Inc. ("TA"), Keith Spizzirri ("Spizzirri"), and Bob Lorgeree ("Lorgeree") are their
24   joint employers.  Defendants oppose at docket 320.  Plaintiffs reply at 328.  Oral
25   argument was heard on March 17, 2015.
26
27
28
     _____

              [1]29 U.S.C. § 201 *et seq*.

1

## II.  BACKGROUND

Plaintiffs and the putative class members currently work or have worked for IntelliQuick as delivery drivers.  The putative class consists of three types of drivers: Route Drivers, Freight Drivers, and On-Demand Drivers.[2]  Route Drivers deliver parcels that are assigned to them by IntelliQuick.[3]  Freight Drivers provide similar services, except they deliver larger items that are generally moved on pallets.[4]  On-Demand Drivers perform delivery services on an on-call basis.[5]

Counts I, II, and VI of the Second Amended Complaint ("Complaint") are at issue in plaintiffs' present motion.  Counts I and VI allege FLSA violations: Count I alleges wage and hour violations; Count VI alleges unlawful retaliation.  Count II alleges violations of the Arizona Wage Act.[6]  The viability of each of these claims depends on whether plaintiffs have been misclassified as independent contractors when they are actually employees.

## III.  STANDARD OF REVIEW

A party may move for partial summary judgment pursuant to Rule 56(a) by identifying the part of each claim on which summary judgment is sought.  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under

---

[2]Doc. 305 at 6 ¶ 26; Doc. 321 at 7 ¶ 26.

[3]Doc. 305-1 at 185.

[4]Doc. 305-1 at 198-99.

[5]Doc. 305-1 at 185.

[6]A.R.S. § 23-350 *et seq.*

[7]Fed. R. Civ. P. 56(a).

the governing law will properly preclude the entry of summary judgment."[8]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[10]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[11]  All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[12]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[13]

## IV.  DISCUSSION

**A.   Plaintiffs Have Been Misclassified as Independent Contractors**

**1.   The Drivers Have Been Misclassified as Independent Contractors for Purposes of the FLSA**

Whether an individual is an employee or an independent contractor for purposes of the FLSA is a question of law.[14]  The parties agree that the test the court must use to

---

[8]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9]*Id.*

[10]*Id.* at 323.

[11]*Anderson,* 477 U.S. at 248-49.

[12]*Id.* at 255.

[13]*Id.* at 248-49.

[14]See *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983) (holding that "[a]lthough the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts—whether appellants are employers within the meaning of the FLSA—is a question of law"); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1441 (10th Cir. 1998).

make this determination is the "economic realities" test, which employs a non-

exhaustive list of six-factors set forth by the Ninth Circuit in *Real v. Driscoll Strawberry*

*Associates, Inc.*[15]  These factors are:

> (1) "the degree of the alleged employer's right to control the manner in which the work is to be performed;"
>
> (2) "the alleged employee's opportunity for profit or loss depending upon his managerial skill;"
>
> (3) "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;"
>
> (4) "whether the service rendered requires a special skill;"
>
> (5) "the degree of permanence of the working relationship;" and
>
> (6) "whether the service rendered is an integral part of the alleged employer's business."[16]

Contractual language that purports to describe an individual's working relationship does

not control,[17] nor does the parties' intent.[18]  Instead, the economic realities of the

working relationship are what matters.  The court's ultimate focus is on whether, as a

matter of economic reality, the individual is dependent upon the business to which she

renders service.[19]

Plaintiffs argue that the drivers satisfy each of the six enumerated factors.

Defendants' opposition only challenges plaintiffs' arguments regarding factors one

_____

[15]603 F.2d 748, 754 (9th Cir. 1979).

[16]*Real*, 603 F.2d at 754.

[17]*Id.* at 755 ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA.").

[18]*Id.* ("[T]he subjective intent of the parties to a labor contract cannot override the economic realities reflected in the factors described above.").

[19]*Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (quoting *Bartels v. Birmingham*, 332 U.S. 126 (1947)).  *See also Doty v. Elias*, 733 F.2d 720, 722-23 (10th Cir. 1984) ("The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service, or is, as a matter of economic fact, in business for himself.") (citations omitted).

1    through three.  Thus, defendants effectively concede that the drivers' work does not

2    require a special skill, that there is a significant degree of permanence in the drivers'

3    working relationship with IntelliQuick, and that the drivers' work is in integral part of

4    IntelliQuick's business.

5              a.    **IntelliQuick exercises significant control over the way in which the drivers perform their jobs**

6         The first economic realities test factor measures IntelliQuick's right to control the

7    manner in which the drivers perform their work.  Because the undisputed evidence

8    shows policies and procedures allow IntelliQuick to exercise a great deal of control over

9    the manner in which its drivers perform their jobs, this factor strongly favors plaintiffs.

10        First, IntelliQuick can and does control its drivers' appearance.[20]  All drivers are

11   required to wear an IntelliQuick uniform, including a red IntelliQuick shirt and black

12   pants or shorts, accompanied by an IntelliQuick identification ("ID") badge.[21]

13   IntelliQuick also requires its drivers to have their uniforms professionally cleaned.[22]

14        Second, IntelliQuick trains its drivers on its policies and procedures.[23]

15   IntelliQuick's new driver orientation instructs drivers on which IntelliQuick employees will

16   assign them work, on how to use IntelliQuick's forms—including invoices, delivery slips,

17   and door tags, and on IntelliQuick's deadlines for making deliveries pursuant to each of

18   IntelliQuick's various "Service Types."[24]  The orientation informs drivers that they must

19

20        [20]*Cf. Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989 (9th Cir. 2014)

21   (finding right to control under California law based in part on delivery company's "detailed appearance requirements"); *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033,

22   1042 (9th Cir. 2014) (same, applying Oregon law).

23        [21]Doc. 305-1 at 101, 141; Doc. 305-3 at 4; Doc. 305-5 at 135; Doc. 321 at 10 ¶¶ 52-53.

24        [22]Doc. 305-1 at 124; Doc. 321 at 10 ¶ 55.

25        [23]Doc. 32-3 at 4 ¶ 10; 32-4 at 6 ¶ 16; Doc. 305-1 at 48-49, 168; Doc. 305-3 at 2-6, 38-

26   39; Doc. 305-5 at 24-26; 50-52, 54-58.  Although defendants dispute that they provide training to their drivers, the basis for this dispute is that they contend they provide their drivers

27   "orientation" and not "training."  Doc. 321 at 9 ¶ 41.  This distinction is without a difference.

28        [24]Doc. 305-3 at 2-3.  *See also id*. at 24-25.

-5-

1   file their delivery paperwork with IntelliQuick by the next business day, must call

2   IntelliQuick "if anything [they] are doing takes 5 minutes more than expected," and must

3   inform IntelliQuick if an item is undeliverable for any reason, making a notation to that

4   effect on the package's delivery sticker.[25]  IntelliQuick instructs its drivers on the

5   physical location where they must scan their packages[26] and the proper way to greet

6   customers.[27]  IntelliQuick also mandates the equipment that route drivers must have

7   with them, including a hand truck, ice chest, and clipboard.[28]

8          At oral argument defense counsel argued that even if IntelliQuick has the

9   hypothetical right to train the drivers, it does not actually train all of them, and the

10  training it does provide does not extend "beyond simple instruction on the operation of

11  communication devices and the physical location of where deliveries would be made."

12  This argument's flawed premise is that only formal training provided at the beginning of

13  a driver's tenure is "training."  The record shows that, in addition to initial orientation

14  training, IntelliQuick trains its drivers on an ongoing basis.[29]

---

[25]Doc. 305-3 at 2.  *See also id*. at 24-25.

[26]Doc. 305-3 at 3 ("Never Scan packages at your vehicle.  Always scan inside the delivery location.").

[27]Doc. 305-3 at 4 ("The little polite things like wishing [customers] a good day and waiting without acting rushed, even when you are, go a long way to leaving a positive impression.")

[28]Doc. 305-3 at 3.

[29]*See, e.g.*, Doc. 307 at 105 rows 269 ("[T]his is a training issue the stop was not closed out by the driver"), 277 ("[H]e was having issues scanning to his route but did not let anyone know of this.  Please retrain agent again on Salibas procedures."), and 278 ("[D]river did not follow delivery procedures, please print out attached and educate driver"); Doc. 307 at 110 rows 263, 269, 270, 271 ("All drivers have been advised not to leave pkg with autho"), 272 ("[R]etrained driver on the absolute necessity for verifying ab#s and pc count always"), and 275 ("I will let him know this could of been a chargeback"); Doc. 307 at 130 at rows 383 ("[H]e should of been trained on this I will speak to both him and utility"), 390 ("[T]his was his 1st day training and reggie instructed him improperly he is now aware of sop"), and 395 ("[D]river was charged for the special and has been educated"); and Doc. 307 at 141 row 442 ("[T]raining alert sent out to all drivers and TA.").

1    Third, IntelliQuick subjects its drivers to a series of "uniform standard operating

2  procedures" ("SOPs"),[30] which regulate what the drivers are required to do,[31] within

3  which "time frame" they must do it,[32] what they are required to wear,[33] and which

4  equipment they must use.[34]  IntelliQuick asserts that these SOPs do not show its own

5  control over its drivers because the SOPs are "dictated by specifications set by" its

6  customers.[35]  Even assuming this is true, however, IntelliQuick does not dispute that it

7  enforces the SOPs and its own internal policies with "chargebacks" (i.e., financial

8  penalties) that it deducts from the drivers' pay.

9    IntelliQuick monitors its drivers' work using its "CXT system," which allows

10  IntelliQuick to know where its drivers are at all times and to communicate with them.[36]

11  IntelliQuick also maintains a "care ticket system" that, among other things, documents

12  customer complaints and "service failures," such as late or missed deliveries or protocol

13  violations.[37]  When drivers commit service failures, IntelliQuick may sanction them with

14  chargebacks.[38]  Care ticket system records show that IntelliQuick closely monitors the

15

16

17

18    [30]Doc. 305 at 7-9; Doc. 305-3 at 8; Doc. 305-5 at 2-10, 28-29, 46-48, 60-61, 139-40,
    147-48; Doc. 305-6 at 78, 80, 95-96, 98-108, 110-26, 128, 130-31, 133, 135, 137, 139, 141-42,
19    144, 146, 158-59.

20    [31]See Doc. 305-1 at 201-03 (stating that the purpose of the SOPs was to inform drivers
    of "what they needed to do" with the packages); Doc. 305-5 at 24-25.
21
22    [32]Doc. 305-1 at 205.

23    [33]Doc. 305-5 at 135.

24    [34]See, e.g., Doc. 305-1 at 23.

25    [35]Doc. 321 at 32 ¶ 69.

26    [36]Doc. 305-1 at 221.

27    [37]Doc. 305-2 at 94, 106-08.

28    [38]Doc. 305-1 at 166, 251; Doc. 305-2 at 198; Doc. 305-6 at 158.

details of the drivers' activities[39] and routinely metes out chargebacks or other discipline when a driver's performance falls below expectations.[40]  For example, IntelliQuick has disciplined its drivers for:

- not wearing their IntelliQuick uniform or ID badge;[41]
- improperly using IntelliQuick equipment;[42]
- making inappropriate comments;[43]
- improperly filling out or handling paperwork;[44]
- mishandling packages;[45]
- not calling the customer regarding an undeliverable package;[46] and
- not bringing delivery problems to IntelliQuick's attention.[47]

By closely monitoring the drivers' actions and disciplining them for violations of protocol, IntelliQuick exercises extensive control over the manner in which its drivers perform their jobs.[48]

---

[39]Doc. 309 at 16, 26, 35, 45, 55, 65, 75, 84, 94, 99, 105, 116, 125, 136, 147, 158.

[40]Doc. 309 at 20, 30, 39, 49, 59, 69, 79, 88, 99, 110, 121, 130, 141, 152, 163.  Column BN of these spreadsheets indicates the resolution of the care ticket.  Doc. 305-2 at 106.

[41]Doc. 309 at 74 row 789; *id.* at 146 row 599.

[42]Doc. 309 at 93 row 241; *id*. at 151 row 605.

[43]Doc. 309 at 115 row 323; *id*. at 135 row 433.

[44]Doc. 309 at 34 row 284; *id*. at 54 rows 340-41; *id*. at 104 row 278; *id*. at 135 rows 435, 439, 440, 444, 449.

[45]Doc. 309 at 64 row 632; *id*. at 104 row 270; *id*. at 124 rows 383, 395; *id*. at 129 rows 378, 394.

[46]Doc. 309 at 34 row 283; *id*. at 93 rows 241, 245; *id*. at 124 rows 387, 388.

[47]Doc. 309 at 104 row 266; *id*. at 146 row 602.

[48]*See Brock*, 840 F.2d at 1060.

1    Fourth, IntelliQuick dispatchers have discretion to unilaterally assign pick-ups to

2    Route and Freight Drivers.[49]  This supports the inference that these drivers lack the

3    "degree of independence that would set them apart from what one would consider

4    normal employee status."[50]  Defendants assert that drivers are free to turn down work,

5    and point to opt-in plaintiff Eddie Miller's ("Miller")[51] and plaintiff Robert Campagna's

6    testimony to that effect.[52]  Even if this is true, however, the fact remains that IntelliQuick

7    can and does issue chargebacks to Route and Freight Drivers who turn down assigned

8    work.[53]  At oral argument IntelliQuick's counsel implicitly conceded as much by arguing

9    only that IntelliQuick does not assess such chargebacks against On Demand Drivers.

10   This factor weighs in favor of finding that Route and Freight Drivers are employees.

11   Further, because IntelliQuick does not assess chargebacks against On Demand Drivers

12   for refusing work, however, this factor weighs in favor of finding that On Demand Drivers

13   are independent contractors.

14        Fifth, IntelliQuick controls the time that Freight and Route Drivers must start their

15   work.[54]  IntelliQuick gives them a manifest that informs them of their deliveries, which

16

17

18   _____

19   [49]Doc. 305-1 at 249-53; Doc. 305-2 at 206-07.

20   [50]*Baker*, 137 F.3d at 1441.

21   [51]Doc. 321-1 at 16.

22   [52]Doc. 321-1 at 124-25.  *See also* Doc. 321-1 at 36.

23   [53]Doc. 305-2 at 49, 104-05; Doc. 309 at 25 rows 205, 212, 215; *id*. at 54 row 334; *id*. at
24   83 rows 952, 960, 961; *id*. at 115 row 324; *id*. at 135 row 441; *id*. at 146 row 606.

25   [54]*See* Doc. 305-1 at 128 ("[I]f a driver needed to be at their first stop at 8 a.m., they
     would need to work backwards to determine what time they needed to come in to be able to
26   secure their parcels and be to that stop by 8 a.m. for their first delivery or pickup."); *id*. at 129-
     30 ("Clearly, there was an expected time frame, a window that drivers were to report to IQ to
27   pick up and receive/scan their packages so that they could complete their route in time to be
     able to return and to drop off whatever they had picked up and re-sort and pick up their
28   packages in the afternoon for the afternoon and deliver those packages.").

vary from day-to-day,[55] and the time by which the time-sensitive deliveries must be completed.[56]  As defendants point out, however, On-Demand Drivers are able to determine when to start their workday.[57]  For example, plaintiff Heather Arras testified that the start time for her On-Demand work began when she let dispatch know that she was available.[58]  This particular consideration therefore weighs in favor of plaintiffs with regard to Route and Freight Drivers, and in favor of defendants with regard to On-Demand Drivers.[59]

Defendants make several other arguments regarding their alleged lack of control over the drivers, none of which are persuasive.  For example, defendants note that On-Demand Drivers are free to wait at home for their first delivery of the day,[60] and in between jobs they are free to "kill time" on a computer[61] or run personal errands.[62]  These facts are unavailing because they merely show that IntelliQuick is unable to control its drivers when they are not working, an irrelevant point.

### b. The drivers have few opportunities for profit or loss that depend upon their managerial skill

The second economic realities test factor measures "the alleged employee's opportunity for profit or loss depending upon his managerial skill."[63]  This factor is relevant because experiencing profit or loss based on one's managerial skill is a

---

[55]Doc. 305-1 at 134, 254; Doc. 305-2 at 46-47.

[56]Doc. 305-1 at 255; Doc. 305-2 at 46-47.

[57]Doc. 320 at 14.

[58]Doc. 321-1 at 34-35.

[59]*Cf. Slayman*, 765 F.3d at 1043; *Alexander*, 765 F.3d at 989-90.

[60]Doc. 321-1 at 102-03.

[61]Doc. 321-1 at 106.

[62]Doc. 321-1 at 154.

[63]*Real*, 603 F.2d at 754.

-10-

characteristic of running an independent business.[64]  In *Real*, for example, the Ninth
Circuit found that this factor weighed in favor of finding that the strawberry grower
plaintiffs were employees because their opportunity for profit or loss appeared "to
depend more upon the managerial skills of [their alleged employers] in developing fruitful
varieties of strawberries, in analyzing soil and pest conditions, and in marketing than it
does upon the [growers'] own judgment and industry in weeding, dusting, pruning and
picking."[65]

Assuming all factual inferences in favor of defendants, this factor cuts in favor of
plaintiffs.  It appears that the drivers' opportunity for profit or loss depends more upon
the jobs to which IntelliQuick assigns them than on their own judgment and industry.
This weighs in favor of economic dependence.

It is undisputed that the drivers receive "piecework" wages, meaning that they are
paid by the job instead of by the hour.[66]  Drivers who minimize the costs, or maximize
the revenue, of getting from point A to point B may thereby maximize profits.  As
defendants observe, On-Demand Drivers can maximize profits by declining relatively
low-paying jobs and Route and Freight Drivers can minimize costs by ordering their
deliveries efficiently.[67]  The drivers' ability to increase their profits through such means is
limited, however.  With respect to revenue, On-Demand Drivers' pay is capped by what
IntelliQuick is willing to pay them.  With respect to costs, even if Route and Freight
Drivers are able to rearrange the order of their deliveries, their ability to realize a profit

---

[64]*See Baker*, 137 F.3d at 1441.

[65]*Real*, 603 F.2d at 755.

[66]Doc. 305 at 16 ¶ 96; Doc. 305-1 at 127.

[67]Doc. 320 at 16.  Defendants seem to also argue that the drivers' ability to "hire
additional help, or not hire additional help" is evidence of a profit-making opportunity, but they
do not explain how this might be true.  Further, the deposition testimony they cite does not
show any drivers who have increased their profits by hiring or not hiring help.  *See* Doc. 321 at
33 ¶ 75.

1  from this opportunity is constrained by the fact that IntelliQuick decides which deliveries

2  appear on their manifests.[68]

3      Defendants argue that the drivers can increase their profits in three other ways:

4  by negotiating pay raises, taking on additional work, or selecting fuel-efficient vehicles.

5  None of these arguments is persuasive.  As to defendants' first contention, one's ability

6  to obtain a discretionary pay raise is not the type of profit-maximizing "managerial skill"

7  that is characteristic of independent contractor status.  Employees and independent

8  contractors alike may request pay raises.  The profit-maximizing opportunities that are

9  relevant here are those under the worker's control, not subject to the discretion of the

10  worker's supervisor.  Second, a worker's ability to simply work more is irrelevant.  More

11  work may lead to more revenue, but not necessarily more profit.[69]  Finally, although

12  selecting a fuel-efficient vehicle will likely reduce a driver's costs over the long run, there

13  is little "managerial skill" involved in that decision.

<b>c.    The drivers do not make significant investments in equipment<br>or materials, nor do they employ helpers</b>

14

15      The third economic realities test factor measures "the alleged employee's

16  investment in equipment or materials required for his task, or his employment of

17  helpers."[70]  "The investment 'which must be considered as a factor is the amount of large

18  capital expenditures, such as risk capital and capital investments, not negligible items, or

19

20

21

22  [68]*Cf. Alexander*, 765 F.3d at 990 ("FedEx's lack of control over some parts of its drivers' jobs does not counteract the extensive control it does exercise.").

23  [69]*See Baker*, 137 F.3d at 1441 ("[P]laintiffs' ability to maximize their wages by 'hustling'
24  new work is not synonymous with making a profit."); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d
25  1308, 1316-17 (11th Cir. 2013) ("Plaintiffs' opportunity for profit was largely limited to their
   ability to complete more jobs than assigned, which is analogous to an employee's ability to take
26  on overtime work or an efficient piece-rate worker's ability to produce more pieces.  An
   individual's ability to earn more by being more technically proficient is unrelated to an
27  individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he
   operates his own business.").

28  [70]*Real*, 603 F.2d at 754.

-12-

labor itself.'"[71]  "In making a finding on this factor, it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation."[72] In *Real*, for example, the Ninth Circuit held that the strawberry growers' "investment in light equipment hoes, shovels and picking carts [was] minimal in comparison with the total investment in land, heavy machinery and supplies necessary for growing the strawberries."[73]

Plaintiffs concede that all drivers must invest in a personal vehicle to make deliveries and some purchase their own scanners.[74]  Further, defendants point out that plaintiff Brian Black ("Black") purchased a hand truck and a rubber stamp.[75]  These investments are insignificant, however, when compared to the total capital investment necessary to operate IntelliQuick's delivery business, including the cost of acquiring and maintaining warehouse space, office space, dispatchers, computers, and the CXT software used to coordinate the deliveries.[76]

Further, although defendants correctly observe that the drivers may hire helpers, this "does not prevent a finding that they are employees."[77]  This holds true here in light of defendants' inability to point to any driver who has actually employed a helper.[78]  The

---

[71]*Baker*, 137 F.3d at 1442 (quoting *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir.1989)).

[72]*Id.*

[73]*Real*, 603 F.2d at 755.

[74]Doc. 304 at 17.

[75]Doc. 321-1 at 57.

[76]*Cf. Scantland*, 721 F.3d at 1318 ("[I]n light of the fact that most technicians will already own a vehicle suitable for the work . . . there seems to be little need for significant independent capital.").

[77]*Real*, 603 F.2d at 755.

[78]*See Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 300 (5th Cir. 1975) ("[T]he court below and the parties placed too great reliance on the bare legal powers which each of the parties had under their informal working agreement.  The result was to permit potential powers

-13-

only evidence defendants cite in this regard comes from Miller's deposition testimony that he "put together a crew" of drivers for a large, two-month job.  But even assuming the truth of Miller's testimony and interpreting all reasonable inferences in defendants' favor,[79] the court cannot reasonably infer that Miller employed a helper.  Miller did not testify that he employed any drivers himself and, more importantly, when he was specifically asked whether drivers could employ helpers Miller testified that it was possible but he did not know "that anybody ever did it."[80]

### d.   Summary

Even when viewing the evidence in the light most favorable to defendants, it is clear that IntelliQuick exercises a great deal of control over the manner in which its drivers perform their work.  The details of its drivers' jobs do not display the hallmarks of independent contractor status, such as significant capital investments, the employment of helpers, or opportunities for profit or loss based on the drivers' industry or judgment. Further, as plaintiffs observe, all of the delivery work available to the drivers is routed to them by IntelliQuick—there is no independent market for their services.  Ultimately, as a matter of economic reality, the drivers are dependent upon IntelliQuick.[81]  They have been misclassified as independent contractors for purposes of the FLSA.

---

of little or no effective significance in the actual operation of the working arrangement to overweigh the actual operation, the 'economic reality' of the situation."); *Real*, 603 F.2d at 754 (citing *Mednick*, 508 F.2d at 301); *Donovan*, 656 F.2d at 1372; *Martin v. Selker Bros.*, 949 F.2d 1286, 1294 (3d Cir. 1991); *Perez v. Oak Grove Cinemas, Inc.*, No. 03:13-CV-00728-HZ, 2014 WL 7228983, at *5 (D. Or. Dec. 17, 2014); *Moba v. Total Transp. Servs. Inc.*, No. C13-138 MJP, 2014 WL 1671587, at *1264-65 (W.D. Wash. Apr. 25, 2014).

[79]*See Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir. 1985) ("A party opposing summary judgment is entitled to the benefit of only *reasonable* inferences that may be drawn from the evidence put forth.") (emphasis in original).

[80]Doc. 321-1 at 17.

[81]*See Baker*, 137 F.3d at 1444 ("Ultimately, plaintiffs, like other workers hired by Flint, are dependent upon Flint for the opportunity to render services for however long a particular project lasts.").

### 2.   The Drivers Have Been Misclassified as Independent Contractors for Purposes of the Arizona Wage Act

Arizona has adopted the approach set out in Section 220 of the *Restatement (Second) of Agency* for determining whether an individual is an employee under Arizona law.[82]  Accordingly, courts look to the following eight factors:

1.  The extent of control exercised by the master over details of the work and the degree of supervision;

2.  The distinct nature of the worker's business;

3. Specialization or skilled occupation;

4. Materials and place of work;

5. Duration of employment;

6. Method of payment;

7. Relationship of work done to the regular business of the employer;

8. Belief of the parties.[83]

No one factor is determinative; courts must look to the totality of the facts and circumstances.[84]  "The distinction between an employee and an independent contractor usually rests," however, on the first factor—"the extent of control the employer may exercise over the details of the work."[85]

Despite utilizing different terminology, the Ninth Circuit has observed that "there is no functional difference" between the economic realities test described above and the common law agency test[86] adopted by Arizona.  This observation holds true here, as each of the Arizona factors are discussed in the FLSA section above except for number six (method of payment) and number 8 (belief of the parties).  There is no need to

---

[82]*See Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 141 (Ariz. 1990).

[83]*Id.* at 142.

[84]*El Dorado Ins. Co. v. Indus. Comm'n*, 545 P.2d 465, 467 (Ariz. 1976).

[85]*Cent. Mgmt. Co. v. Indus. Comm'n*, 781 P.2d 1374, 1376 (Ariz. Ct. App.1989).

[86]*Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010).

-15-

address these two remaining factors because, in light of the other factors—in particular, the extensive control that IntelliQuick exercises over its drivers—they are not significant to the outcome of this case.[87]

**B.   Plaintiffs Are Not Entitled to Partial Summary Judgment on their Joint Employer Claim**

Plaintiffs next argue that IntelliQuick, TA, Spizzirri, and Lorgeree are joint employers under the FLSA.[88]  "Regulations promulgated under the FLSA recognized that an employee may have more than one employer under the FLSA.  When more than one entity is an employer for purposes of the FLSA, the entities are termed 'joint employers.'"[89] On one hand, if "two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee . . . , each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the Act."[90]  But on the other hand, if the employee is employed jointly by two or more employers, "all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act."[91]

The entirety of plaintiffs' argument is that "[d]efendants were each directly or indirectly involved in the operational decisions of IntelliQuick in terms of the work performed by Plaintiffs."[92]  Defendants argue that plaintiffs have not met their summary judgment burden of showing that each of these three defendants is a joint employer.

---

[87]*See In re Brown*, 743 F.2d 664, 667 n.3 (9th Cir. 1984) (declining to consider additional factor "not significant to the outcome of the case").

[88]Doc. 304 at 24-25.

[89]*Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (citing 29 C.F.R. § 791.2(a)).

[90]29 C.F.R. § 791.2(a).

[91]*Id.*

[92]Doc. 304 at 24-25.

1  With respect to TA and Lorgeree, defendants are clearly correct; the only evidence upon

2  which plaintiffs' argument relies pertains to Spizzirri.[93]

3       Plaintiffs' showing with regard to Spizzirri is also inadequate.  Although the joint

4  employment determination requires consideration of the total employment situation,

5  courts focus "primarily on four factors: 'whether the alleged employer (1) had the power

6  to hire and fire employees, (2) supervised and controlled employee work schedules or

7  conditions of payment, (3) determined the rate and method of payment, and

8  (4) maintained employment records.'"[94]  Plaintiffs fail to address any of these factors in

9  their initial motion and instead rely on 29 C.F.R. § 791.2(b)(3), which applies to

10 "horizontal" joint employment, not the "vertical" joint employment alleged here.[95]

11 Plaintiffs' request for partial summary judgment on this claim will be denied.

## V.  CONCLUSION

13      For the reasons above, the motion at docket 304 is GRANTED IN PART and

14 DENIED IN PART as follows: Plaintiffs' request for a determination that they are

15 employees for purposes of the FLSA and the Arizona Wage Act is GRANTED, and

16 plaintiff's request for partial summary judgment holding that defendants Transportation

17 Authority, Inc., Keith Spizzirri, and Bob Lorgeree are joint employers under the FLSA is

18 DENIED.

19      DATED this 23rd day of March 2015.

                                        /s/ JOHN W. SEDWICK
                                        SENIOR UNITED STATES DISTRICT JUDGE

[93]*See* Doc. 305-1 at 247; Doc. 305-2 at 110, 232 (testimony that Spizzirri was involved in issuing chargebacks); Doc. 305-1 at 194; Doc. 305-2 at 44 (testimony that Spizzirri established pay rates); Doc. 305-1 at 168 (testimony that Spizzirri expected all of the drivers to be at a meeting).

[94]*Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (quoting *Bonnette*, 704 F.2d at 1470).

[95]*Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 917 (9th Cir. 2003).