UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| **David Collinge, *et al*.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **2:12-cv-00824 JWS** |
| | ) | |
| **vs.** | ) | |
| | ) | **SEALED ORDER AND OPINION** |
| **IntelliQuick Delivery, Inc., *et al*.** | ) | |
| | ) | **[Re: Motions at Dockets 428, 430, 432** |
| **Defendants.** | ) | **& 438]** |
| | ) | |

## I.  MOTIONS PRESENTED

Before the court are four motions: two summary judgment motions and two Rule 702 motions.  At docket 428 defendants IntelliQuick Delivery, Inc., *et al*. (collectively, "IntelliQuick") move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56.  IntelliQuick submits a separate statement of facts in support of the motion at docket 429.  Plaintiffs David Collinge, *et al*. (collectively "Plaintiffs") oppose at docket 455.  Plaintiffs submit a controverting statement of facts at

docket 456, a declaration of counsel in support thereof at docket 457, and confidential

exhibits filed under seal at docket 459.  IntelliQuick replies at docket 464.

At docket 438 Plaintiffs move for partial summary judgment.  Plaintiffs submit a

separate statement of facts at docket 431 and a declaration of counsel in support

thereof at dockets 433 and 434.  IntelliQuick opposes at docket 449 and submits a

controverting statement of facts at docket 452.  Plaintiffs reply at docket 473.

At docket 430 IntelliQuick moves pursuant to Rule 702 to preclude expert

witness evidence from Plaintiffs' expert, David M. Breshears, CPA CFF ("Breshears").

Plaintiffs oppose the motion at docket 454.  IntelliQuick replies at docket 463.

At docket 432 Plaintiffs move pursuant to Rules 104[1] and 702[2] to preclude expert

witness evidence from IntelliQuick's expert, Robert W. Crandall, MBA ("Crandall").

IntelliQuick opposes at docket 444.  Plaintiffs reply at docket 465.

Oral argument was requested but would not assist the court.

## II.  BACKGROUND

The background of this case is set out in detail in the court's order at docket 342.

Suffice it to say for present purposes that Plaintiffs and the class they represent

currently work or have worked for IntelliQuick as delivery drivers.  Their Second

Amended Complaint alleges violations of the Fair Labor Standards Act ("FLSA")

---

[1]*Cf. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) ("Faced with a proffer of expert scientific testimony, . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

[2]Plaintiffs also cite Rules 703 and 704 as bases for their motion, but they do not actually base any of their arguments on either of these rules.

(Count I); violations of Arizona's Wage Act (Count II), restitution and unjust enrichment (Count III), violations of the Family and Medical Leave Act ("FMLA") (Count V), and seeks a declaratory judgment that several of defendants' contracts are unenforceable (Count IV).  In addition to naming IntelliQuick Delivery, Inc. as a defendant, Plaintiffs also name six individual defendants who allegedly controlled the conditions of their employment.  Plaintiffs assert that the parties have stipulated to the dismissal of two such defendants, Jason Mittendorf and William "Bill" Cocchia,[3] but such a stipulation has not yet been filed.

## III.  DISCUSSION

**A.     The Parties' Rule 702 Motions**

At docket 343 this court ruled that IntelliQuick had mis-classified Plaintiffs as independent contractors when in fact they are employees.  Among other things, the parties now dispute whether Plaintiffs can meet their burden of establishing that IntelliQuick failed to pay its drivers overtime or minimum wages required under the FSLA.[4]  Plaintiffs' task is made much more difficult by IntelliQuick's failure to track the hours its drivers worked.[5]  Indeed, even after the court issued its ruling that its drivers are employees, IntelliQuick continues to treat its "drivers as independent contractors"

---

[3]Doc. 455 at 6 n.1.

[4]*See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946) ("An employee who brings suit under § 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated.").

[5]Doc. 452 at 18 ¶ 105 ("Defendants do not dispute that IntelliQuick has not changed its 'business model,' regarding its drivers as independent contractors, and does not (and has never) tracked [sic] hours worked.").

and maintains that it is under no "obligation to accurately track and record the hours" they work.[6]

The Supreme Court in *Anderson v. Mt. Clemens Pottery Co.*, proscribed the procedure that courts must follow where, as here, they are presented with the "difficult problem" that arises when an "employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes."[7]  Considering the FLSA's remedial nature and "the great public policy which it embodies," Courts are not to "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work."[8]  Instead, courts will hold that the employee has met his burden if his evidence (1) proves that "he has in fact performed work for which he was improperly compensated" and (2) is sufficient to show "the amount and extent of that work as a matter of just and reasonable inference."[9]  If the employee meets this relatively light burden, the burden then shifts to the employer to come forward with evidence that establishes either "the precise amount of work performed" or the unreasonableness of the "inference to be drawn from the employee's evidence."[10] "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."[11]

---

[6]*Id.* at 18 ¶¶ 105–06.

[7]328 U.S. at 687.

[8]*Id.*

[9]*Id.*

[10]*Id.* at 687–88.

[11]*Id.* at 688.

Here, Plaintiffs seek to use Breshears' expert witness testimony to establish both that they have not been properly compensated for their work and a "just and reasonable inference" of their damages.[12]  To counter this evidence, IntelliQuick intends to use Crandall's expert witness testimony to discredit Breshears' estimates.  Each party now moves to preclude the other's expert.

### 1.    Standard of review

The district courts exercise broad discretion when ruling on motions *in limine*.[13] In order for evidence to be excluded under such motions, it must be "clearly inadmissible on all potential grounds."[14]  "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."[15]

"It is settled law that in limine rulings are provisional.  Such 'rulings are not binding on the trial judge [who] may always change his mind during the course of a trial.'"[16]  "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial.  Denial merely means that without

---

[12]Doc. 438 at 18.

[13]*See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).

[14]*Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

[15]*Hawthorne Partners v. AT & T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).

[16]*United States v. Benedetti*, 433 F.3d 111, 117 (1st Cir. 2005) (quoting *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000)).

the context of trial, the court is unable to determine whether the evidence in question should be excluded."[17]

Rule 702, as amended in 2000 to incorporate the standards set out by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[18] and *Kumho Tire Co. v. Carmichael*,[19] allows qualified experts to offer opinion testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[20]

"This list of requirements makes the task of determining admissibility sound more mechanical and less judgmental than it really is."[21]  "[A] district court's inquiry into admissibility is a flexible one,"[22] focused on assuring that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[23]  "It is the proponent

---

[17]*Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

[18]509 U.S. 579 (1993).

[19]119 S.Ct. 1167 (1999).

[20]Fed. R. Evid. 702.

[21]*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

[22]*City of Pomona v. SQM N. Am. Corp.*, Nos. 12-55147, 12-55193, 2014 WL 1724505, at *3 (9th Cir. May 2, 2014).

[23]*Daubert*, 509 U.S. at 597 (footnotes and citations omitted).

of the expert who has the burden of proving admissibility"[24] of expert witness evidence by the preponderance of the evidence.[25]

"[R]ejection of expert testimony is the exception rather than the rule."[26]  The district court's essential task is "to screen the jury from unreliable nonsense opinions," but not "exclude opinions merely because they are impeachable."[27]  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[28]

### 2.    Breshears' testimony is admissible

Breshears estimated the hours Plaintiffs worked "based on delivery times of parcels associated with each Driver," which Breshears gathered from "electronic delivery-related records produced by [IntelliQuick] from its CXT software system" ("CXT System").[29]  The CXT System is a computer application that tracks "the movement of items, parcels, or packages from the . . . origin of an order, to completion of the delivery and invoicing to the client."[30]  Breshears testified that he used data showing "where the individual first shows up within the defendants' system" and "the last point in time

---

[24]*Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

[25]*Daubert*, 509 U.S. at 592 n.10.

[26]Fed. R. Evid. 702 comment to the 2000 amendments.

[27]*Alaska Rent-A-Car*, 738 F.3d at 969.

[28]*Daubert*, 509 U.S. at 595.

[29]Doc. 438 at 18.  *See also* Breshears' report, doc. 433-2 at 14–15 ¶¶ 25–30.

[30]Doc. 431-2 at 477.

they're interacting with the system" as "bookends" that approximate the hours the driver worked on that particular day.[31]   The data sources and data points Breshears considered in performing this analysis are as follows:

| Data Source | Data Point |
|---|---|
| Settlement data | Delivery time[32] |
| Driver Action Work Logs | Event timestamps[33] |
| Driver On-Demand Manifests | Due times[34] |
| Driver Route Manifests | Stop times[35] |

Generally speaking, for each of these data sources Breshears calculated the number of hours between the minimum and maximum data point for each day,[36] then calculated the "implied number of hours worked" as the result that yielded the greatest number of hours among all data sources.[37]

---

[31]Doc. 457-2 at 36–37.  *See also* Breshears' testimony at doc. 457-2 at 79 ("[M]y analysis is based on the delivery-related settlement data, the packaged [sic] delivery information.  Whatever times were shown in that data, showing interactions with the system, would represent the first—the start of that person's day and the end of that person's day.").

[32]Doc. 433-2 at 12 ¶ 14.

[33]*Id.* at 13 ¶ 17.

[34]*Id.* ¶ 19.

[35]*Id.* at 14 ¶ 21.

[36]*Id.* at 13–14 ¶¶ 17, 19, and 21.

[37]*Id.* at 14 ¶ 25.  Plaintiffs state that "for those weeks where no CXT data was available or was not sufficiently reliable," Breshears used assumed hours "based on the historical CXT data and weekly rates of pay for the same or similarly situated Drivers by looking at the Driver's prior work history where available and, where not available, looking at similar Driver type (i.e. Freight, Route and On-Demand." Doc. 454 at 11.  *See also* Breshears' deposition transcript, doc. 457-2 at 44 ("[A]nything prior to 5:00 a.m. I considered outside of the range of data points to analyze, and anything after 8:00 p.m. I considered outside of the range of data points to analyze."); *id.* at 47 ("I used their actual hours for each day based on the data provided by the

IntelliQuick's motion attacks Breshears' methodology on three grounds.[38]  First, it argues that Breshears' methodology is flawed to the extent Breshears used timestamps indicating that a package was dropped off at IntelliQuick's facility as the times that on-demand drivers began working.[39]  Plaintiffs respond by arguing that it is proper to use such entries as proxies for when the drivers began working "because that is when Drivers would be notified that there was an order."[40]  IntelliQuick does not address Plaintiffs' argument in reply.  The court finds that IntelliQuick has identified a potentially faulty assumption upon which at least part of Breshears' opinion is based.  This does not establish grounds for precluding Breshears' methodology as fundamentally unreliable, however.  Because Breshears' assumption can be adequately challenged through cross-examination and the presentation of contrary evidence, IntelliQuick's motion to preclude this evidence fails.[41]

Second, IntelliQuick argues that Breshears incorrectly treated a package's "due time" as the time that the package was actually delivered by the driver, when in reality that entry does not necessarily correspond with actual driver activity.[42]  Breshears testified at his deposition that he used the due times from the Driver On-Demand

defendant except where the hours for that person were less than 30 minutes.").

[38]See doc. 430 at 2 ("Mr. Breshears' methodology for estimating hours worked by drivers epitomizes the type of unreliable opinions that *Daubert* prohibits.").

[39]Doc. 430 at 6; doc. 463 at 3.  The same criticism is found in Crandall's report. Doc. 430-1 at 8 ¶ 12.

[40]Doc. 454 at 17–18.

[41]*Alaska Rent-A-Car*, 738 F.3d at 969.

[42]Doc. 430 at 7; doc. 463 at 3–4.

Manifests to show a "window of deliveries."[43]  Under this method, if an on-demand

driver had due times between noon and 7 p.m., Breshears credited the driver with

seven hours of work that day, even though he admitted that the "due time" data did not

indicate when any of the packages were actually delivered.[44]  Plaintiffs do not respond

to this challenge specifically.  Instead, they cite various cases where employers have

failed to maintain adequate employment records and courts have accepted imprecise

data from which the fact finder could infer the number of hours worked.[45]

As IntelliQuick argues and Plaintiffs tacitly concede, Breshears' use of "due

times" is an inherently imperfect method of calculating hours worked.  Nonetheless,

given IntelliQuick's failure to maintain precise records showing the drivers' hours and

the Supreme Court's teaching in *Mt. Clemens*, Plaintiffs are not required to recreate

their hours with certainty.  Their proxy evidence must merely support a reasonable

---

[43]Doc. 430-1 at 117.

[44]Doc. 430-1 at 117.

[45]*See Martin v. Selker Bros.*, 949 F.2d 1286, 1298 (3d Cir. 1991) ("Documentary evidence exists as to the gallonage handled by William Koch at the Thirteenth Street station and at each of the other stations, from which an inference of hours worked can be made."); *Bedasie v. Mr. Z Towing, Inc.*, No. 13 CV 5453, 2017 WL 1135727, at *22 (E.D.N.Y. Mar. 24, 2017) ("When accurate records are not available to determine the exact number of hours a plaintiff has worked, courts have inferred how many hours plaintiff worked, on average, in a particular week based on records that are available."); *Longlois v. Stratasys, Inc.*, 88 F. Supp. 3d 1058, 1064 (D. Minn. 2015) ("Stratasys did not keep a precise record of Longlois' hours during the time period relevant to that claim.  It is evident, though, that there does exist a variety of other evidence—contemporaneous scheduling and payroll records, travel receipts, and computer log-in information, for instance—from which Longlois' workdays could be reconstructed."); *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 466 (S.D.N.Y. 2014) ("Had defendants' time records been complete, [the task of tabulating the hours worked] would have been wholly mechanistic. The gaps in the records, however, called upon Dr. Crawford to exercise judgment as to what reliable proxies would be for the missing data (e.g., log-out times). The issue for the Court is whether Dr. Crawford's methodology to fill these lacunae is reliable. It is.").

inference of their hours.  Given this relatively low bar, the court finds that Breshears'

use of due times is supported by ample data, meets the minimum standards of

reliability under Rule 702, and will be of assistance to the jury.  Whatever flaws exist in

using due times as a proxy for hours worked go to the weight, not the admissibility, of

Breshears' testimony.

Finally, IntelliQuick criticizes Breshears' methodology because it falsely assumes

that "drivers continuously worked between the first and last events in the software each

day without taking any breaks."[46]  IntelliQuick argues that this assumption is refuted by

(1) evidence of the actual driving distances between stops,[47] (2) GPS data showing the

duration of stops,[48] and (3) deposition testimony from drivers who admitted to taking

breaks during the day,[49] which Breshears' report does not consider.[50]  To illustrate this

critique IntelliQuick highlights several "gaps" in the timestamps for a particular driver's

deliveries that, according to Crandall, "cannot be reasonably explained by driving time

---

[46]Doc. 430 at 8.  IntelliQuick also criticizes Breshears for failing to account for the fact that drivers rearranged their routes to maximize efficiency.  *Id.* at 9–10 (citing, *e.g.*, the deposition testimony of Heather Arras, doc. 430-1 at 155).  This argument fails because IntelliQuick does not explain why this renders Breshears' methodology unreliable.

[47]At his deposition Breshears testified that the data he analyzed contains delivery addresses but his calculations do not incorporate that information.  Doc. 430-1 at 109 ("No, I have not analyzed the addresses.  That information is in the data, but I have not specifically analyzed the two data points or the origin and destination addresses.").

[48]Crandall states in his report that GPS data from 432 "Driver days when both the delivery data and the GPS sample data were available" show that "the average stop time was 5.98 minutes."  Doc. 433-3 at 26.

[49]*See, e.g., id.* at 153–54 (testifying that she usually took a 30-minute lunch break when she was an on-demand driver).

[50]The court also construes this as a challenge under Rule 702(b).

or other work-related activity."[51]  For example, the driver's first timestamp of the day

occurred at 5 a.m. and the second occurred at 9 a.m.  Although Breshears assumed

that the driver worked continuously during this time, Crandall calculated "the maximum

driving time" between those two stops and concluded that there was a "segment of 1

hour and 24 minutes when the Driver was not driving" and therefore must have been

taking a break.[52]

Plaintiffs offer two responses.  First, they argue that Breshears' assumption that

drivers took no breaks is "consistent with the universal testimony of the . . . Drivers

(including in the depositions that Defendants cite) that" even when they were not driving

"they were not free to do as they wished but that they were working from the time they

received their first call."[53]  Even when the drivers were doing nothing more than waiting

---

[51]Doc. 433-3 at 18–19 ¶ 22, 35.

[52]*Id.* at 19.

[53]Doc. 454 at 15 (citing deposition of David Collinge, doc. 457-2 at 135 (testifying that IntelliQuick told him, "'When you finish a job, then just sit tight, unless we tell you we need you to move to a different area.'  Sometimes they'd say, 'You're here, but I need you to move over here for this other job.'"); deposition of Eliseo Castillo, doc. 457-2 at 112 ("Q. Can you tell me approximately how many times in an average day you would be waiting between assignments?  A. Most of the time the wait time between the two assignments tends to be, like, 30 minutes.  Q. Can you estimate for me about how many wait times there would be in an average day?  A. Oh. During a slow time it's, like, around three times within a day.  Q. What about during a time that wasn't slow?  A. No rest.  Q. So that would be when it was very busy?  A. Yes. Yes.  Q. What about on an average day?  A. On an ordinary day it's, like, probably around twice.  Twice, the break."); deposition of Susan Little, doc. 457-2 at 158 (Q. "Do you understand your duties as an on-demand driver to just do pickups and deliveries as requested throughout the day by dispatch?  . . . .  A. Yes. But I could not move from A to B.  I had to wait at that location."); *id.* at 159 ("Every time I would clear, I would call them up, 'I'm clear.'  And when they get work, they give it to me.  Sometimes I had to wait three hours for the next job, and sometimes I had to wait two minutes. Just varied."); deposition of Yvonne Trevino, doc. 457-2 at 228 ("Q. And when you had to wait . . . in a certain area, did you literally have to stay put in that specific location or could you just be in that general area of vicinity?  A. They wanted you in the general area vicinity because they knew if you needed to go to the bathroom or coffee, they knew you were going to drive to the nearest station or something do that [sic].  Sometimes maybe she would

for more deliveries during those gaps, Plaintiffs argue, that time is compensable

because it was spent "primarily for the benefit" of IntelliQuick.[54]  And second, with

regard to lunch breaks, they assert that the evidence shows that drivers were often too

busy to take a lunch break[55] and, if not, the break was *de minimus*[56] and therefore

compensable.[57]

    IntelliQuick reads the district court's decision in *Adami v. Cardo Windows* as

standing for the broad proposition that "[a]n expert's failure to account for actual

employee travel time renders the expert's calculations 'methodologically unreliable.'"[58]

───────────────────

tell you to stay put because they knew actually another blood work was going to come up right there at that same building.  'Please don't leave the building.'  So dispatch was pretty good about telling you.").

    [54]Doc. 454 at 13, 16 (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait . . . may be treated by the parties as a benefit to the employer.").

    [55]*See* deposition of Brian Kingman, doc. 457-2 at 148 ("[W]hen I first started, I came in at 7:30 and realized there is no way I can finish this huge route, so I started coming in at 7:00. But then it got to the point I was coming in at 6:45 and then not having time for lunch.  So I'd pack a lunch and I'd too often forget it.  My wife would say it was a good way to lose weight."); deposition of Yvonne Trevino, doc. 457-2 at 234 ("You ate your lunches pretty much in between scanning and stacking because there was no lunch hour.  And you really had no time to do it while you're on the road because you're not really able to complete your route because you had a lot.");

    [56]*See* deposition of Eliseo Castillo, doc. 457-2 at 112 (Q. "Can you approximate for me about how long of a lunch you would take on a typical day?  A. Most likely it's going to be short, especially if you're going to have a delivery or pickup.  It's going to be short.  Q. What if you didn't have a delivery or a pickup?  A. Then I eat on a regular.").

    [57]Doc. 454 at 23 n.14 (citing 29 C.F.R. § 785.18 ("Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry.  They promote the efficiency of the employee and are customarily paid for as working time.  They must be counted as hours worked.").

    [58]Doc. 430 at 10 (quoting *Adami v. Cardo Windows, Inc.*, No. CIV.A. 12-2804 JBS, 2015 WL 1471844, at *12 (D.N.J. Mar. 31, 2015)).

This reading is unpersuasive for three reasons.  First, a rigid rule like this would conflict with the context-specific nature of the district court's inquiry into admissibility.  Second, IntelliQuick does not accurately describe *Adami*.  The plaintiffs' expert in *Adami* did far more than fail to account for employee travel time.  He also did not explain how he calculated average hourly rates of pay, did not explain how he arrived at an estimate for overtime hours, did not tailor his calculation to the relevant time frame, did not mention "any documents in the record," made "no effort to reconstruct each work day or week, with all its variability based on job assignments and locations," and relied on the wrong regulation as the basis of his damages calculation.[59]  For all of those reasons, the court precluded the expert's evidence under Rule 702, holding that his calculations were "methodologically unreliable and fail[ed] to fit the data or the requirements for a weekly calculation."[60]  And third, *Adami* is inapposite because the plaintiffs there did not contend that the idle time indicated in the data was legally compensable.

IntelliQuick also relies on *Farmer v. DirectSat USA, LLC*.[61]  There, the plaintiffs' expert relied on GPS data to estimate satellite installation technicians' work hours as "the time between the first and last movement of a technician's van each day."[62]  His calculation assumed that the employees took no breaks, but at his deposition he could

---

[59]*Adami*, 2015 WL 1471844, at *11.

[60]*Id.* at *12.

[61]*Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 1195651 (N.D. Ill. Mar. 22, 2013).

[62]*Id.* at *2.

-14-

not support this assumption with either evidence or a cogent rationale.[63]  The court

therefore held that the expert's "self-serving assumption that the technician was working

[was] not a scientific determination" and precluded the expert's testimony as

unreliable.[64]

The situation presented here differs from *Farmer* because Breshears'

assumption that the drivers did not take uncompensable breaks is neither arbitrary nor

unsupported.  It is supported by Plaintiffs' legal theories regarding the compensability of

idle time and testimony from various drivers.  Of course, IntelliQuick disagrees with

Plaintiffs' legal argument and presents contrary evidence.[65]  But these factual and legal

challenges[66] are not attacks on Breshears' general methodology.  Even if IntelliQuick's

challenges to Breshears' break time assumptions are colorable, they do not go to

admissibility.[67]

---

[63]*Id.* at *7.

[64]*Id.* at *8.

[65]*See* Breshears' deposition, doc. 430-1 at 94 (testifying about GPS data that, according to IntelliQuick, shows that a driver was at a casino for 35 minutes on a day where there was no delivery at that casino).

[66]*See Berry v. Cty. of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994) ("Whether and to what extent employees are able to use on-call time for personal activities" and "[w]hether there was an agreement between the employer and the employees that employees would receive compensation only for actual work conducted while on-call" are questions of fact; "whether the limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered compensable overtime under the FLSA is a question of law.")).

[67]*See Alaska Rent-A-Car*, 738 F.3d at 969.

### 3.      Crandall's testimony is mostly admissible

Crandall's report identifies numerous alleged flaws in Breshears' report. Crandall states that these criticisms are based on his review of the same data that Breshears reviewed "as well as data produced to plaintiffs, but not used by Mr. Breshears in his analysis."[68]  In addition to critiquing Breshears' opinion, Crandall created his own methodology for estimating the drivers' hours "using travel times based on data from Google Maps and an average amount of time spent at each stop based on the GPS data for days in Mr. Breshears' analysis (6 minutes), and finally, an assumption that Drivers spent 30 minutes per day on pick-ups from IntelliQuick facilities."[69]  Using this methodology, Crandall estimated that the drivers worked 30.58 hours per week on average and were paid $17.64 per hour.[70]

### a.      Rule 702(b)

Rule 702(b) requires expert testimony to be "based on sufficient facts or data." The advisory committee's notes state that the rule's emphasis on sufficiency "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."[71]  Instead, the sufficiency inquiry examines "the nature and scope of the opinion offered, the quantity of data both

---

[68]Doc. 433-3 at 11 ¶ 5.

[69]*Id.* at 15 ¶ 14.

[70]*Id.* at 16 ¶ 17.

[71]Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom."[72]

Plaintiffs argue that the data upon which Crandall's report is based is insufficient in two ways. First, Plaintiffs argue Crandall's GPS data is insufficient because it covers only seven of the approximately 900 class members,[73] does not cover the entire class period, and contains significant gaps.[74] IntelliQuick responds by asserting that Crandall only relied on GPS data when forming his opinions on (1) the drivers' "routing decisions" (2) stop durations, and (3) the validity of Breshears' estimates.[75] IntelliQuick also argues that Plaintiffs cannot complain that the data is insufficient because Breshears relied on a sample constituting less than 2% of all possible data in a previous case.[76]

The GPS data upon which Crandall relies is problematic. The sample that Crandall analyzed covers, at most, eight tenths of one percent of the relevant information: It covers only 7 of the 900 total class members (0.8%) or 1,149 total

---

[72]29 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 6268 (2d ed. 2017).

[73]Plaintiffs assert inconsistent estimates of the class size. They initially estimated the class as containing 950 members, but later reduced that amount to 900. Doc. 432 at 7; doc. 433 at 2 ¶ 4; doc. 465 at 13. Due to this inconsistency, the court will use the more conservative estimate.

[74]Breshears states that there were no GPS records for Robert Campagna "between April 10, 2013 and December 30, 2013 or for the calendar year 2014" despite the fact that IntelliQuick issued him regular payments from April 2009 through July 2014. Doc. 433-4 at 15 ¶ G(2).

[75]Doc. 444 at 7.

[76]*Id.* (citing *Villalpando v. Exel Direct Inc.*, No. 12-cv-04137-JCS, 2016 WL 1598663, at *20 (N.D. Cal. Apr. 21, 2016)).

drivers for which delivery data exists (0.6%), and covers only 3,170 driver delivery days

out of the 387,605 "unique Driver days" contained in the delivery data (0.8%).  Crandall

himself acknowledges that this small sample size "may be" an insufficient basis for

class-wide inferences, yet he draws class-wide inferences on a subset of that very data.

He bases his class-wide conclusion that the average stop duration was 6 minutes on a

subset of the GPS data that represents only 0.1% of the universe of available data and

on an estimate made by IntelliQuick's CFO.[77]  The court holds that Crandall's opinion

on average stop duration is not based on sufficient data and, accordingly, that opinion

will be excluded under Rule 702(b).[78]  This decision does not preclude Crandall from

relying on the GPS data entirely, however.  For example, there is no reason to preclude

Crandall's use of the GPS data to challenge Breshears' conclusions.

Second, Plaintiffs argue that Crandall's opinion is based on insufficient data

because he considered only one deposition, Spizzirri's, and ignored the testimony of all

other IntelliQuick managers and all drivers.[79]  The primary consequence of Crandall's

failure to consider these depositions, according to Plaintiffs, is that Crandall's "route

optimization" method—under which drivers reorder their route deliveries to create the

---

[77]Crandall calculates the class-wide average delivery stop time based on two sources: (1) IntelliQuick's CFO told him that the average stop time was between 5 and 7 minutes and (2) he considered 432 driver days where both the delivery data and GPS data were available (0.1% of the total driver days).  Doc. 433-3 at 26 ¶ 37.  To the extent IntelliQuick seeks to offer Crandall's statement about what IntelliQuick's CFO told him to establish that the average stop time was between 5 and 7 minutes, Plaintiffs' hearsay objection is granted.  Fed. R. Evid. 802.

[78]Accordingly, there is no need to reach Plaintiffs' argument that this evidence should be excluded under Rule 702(c).

[79]Doc. 432 at 8, 18 (citing Crandall's list of data and documents that he reviewed, doc. 433-3 at 32–33).

fastest possible route[80]—is divorced from reality.[81]  IntelliQuick does not respond to this specific argument, but it does argue that the evidence shows that drivers employ route optimization.[82]

Although Plaintiffs cite several cases where courts have precluded expert testimony because the experts did not review sufficient facts,[83] their argument is unpersuasive.  As an expert with "significant experience in examining work activity data" in the delivery industry,[84] Crandall is allowed to draw on that experience to inform his testimony in this case, including his opinion that drivers tend to choose the most efficient route possible.  Crandall's failure to review deposition testimony to validate this opinion is a possible weakness in his report.  But because such a review is not inherent to Crandall's methodology, the court declines to rule that his opinion regarding route optimization is based on insufficient facts or data.[85]  Plaintiffs will be able to attack the

---

[80]Doc. 433-3 at 25.

[81]Doc. 432 at 15.

[82]*See* deposition of Brian Kingman, doc. 430-1 at 162 (Q. "And how do you determine what order to put the packages in?  A. Well, other than the requirements of certain items [that] have time limits on them, [I] pretty much do it in a sequence that's the most efficient for time . . . ."); deposition of James Monahan, doc. 430-1 at 170–71 ("Q. You mentioned that you would need to put those items in order; is that correct?  A. It would depend on the number of stops or deliveries within that territory.  You might not always put them in the same order because there would be different ones different days. So you just did it in a manner that made it more efficient.").

[83]*See, e.g., Wurtzel v. Starbucks Coffee Co.*, 257 F. Supp. 2d 520, 526 (E.D.N.Y. 2003) ("Dr. Goldberg acknowledges that had no knowledge as to how the Plaintiff's incident occurred. He never met with the Plaintiff, did not review the Complaint, discovery responses or deposition transcripts.  Not surprisingly, Dr. Goldberg's tests have no relationship to the alleged facts.").

[84]Doc. 433-3 at 9 ¶ 1.

[85]*See United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008) ("[T]he Court does not examine whether the facts obtained by the witness are themselves

-19-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

validity of Crandall's assumptions through cross-examination and the presentation of contrary evidence.

### b.    Rule 702(c)

Rule 702(c) requires expert testimony to be "the product of reliable principles and methods."  To reach his opinion that Plaintiffs worked no overtime, Crandall calculated the average hours they worked per week as 30.58.[86]  This opinion is inadmissible because using average hours over the course of many work weeks is an irrelevant, unreliable method for determining whether overtime is owed under the FLSA.[87]

IntelliQuick correctly notes that a court may find that a plaintiff has met her burden of alleging a plausible overtime violation at the pleading stage by alleging average hours worked,[88] but this holding is of no significance here, as we have moved well past the pleading stage and onto the evidence stage of this litigation.  IntelliQuick

---

reliable—whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion.  Rather, the inquiry examines only whether the witness obtained the amount of data that the methodology itself demands.") (emphasis in original) (doc. 433).

[86]Doc. 433-3 at 27 ¶ 38.  *See also* IntelliQuick's opposition, doc. 444 at 8 ("Mr. Crandall determined the average travel time per day and combined the average travel time with the average stop time multiplied by the average number of stops per day, to determine the average weekly hours worked.").

[87]*See* 29 C.F.R. § 778.104 ("The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks.  Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40.").

[88]*Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 645 (9th Cir. 2014) ("A plaintiff may establish a plausible claim by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility.").

also relies on *Tyson Foods v. Bouaphakeo*.[89]   As IntelliQuick notes, the Supreme Court

in *Tyson* allowed the trial court to rely on the average the amount of time employees

spent donning and doffing equipment when calculating overtime liability.[90]   But the

Court did not hold, as IntelliQuick implies, that an average amount of hours over *several*

*work weeks* can be used to determine whether a defendant is liable for overtime pay for

any particular week.   Instead, the *Tyson* court countenanced using an average to

calculate the duration of a specific daily task that was then applied on a week-by-week

basis to determine overtime liability.[91]   Crandall is precluded from using averages of

hours worked over multiple weeks to estimate IntelliQuick's overtime liability.

### c.   Speculation and hearsay

An expert's testimony must be based on "more than subjective belief or

unsupported speculation."[92]   Plaintiffs object to the following statements from Crandall's

report on speculation grounds:

- At paragraphs 14 and 41 of his report Crandall references the fact that

    some drivers "sub-contracted out some deliveries to other" drivers.[93]

    Crandall explains that he "was informed that the delivery data may include

---

[89]136 S. Ct. 1036, 1043–45 (2016).

[90]*Id.* at 1047.

[91]*Id.* (allowing courts to rely on representative proof to "fill in an evidentiary gap created by the employer's failure to keep adequate records" but noting that this does not absolve "the employees from proving individual injury").

[92]*Daubert*, 509 U.S. at 590.   *See also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) ("[S]peculative testimony is inherently unreliable.").

[93]Doc. 433-3 at 15 ¶ 14, 28 ¶ 41.

-21-

contractors who employed additional drivers"[94] but does not identify the

individual who informed him of this fact or any supporting evidence.

IntelliQuick responds by pointing to the deposition transcript of driver

Heather Arras, where she states that when she was injured in a car

accident her brother helped her make deliveries without being paid.[95]

Even if this testimony established that Ms. Arras employed another driver

(it does not), Crandall did not rely on this testimony.  Plaintiffs' speculation

objection is granted;[96] Crandall is precluded from offering his opinion that

some drivers employed other drivers.

• At paragraph seven of his report Crandall states that the data "indicates

that some Drivers are less diligent in their scanning: they may not scan

each parcel at the actual pickup or delivery time, but rather, will process

the scans later in bulk."[97]  Plaintiffs object to this statement on speculation

and hearsay grounds.  These objections are overruled.  Contrary to

Plaintiffs' argument, Crandall based these statements on his review of the

data, not hearsay or speculation.

• Also at paragraph seven of his report, Crandall states that "routed

deliveries often arrive at IntelliQuick's facility in bulk, in which case a

---

[94]*Id.* at 28 n.15.

[95]Doc. 444-1 at 3.

[96]In addition, IntelliQuick may not offer Crandall's statement that he "was informed that the delivery data may include contractors who employed additional drivers" as proof of the matter asserted because that is hearsay.  Fed. R. Evid. 801.

[97]Doc. 433-3 at 12.

-22-

single 'drop off' time is recorded."[98]  Plaintiffs argue that this statement is

unsupported speculation and/or hearsay; IntelliQuick appears to argue

that this assertion is supported by the data Crandall reviewed.[99]  Based on

the record currently before the court, the court cannot determine

Crandall's basis for this statement.  For that reason, Plaintiffs' objection is

denied without prejudice.

• At various points Crandall opines that (1) it is "very unlikely" that certain

IntelliQuick records represent actual work time;[100] (2) some "amount[s] of

time cannot be reasonably explained;"[101] (3) drivers "may not have worked

overtime;"[102] (4) "[t]he fundamental problem with Mr. Breshears' approach

is that it does not consider that the Driver pay structure includes expense

reimbursements;"[103] (5) even if IntelliQuick had paid its drivers as

employees, its chargebacks would not have affected the drivers' net pay

because those losses would be absorbed by IntelliQuick directly, leading

to reduced driver pay;[104] (6) "GPS data provides insight regarding Drivers'

routing decisions and the work and non-work related stops they make

---

[98]*Id.*

[99]Doc. 444 at 11.

[100]Doc. 433-3 at 20.

[101]*Id.* at 19.

[102]*Id.* at 21.

[103]*Id.* at 22.

[104]*Id.*

throughout the day;"[105] and (7) "[t]o the extent that certain Drivers did work overtime on some work weeks, individualized inquiry would be necessary to identify the reasons for the longer than average work hours and to investigate whether the Driver was compensated fairly for that work week relative to some benchmark."[106]  Plaintiffs attack each of these statements on speculation and hearsay grounds.  These objections are overruled without prejudice because the basis for these statements appears to be Crandall's specialized knowledge as an expert, not speculation or hearsay.

### d.    Legal conclusions

Although an expert's opinion is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact,"[107] the expert "cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."[108]  "[I]nstructing the jury as to the applicable law is the distinct and exclusive province of the court."[109] Plaintiffs object to the following two statements from Crandall's report that allegedly run afoul of this rule:

•        "Given that plaintiffs cannot rely upon averages for overtime and minimum wage liability purposes, the case now devolves into inherently

---

[105]*Id.* at 12.

[106]*Id.* at 27.

[107]Fed. R. Evid. 704(a).

[108]*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).

[109]*Id.*

individualized assessments, which may require conducting additional

individualized inquiry to make reliable liability and damages

determinations."[110]

This objection is overruled.  Earlier in that paragraph Crandall states his opinion

that "the average hours per week produced by [his] quantity of work model were 30.58,

which is well below the overtime threshold."[111]  Crandall is stating an opinion that

plaintiffs cannot rely upon averages to establish liability as a matter of fact, not of law.

In any event, given the court's ruling that Crandall is precluded from using multiple-

week averages to establish IntelliQuick's overtime liability this objection is likely moot.

- "[P]laintiffs allege that Drivers had expenses unlawfully deducted from

    earnings.  However, liability on those claims hinge on whether the

    expense reimbursements were built into the rates that Drivers were paid

    for deliveries.  If that is the case, then there are no claims for

    unreimbursed business expenses."[112]

In this example, Crandall goes beyond stating a factual opinion (the pay structure

includes expense reimbursements) and expresses an opinion on a question of law (if

the pay structure includes expense reimbursements, then IntelliQuick is not liable for

making deductions).  Plaintiffs' objection is granted.

---

[110]Doc. 433-3 at 16 ¶ 17.

[111]*Id.*

[112]*Id.* at 13–14 ¶ 10.  *See also id.* at 22 ¶ 28 ("The fundamental problem with
Mr. Breshears' approach is that it does not consider that the Driver pay structure includes
expense reimbursements.").

**B.     Summary Judgment**

Before the court are cross-motions for partial summary judgment.  IntelliQuick's

motion for partial summary judgment is directed at the remaining individual defendants:

Felicia Tavison ("Tavison"), Steven Anastase ("Anastase"), Jeffrey Lieber ("Lieber"),

and Keith Spizzirri ("Spizzirri") (collectively, "the individual defendants").  These

individual defendants argue that they are entitled to summary judgment on Plaintiffs'

FLSA claims against them because they do not meet the definition of "employers"

under the Act.  For their part, Plaintiffs' motion for partial summary judgment is directed

at Counts I, II, and IV of the complaint.

**1.      Standard of review**

Summary judgment is appropriate where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."[113]  The

materiality requirement ensures that "only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment."[114]  Ultimately, "summary judgment will not lie if the . . . evidence is such that

a reasonable jury could return a verdict for the nonmoving party."[115]  However, summary

judgment is appropriate "against a party who fails to make a showing sufficient to

---

[113]Fed. R. Civ. P. 56(a).

[114]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[115]*Id.*

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[116]

    The moving party has the burden of showing that there is no genuine dispute as to any material fact.[117]  Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[118]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[119]  All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[120]  However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[121]

### 2.   Whether the individual defendants are employers

The FLSA provides that "[a]ny employer who violates " the Act's wage and hour protections "shall be liable to the employee or employees affected in the amount of their

---

[116]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[117]*Id.* at 323.

[118]*Id.* at 323–25.

[119]*Anderson*, 477 U.S. at 248–49.

[120]*Id.* at 255.

[121]*Id.* at 248–49.

unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."[122]  The term "employer" is defined broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee."[123]  Courts must give this definition of "employer" "'an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'"[124]

Courts apply the "economic reality" test to determine whether an individual is an employer under the FLSA.[125]  "[T]he overarching concern" of this test "is whether the alleged employer possessed the power to control the workers in question."[126]  Looking at "'the circumstances of the whole activity,'" not any one factor, courts must determine whether the individual exercises sufficient "'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship,"[127] that they can be said to have a "personal responsibility for statutory compliance."[128]  Factors indicating this level of control include whether the alleged employer "(1) had the power

---

[122]29 U.S.C. § 216(b).

[123]29 U.S.C. § 203(d).

[124]*Boucher v. Shaw*, 572 F.3d 1087, 1090 (9th Cir. 2009) (quoting *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir.1999) (en banc).  *See also Falk v. Brennan*, 414 U.S. 190, 195 (1973) ("In view of the expansiveness of the Act's definition of 'employer' and the extent of D & F's managerial responsibilities at each of the buildings, which gave it substantial control of the terms and conditions of the work of these employees, we hold that D & F is, under the statutory definition, an 'employer' of the maintenance workers.").

[125]*Boucher*, 572 F.3d at 1091.

[126]*Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999).

[127]*Boucher*, 572 F.3d at 1091 (quoting *Lambert*, 180 F.3d at 1012).

[128]*Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (5th Cir. 2007) (cited with approval in *Boucher*, 572 F.3d at 1091).

to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."[129]

Plaintiffs bear the burden of proving that the individual defendants were employers under FLSA.[130]  The determination of employer status presents a mixed question of fact and law where the ultimate question whether an individual is an employer for FLSA purposes is a question of law to be determined by the court.[131]

### a.    Felicia Tavison

### (1)    Power to hire and fire

Tavison was IntelliQuick's Phoenix Operations Manager.  Plaintiffs support their contention that Tavison had the power to hire with the deposition testimony of Jason Ortiz ("Ortiz"), an IntelliQuick operations manager, who stated that "Tom Allen or Ms. Tavison were the ones that made the decisions on . . . who is going to [be selected to drive certain freight delivery routes], you know—I would say, Hey, I have a route. This guy is leaving, or here's a route that's coming available, I need a body.  I need a

---

[129]*Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (disapproved of on other grounds by *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 539 (1985)).

[130]*Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) ("Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act.").

[131] *Bonnette*, 704 F.2d at 1469 ("Although the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts—whether [an individual is an employer] within the meaning of the FLSA—is a question of law.").

1
2
3
4

contractor that can do it."[132]   IntelliQuick does not respond to this evidence.[133]  Although Ortiz's testimony is muddled, when viewed in the light most favorable to Plaintiffs it would support a reasonable finding that Tavison had the power to hire drivers.

5
6
7
8
9
10
11

Plaintiffs support their contention that Tavison had the power to fire with Tavison's own deposition testimony concerning an email she sent in which she told someone to inform a route driver that the driver was being terminated from her route with a particular client.[134]  IntelliQuick concedes that this testimony shows that Tavison "made the determination . . . to discontinue the contract of the subject driver."[135]  This testimony would support a reasonable finding that Tavison had the power to fire drivers.

### (2)     Supervision and control over work schedules or conditions of employment

12
13

14
15
16
17
18
19
20
21

Tavison testified that when she became the Operations Manager in Phoenix she "pretty much" supervised "all of the employees underneath the route and freight distribution, as well as . . . overseeing the customer service and dispatch."[136] IntelliQuick argues that Tavison was not talking about drivers because she understood drivers "to be independent contractors, not employees."[137]  This argument is belied by the record, which shows that Tavison supervised various aspects of the drivers'

22

[132]Doc. 457-2 at 194–95.

23

[133]Doc. 464 at 8–9.

24

[134]Doc. 429-1 at 32–33.

25
26

[135]Doc. 464 at 9.  Contrary to IntelliQuick's argument, the fact that two other managers were copied on Tavison's email announcing the termination is of no significance.

27

[136]Doc. 429-1 at 13.

28

[137]Doc. 464 at 6.

conditions of employment.  For instance, she selected "the best and brightest drivers"

for a certain assignment,[138] sent out "training alerts" to drivers,[139] and ordered drivers to

wear proper uniforms.[140]  This would support a reasonable finding that Tavison

exercised control over the drivers' conditions of employment.

### (3)    Rate and method of payment

As evidence of Tavison's control over drivers' rate and method of payment,

Plaintiffs point to Tavison's testimony that she was given the power to decide whether a

certain driver would be paid for the time he spent training a new driver.[141]  They also

assert that Tavison had discretion to issue "chargebacks," which are deductions from

drivers' pay based on "service failures," but the evidence upon which they rely shows

that Tavison merely had authority to flag the service failure and the ultimate decision

regarding whether to issue a chargeback was left to the manager of the driver's

department.[142]  Tavison also testified that she did not establish the drivers' pay rates.[143]

In sum, although the evidence shows that Tavison was given discretion to

determine whether to pay a driver in one instance, Plaintiffs' evidence on the whole is

---

[138]Doc. 429-1 at 34.

[139]Doc. 457-2 at 212.

[140]Doc. 429-1 at 30.

[141]*Id.* at 34.

[142]Doc. 429-1 at 45.  *See also* Ortiz's testimony, doc. 457-2 at 209 ("A. A lot of times I was told to charge back, but if I didn't feel comfortable doing it, then I wouldn't do it.  Q. Who would tell you to issue a chargeback on those occasions when you were told?  A. Sometimes Ms. Tavison or Mr. Lieber, or in other times, Mr. Spizzirri.").

[143]Doc. 429-1 at 11.

insufficient to support a reasonable finding that Tavison had the power to control the drivers' rate and method of payment.

### (4)    Employment records

Plaintiffs admit that the individual defendants "did not maintain formal employment records."[144]  They argue that this fact is of no consequence, however, because IntelliQuick did not keep any formal employment records at all.[145]  IntelliQuick does not deny that it does not keep any formal employment records, nor does it respond to the substance of Plaintiffs' argument.  The court agrees with Plaintiffs that, given that IntelliQuick does not keep any formal employment records, this factor is neutral with regard to each individual defendant.

### (5)    Conclusion

The above evidence could support a reasonable finding that Tavison had the power to hire, fire, and supervise IntelliQuick's delivery drivers.  Plaintiffs argue that such findings would establish that Tavison was an "employer" under the FLSA.  The court disagrees.

In *Boucher v. Shaw*, the Ninth Circuit held that managers can be "employers" under the FLSA in certain circumstances.[146]  *Boucher* involved a FLSA action against three managers: (1) the company's Chairman and Chief Executive Officer; (2) the

---

[144]Doc. 455 at 23.

[145]*Id.* (citing *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 36 (E.D.N.Y. 2015) ("The fact that Individual Defendants did not keep employment records does not undermine this finding because no employment records were kept; thus, the economic reality is that all employer tasks that were handled by the Individual Defendants.").

[146]572 F.3d at 1090–91.

company's Chief Financial Officer; and (3) a manager "responsible for handling labor and employment matters."[147]  These managers could not be held liable for state-law wage and hour violations because, under the common law, agents for disclosed principals are not parties to the principals' employment contracts.[148]  Yet, the Ninth Circuit held that the reach of the FLSA is more expansive and subjects managers to liability where they exercise "'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship."[149]  But, this does not mean that FLSA liability attaches to "just any employee with some supervisory control over other employees."[150]  In *Chao*, a case *Boucher* cites with approval, the First Circuit explained that the type of control necessary to trigger FLSA liability relates to control over the company's statutory compliance.[151]  Whether this is manifested in the manager's control over the employees' work relationships or in the manager's "control over the purse strings,"[152] the focus of the court's inquiry is whether the manager's exercise of that control was "instrumental in 'causing' the corporation to violate the FLSA."[153]

---

[147]*Id.* at 1089.

[148]*Id.* at 1090.

[149]*Id.* at 1091 (quoting *Lambert*, 180 F.3d at 1012).

[150]*Chao*, 493 F.3d at 34.

[151]*Id.*

[152]*Bonnette*, 704 F.2d at 1470.

[153]*Chao*, 493 F.3d at 34.  *See also Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) ("[T]he FLSA's definition of employer is 'sufficiently broad to encompass an individual who, though lacking a possessory interest in the "employer" corporation, effectively

On the whole, Plaintiffs' evidence is insufficient to establish that Tavison was responsible for IntelliQuick's alleged wage and hour violations.  As a supervisor, she exercised certain control over the drivers.  But, Plaintiffs have not shown that she controlled critical aspects of the drivers' employment relationships with IntelliQuick, such as the number of hours they worked or the rate and method of payment.  Plaintiffs have not shown that Tavison was the drivers' employer as a matter of "economic reality."

### b.    Steven Anastase

Anastase worked as IntelliQuick's Regional Operations Manager.  According to his job description, his job responsibilities included "direct[ing] the operational functions of IntelliQuick Delivery;" "deveop[ing] required organization and continuity of manpower;" "recruit[ing], select[ing], train[ing], schedul[ing], develop[ing], motivat[ing], and review[ing] all related employees;" "[r]ecommend[ing] pricing changes based on analysis of competitive activity, market conditions and profitability;" and "[c]onvert[ing] all flat rate [drivers] to a commission-based incentive."[154]

### (1)    Power to hire and fire

Plaintiffs submit a March 1, 2012 email that Anastase sent to Lieber in which Anastase states that a certain driver was "no longer employed" and that Anastase "told

---

dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees.'") (quoting *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194–95 (5th Cir. 1983)).

[154]Doc. 457-3 at 43–45.

him he would be paid through the end" of the week.[155]  They also submit deposition

testimony showing that Anastase and Lieber met with plaintiff David Collinge

("Collinge") to inform him that his route had been terminated and Anastase offered him

alternative work.[156]  Although IntelliQuick argues that this evidence does not

demonstrate that Anastase had the power to hire and fire because Collinge "continued

working after the meeting,"[157] it would be reasonable to find otherwise.

### (2) Supervision and control over work schedules or conditions of employment

Anastase testified that he did not supervise drivers directly but instead he

supervised other employees who supervised drivers.[158]  This supervisory power

included the power to control driver work schedules.  For instance, in an email sent to

Spizzirri, Anastase states, "We are pressing after our managers meeting on

Wednesday night to get the PM routes out earlier.  Everyone on board with target

depart of 1300.  I will be happy with 1315 consistently."[159]  Anastase, through the

managers he supervised, also dictated conditions of the drivers' employment, including

the procedures that drivers must follow when certain deliveries cannot be completed,[160]

---

[155]Doc. 475-4 at 76.

[156]Doc. 429-1 at 299; doc. 457-2 at 137.  *See also* 457-3 at 21.

[157]Doc. 464 at 7.

[158]Doc. 429-1 at 201.

[159]Doc. 459 at 8.

[160]Doc. 459-4 at 31.

the drug screening procedures drivers must follow after being involved in an accident,[161] and the training drivers must undergo after committing errors.[162]  This evidence, as well as Anastase's job description, could support a reasonable finding that Anastase controlled the drivers' work schedules and conditions of employment.

It should be noted that Plaintiffs also argue that Anastase controlled the drivers' employment through the contracts he negotiated with IntelliQuick customers.[163]  As IntelliQuick correctly observes, however, Plaintiffs' evidence shows that Spizzirri exercised control over these contracts.[164]

### (3)    Rate and method of payment

In arguing that Anastase controlled the drivers' rate and method of payment, Plaintiffs rely primarily on Anastase's job description document discussed above, which states that his job duties include "[c]onvert[ing] all flat rate [drivers] to a commission-based incentive" and reviewing driver "settlement process to ensure accuracy of paid settlements."[165]  But Plaintiffs lack evidence showing that Anastase actually exercised any control over the drivers' rate and method of payment.  Anastase testified that the project to institute a commission-based pay system "never took off the

---

[161]*Id.* at 36.

[162]Doc. 429-1 at 226.

[163]*See* Doc. 456 at 26–28 ¶¶ 54, 57, and 58.

[164]*See* doc. 459-4 at 26 (Spizzirri stating in response to Anastase's email, "I will review the details," "[n]ice prep work," and "I will set pricing on this"); *id.* at 33 (Anastase stating to Spizzirri, "I will forward the recommended change items for your review.").

[165]Doc. 457-3 at 43–45.

ground."[166]  The only other evidence Plaintiffs cite is an email Anastase sent Spizzirri in which he states that he had been "thinking about per unit settlement on the routes."[167] This is not an example of Anastase making a decision "about how to compensate drivers,"[168] as Plaintiffs suggest.  Based on Plaintiffs' evidence, no reasonable fact-finder could conclude that Anastase had the power to control the drivers' wages or method of payment.

### (4)    Conclusion

Plaintiffs' evidence is insufficient to establish that Anastase was responsible for IntelliQuick's alleged wage and hour violations.  The evidence put forth by Plaintiffs shows that Anastase exercised indirect control over the drivers' work schedules and conditions of employment and had the power to hire and fire drivers.  Nonetheless, Plaintiffs have not shown that Anastase exercised control over the "nature and structure of the employment relationship."[169]

---

[166]Doc. 429-1 at 207.  Given that the project appeared in a Anastase's job description it was not likely his idea to begin with.

[167]Doc. 459-4 at 29.

[168]Doc. 456 at 25 ¶ 53.

[169]*Boucher*, 572 F.3d at 1091.

### c.   Jeffrey Lieber

#### (1)   Power to hire and fire

Lieber was IntelliQuick's Executive Vice President.  Plaintiffs submit ample evidence that he exercised the power to hire and fire drivers.[170]  IntelliQuick does not specifically dispute that Lieber had this power.

#### (2)   Supervision and control over work schedules or conditions of employment

Lieber negotiated and executed contracts with IntelliQuick customers that dictated the terms under which the drivers worked.[171]  Some of these contracts contained delivery times[172] and provided that deliveries could occur on the weekends or on holidays.[173]  Others dictated the protocols that drivers would follow when performing delivery services under the contract.[174]  This evidence would support a reasonable conclusion that Lieber controlled drivers' work schedules and conditions of employment.

#### (3)   Rate and method of payment

Lieber testified that he had "a review and approval function" with regard to driver pay.[175]  And Ortiz and Tavison testified that Lieber had authority to set the drivers' rate

---

[170]*See* doc. 429-1 at 31, 301; doc. 457-2 at 100; doc. 457-3 at 12, 39, 72, 80.

[171]*See* doc. 429-1 at 258; doc. 457-2 at 218; doc. 459-2 at 2–8; 459-3 at 5–8, 12, 19–20, 29; doc. 459-4 at 18–24.

[172]Doc. 459-2 at 3.

[173]*See id.* at 4.

[174]*See* doc. 459-4 at 22–23.

[175]Doc. 429-1 at 256.

of pay.[176]   Further, Lieber had the power to order deductions withheld from drivers' pay for service failures.[177]   IntelliQuick responds by arguing that Plaintiffs' evidence is insufficient because, at best, it shows that Lieber was but one individual with power to control driver pay.[178]   This argument is unavailing because absolute control is not required to confer employer status on an individual.[179]   Based on the record before the court, the question whether Lieber exercised control over the rate and method of driver pay presents a genuine dispute as to material fact.

### (4)   Conclusion

In sum, Plaintiffs have presented sufficient evidence from which it may be reasonably determined that Lieber exercised significant control over the drivers' employment relationship.  Lieber's power to hire and fire is not in dispute.  Should the court also find that Lieber controlled the drivers' work schedules or conditions of employment and their rate of pay, the court will likely hold that Lieber is an employer for purposes of the FLSA.

---

[176]Doc. 429-1 at 51; doc. 457-2 at 196, 214.

[177]*See* doc. 457-3 at 32.

[178]Doc. 429 at 7 ¶ 45 ("[M]ore than just a single person was involved in ensuring that routes were paid at rates that would stay in-line with the revenue related to those routes.").

[179]*Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999) (holding that employer status does not depend on "any sort of absolute control of one's employees.  Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA . . . .").

1

### d. Keith Spizzirri

Spizzirri is IntelliQuick's owner, Chief Executive Officer, President, and sole Director.[180]

### (1) Power to hire and fire

IntelliQuick does not seriously dispute that Spizzirri has the power to hire and fire drivers. Indeed, the undisputed evidence shows Spizzirri exercising that power.[181]

### (2) Supervision and control over work schedules or conditions of employment

Spizzirri negotiated and executed contracts with IntelliQuick customers that dictated the terms under which the drivers worked.[182] Plaintiffs have submitted evidence showing Spizzirri also controlled the drivers' conditions of employment indirectly by ordering his managers to deduct money from drivers' pay for taking leave on short notice;[183] to tell a driver to leave the scene of an accident she witnessed before

---

[180]Doc. 321 at 2 ¶ 1.

[181]*See* doc. 457-3 at 9 (Spizzirri telling Cocchia, "If that driver is a mope and cant [sic] hustle replace him[.]"); *id.* at 53 (Spizzirri ordering Anastase to "get rid of the smokers"); *id.* at 55 (After ordering driver discipline, Spizzirri stating, "[N]ext time his or her contract will be [terminated]."); *id.* at 74 (Spizzirri ordering a driver "to be term[inated] immediately."); doc. 457-4 at 3 (In response to a complaint about a driver, Spizzirri stating, "[O]ne more complaint and good bye it is[.]").

[182]*See* doc. 459 at 14–21 (requiring IntelliQuick drivers to comply with customer's procedures manual, comply with customer's committed delivery times, wear IntelliQuick uniforms, follow certain delivery protocols, submit to drug testing); doc. 459-2 at 10–11 (similar contract); doc. 459-3 at 2–3 (similar contract); *id.* at 15–17 (similar contract); *id.* at 22–25 (similar contract); doc. 459-4 at 8–10 (similar contract); *id.* at 12–13 (similar contract).

[183]Doc. 431-3 at 2–4.

the police arrived;[184] to instruct drivers to carry adequate dry ice;[185] to instruct a driver to improve her grooming;[186] to "clean up" certain drivers and require them to tuck in their shirts;[187] and to "make some moves with routes to make an economic impact and send a [s]olid message" that the drivers are not secure and this lawsuit will not protect them.[188]   Spizzirri also exercised this power directly, such as when he confronted a driver about his vehicle's dirty windows;[189] called driver meetings that he expected all of IntelliQuick's drivers to attend;[190] and sent an email to all drivers with various instructions.[191]

IntelliQuick characterizes Plaintiffs' evidence as insufficient, arguing that it merely shows that "Spizzirri would check in from time to time on day-to-day operations" but such check-ins were "not under his normal purview."[192]   This argument fails for two reasons.   First, the court disagrees with IntelliQuick's characterization of the evidence, which actually shows that Spizzirri was extensively involved with the conditions of the drivers' employment.   Second, even if Spizzirri only occasionally controlled the drivers,

---

[184]Doc. 457-3 at 70.

[185]Doc. 429-1 at 310, 343.

[186]Doc. 457-4 at 3.

[187]Doc. 457-3 at 53.

[188]*Id.* at 24.

[189]Doc. 457-3 at 88.

[190]*Id.* at 37.   *See also* doc. 429-1 at 342; doc. 457-2 at 164.

[191]Doc. 457-3 at 7.

[192]Doc. 464 at 6.

that fact would not allow him to evade FLSA liability.  Control may be "exercised only occasionally . . . without removing the employment relationship from the protections of the FLSA."[193]

IntelliQuick also notes that "Spizzirri was rarely in the warehouse where Plaintiffs performed their work" and on that basis argues that Spizzirri's role with IntelliQuick is akin to the role played by the owner's wife in *Mariche v. Phoenix Oil*., who allegedly supervised the plaintiff "on occasion."[194]  In *Mariche*, however, the plaintiff admitted in his deposition that the owner's wife neither supervised him nor determined his compensation.[195]  The evidence also showed that she "was rarely present at the store and was only paid a small annual sum for part-time auditing work and other minimal tasks."[196]  This level of control is obviously different than Spizzirri's level of control over the drivers at IntelliQuick.

IntelliQuick relies heavily on two other factually inapposite cases.  One is *Gray v. Powers*.[197]  The defendant there, Mr. Powers, co-owned a lounge in Houston, Texas, with four other individuals.[198]  The evidence showed that "Powers only visited the club on five or six occasions during the seventeen months the club was open for business"

---

[193]*Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999).

[194]*Id.* (citing *Mariche v. Phoenix Oil, LLC*, No. 2:13-cv-00550, 2014 WL 2467964, at *7 (D. Ariz. June 3, 2014)).

[195]*Mariche*, 2014 WL 2467964 at *7.

[196]*Id.*

[197]*Gray v. Powers*, 673 F.3d 352 (5th Cir. 2012).

[198]*Id.* at 353.

and during those rare visits "the bartenders would tell him how much they made in tips."[199]  The plaintiff "admitted in a deposition that Powers was not involved in the club's day-to-day operations" and the plaintiff could not remember any occasion when Powers directed his work other than when he (1) once told the plaintiff "he was doing a 'great job'" and (2) twice asked the plaintiff "to serve specific people while Powers was a patron at the club."[200]  In pertinent part, the plaintiff's only evidence of Powers' power to hire and fire employees showed "the collective power" that all of the co-owners "exercised to hire and fire general managers."[201]  The Fifth Circuit ruled that the plaintiff's evidence did not raise a question of material fact with regard to Powers' power to hire and fire employees because "Powers's participation in a joint decision with co-owners of [the club] proves nothing about whether Powers had the authority individually to control employment terms of lower-level employees."[202]  *Gray* is easily differentiated from this case because Spizzirri sits alone atop IntelliQuick's corporate hierarchy and does in fact exercise control over his workers.[203]

---

[199]*Id.*

[200]*Id.* at 354.

[201]*Id.* at 355.

[202]*Id.*

[203]IntelliQuick's reliance on *Branum v. Richardson* is misplaced for the same reason. No. 3:10-cv-852, 2014 WL 795080, at *3 (S.D. Miss. Feb. 27, 2014) (plaintiff failed to produce any evidence showing individual defendants' "participation in personnel matters such as hiring, firing, management of work schedules, control of rate and method of payment, and maintenance of employee records.").

The other case upon which IntelliQuick unpersuasively relies is *Solis v. Velocity Express.*[204]   There, the evidence showed that although the individual defendants possessed theoretical control over employment decisions, they never actually exercised that control.[205]   The same cannot be said about Spizzirri.

### (3)   Rate and method of payment

IntelliQuick has previously admitted in this litigation that Spizzirri sets "[d]river rates and pay."[206]   Ample evidence in the record currently before the court supports this admission.[207]   IntelliQuick does not address this admission.   Instead, it attempts to downplay its significance by arguing that Spizzirri's subordinates were in charge of "day-to-day driver compensation decisions," not Spizzirri himself.[208]   This argument is unavailing because, even if Spizzirri only exercised his power to control driver pay occasionally, or indirectly, that would not "diminish the significance of its existence."[209]

---

[204]No. CV 09-864-MO, 2010 WL 2990293 (D. Or. July 26, 2010).

[205]*Id.* at *7.

[206]*See* doc. 305 at 19 ¶ 129; doc. 321 at 19 ¶ 129.

[207]*See, e.g.,* Tavison deposition, doc. 429-1 at 11 (Q. "During the time that you were branch manager in Tucson, do you know how rates were established to pay route drivers or on-demand drivers for deliveries that they made out of the Tucson location?  A. Yes.  Q. How were those rates established?  A. By Keith Spizzirri."); Ortiz deposition, doc. 457-2 at 196 (stating that driver rates were set by Lieber or Spizzirri); doc. 457-3 at 9 (Spizzirri stating that a certain driver's pay was too high).

[208]Doc. 464 at 11–12.

[209]*Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982).  *See also Herman*, 172 F.3d at 140 ("Portnoy contends that . . . only evidence indicating his direct control over the guards should be considered.  Such a contention ignores the relevance of the totality of the circumstances in determining Portnoy's operational control of RSR's employment of the guards.").

-44-

1

**(4)     Conclusion**

2

3

On the whole, the above evidence establishes that, as the owner, CEO,

4

President, and sole Director of IntelliQuick, Spizzirri had complete economic power over

5

the drivers' employment relationship and ultimate control over the nature and structure

6

of that relationship.  "[U]nder the FLSA's liberal definition of 'employer,'"[210] Spizzirri is an

7

employer of the drivers who work for him as a matter of economic reality.

8

**3.     Whether Plaintiffs are entitled to summary judgment on their FLSA claim (Count I)**

9

10

An FLSA claim has three elements: (1) the plaintiff was employed by the

11

defendant during the relevant period; (2) the plaintiff was a covered employee; and

12

(3) the defendant failed to pay the plaintiff minimum wage and/or overtime pay (or failed

13

to keep payroll records in accordance with the Act).[211]  Plaintiffs argue that summary

14

judgment should be granted in their favor because there is no genuine dispute as to

15

any of these elements.  In response, IntelliQuick argues that the parties' legitimate

16

dispute regarding the hours Plaintiffs worked defeats Plaintiffs' motion.  The court

17

agrees.

18

19

Through Breshears' testimony, Plaintiffs have presented evidence that tends to

20

show that they have been improperly compensated for their work and tends to show, as

21

a matter of "just and reasonable inference," the amount and extent of that work.[212]

22

23

24

_____

25

[210]*Bonnette*, 704 F.2d at 1470.

26

[211]*Quinonez v. Reliable Auto Glass, LLC*, No. CV-12-000452-PHX-GMS, 2012 WL
2848426, at *1–2 (D. Ariz. July 11, 2012).

27

[212]*Mt. Clemens*, 328 U.S. at 687.

28

Thus, the burden shifts to IntelliQuick to come forward with evidence that establishes

either "the precise amount of work performed" or the unreasonableness of the inference

to be drawn from Breshears' testimony.[213]  IntelliQuick attempts to accomplish the latter

task with Crandall's testimony.  Because reasonable minds may differ as to the

reasonableness of the inferences to be drawn from Breshears' testimony, summary

judgment does not lie.[214]

### 4.    Whether Plaintiffs are entitled to summary judgment regarding a third year of liability and liquidated damages under their FLSA claim

If a defendant's FLSA violations are willful, it will be liable for those violations in

"the preceding three years rather than just the preceding two years."[215]  "To prove a

particular FLSA violation willful under § 255, the Supreme Court has, in general,

required evidence of an employer's 'kn[owing] or [ ] reckless disregard for the matter of

whether its conduct was prohibited by the statute.'"[216] The reckless disregard standard

is met where the "employer disregarded the very 'possibility' that it was violating the

---

[213]*Id.* at 687–88.

[214]*See Tyson Foods*, 136 S. Ct. at 1049 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.  Reasonable minds may differ as to whether the average time Mericle calculated is probative as to the time actually worked by each employee.  Resolving that question, however, is the near-exclusive province of the jury.").  In light of this ruling, the court need not reach IntelliQuick's argument that "a portion" of the class is exempt from the FLSA under FLSA's minimum wage and overtime requirements under the Motor Carrier Exemption.  Doc. 449 at 12–16.  This ruling also defeats Plaintiffs' motion for summary judgment on their Arizona Wage Act claim for overtime and minimum wages.  Doc. 438 at 22–24.

[215]*Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003) (citing 29 U.S.C. § 255(a) ("[A] cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.")).

[216]*Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

statute."[217]  For example, the Ninth Circuit has held that willfulness is established where the evidence showed that the employer knew its FLSA requirements "yet took no affirmative action to assure compliance with them."[218]  The plaintiff bears the burden of proving an employer's willfulness.[219]  "The determination of willfulness is a mixed question of law and fact."[220]

The FLSA's liquidated damages provision presents a related inquiry.  The FLSA imposes liquidated damages, in addition to damages for unpaid minimum wages or overtime compensation, on violating employers unless the employer can establish that it acted in good faith.[221]  This inquiry is intertwined with the willfulness inquiry discussed above because "a finding of good faith is plainly inconsistent with a finding of willfulness,"[222] but, here, the burden is on the employer to show good faith.[223]  "To avail itself of this defense, the employer must establish that it had an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for

---

[217]*Id.* at 908–09.

[218]*Id.* at 909.  *See also Haro v. City of Los Angeles*, 745 F.3d 1249, 1258 (9th Cir. 2014) (holding that employer's failure to "take any steps to obtain an opinion letter from the Department of Labor regarding Plaintiffs' positions" despite knowledge of "red flags" showed willfulness); *Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (willfulness shown where employer knew of FLSA obligations, yet, there was "no evidence of affirmative actions taken by the [employer] to ensure" compliance with the FLSA).

[219]*See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999).

[220]*Alvarez*, 339 F.3d at 908.

[221]29 U.S.C. § 216(b).

[222]*Chao*, 346 F.3d at 920.

[223]*Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1272 (11th Cir. 2008).

-47-

believing that [its] conduct complie[d] with the Act."[224]   "Whether the employer acted in

good faith and whether it had objectively reasonable grounds for its action are mixed

questions of fact and law."[225]

The evidence here establishes that IntelliQuick recklessly disregarded the

possibility that it would violate the FLSA by not paying its drivers based on the hours

they worked.  IntelliQuick does not dispute that it knew it would be required to comply

with the FLSA's requirements if its drivers were classified as employees, not

independent contractors.[226]   Indeed, this knowledge is displayed in the independent

contractor agreement that it drafted, which requires drivers to disavow their employee

status at least 5 times[227] and shows IntelliQuick's knowledge of the FLSA's test for

employee status.[228]   Thus, the record shows that IntelliQuick at least was aware of the

---

[224]*Flores*, 824 F.3d at 905 (9th Cir. 2016) (internal quotation marks omitted) (quoting *Local 246 Util. Workers Union of Am. v. S. California Edison Co.*, 83 F.3d 292, 298 (9th Cir. 1996)).

[225]*Id.*

[226]Doc. 452 at 4 ¶ 9.

[227]*See* doc. 431-3 at 44 ("Owner/Operator will be available to perform services for Customers located by Broker on the basis of an independent contractor, and not that of an employee of either Broker or Customers."); *id.* ("**OWNER/OPERATOR IS NOT AN EMPLOYEE OF BROKER OR BROKER'S CUSTOMERS**.") (emphasis in original); *id.* at 47 ("owner/operator will not be treated as an employee with respect to any services for federal, state or local tax purposes, and agrees, represents and warrants that it is an independent contractor engaged in an independently established trade, occupation or business . . . ."); *id.* at 48 ("**OWNER/OPERATOR SHALL NOT BE COVERED BY BROKER'S WORKERS' COMPENSATION INSURANCE BECAUSE OWNER/OPERATOR IS ENGAGED IN AN INDEPENDENTLY ESTABLISHED TRADE, OCCUPATION OR BUSINESS AND IS NOT AN EMPLOYEE OF BROKER**.") (emphasis in original); *id.* at 49 ("It is expressly agreed that Owner/Operator is an independent contractor.  Owner/Operator will not be considered an employee of Broker for any purpose whatsoever.").

[228]*See, e.g., id.* at 49 ("Broker neither has nor reserves any right of power to exercise any direction, control or determination over the manner, means or methods of

-48-

*possibility* that it was violating the statute by treating its drivers as independent

contractors.

The record also contains no evidence showing that IntelliQuick "actively

endeavored to ensure" compliance with the FLSA.[229]   IntelliQuick does not dispute

Plaintiffs' assertion that there is no evidence showing that it "ever checked with the

Department of Labor, consulted an attorney, or made any other reasonable effort to

determine whether its classification of Drivers as independent contractors was lawful

under the FLSA."[230]   The only evidence that IntelliQuick cites, both in opposition to

Plaintiffs' willfulness argument and in support of its good faith argument, is an October

2001 opinion letter issued by Internal Revenue Service ("IRS") to IntelliQuick when it

was operating under the name "Jet Delivery Corporation."[231]   This letter is unavailing for

several reasons.   To begin, it was issued by the IRS, not the Department of Labor, and

it does not concern the FLSA.   But more importantly, the facts described in the letter do

not describe IntelliQuick's practices.[232]   For example, the letter states that the driver in

question "was not supervised or controlled in the performance of her services," and the

"firm did not have the right to change the methods used by the worker or direct the

---

Owner/Operator's business activities and objectives in operating its business.").

[229]*Alvarez*, 339 F.3d at 910.

[230]Doc. 438 at 20–21.

[231]Doc. 452 at 27 ¶ 14; doc. 452-1 at 52–53.   *See also* doc. 431-2 at 18:17–19.

[232]Also, the IRS states that it did not "judge the validity of the facts provided."
Doc. 452-1 at 53.

-49-

worker on how to do the work."[233]  As the court describes in detail in its order at

docket 343, this clearly does not describe IntelliQuick's relationship with its drivers.

IntelliQuick can and does supervise its drivers, and it routinely directs its drivers on how

to do their jobs.  Because the facts described in this letter do not come close to

describing IntelliQuick's operations, the letter is not evidence of an honest effort that

IntelliQuick took to ensure compliance with the FLSA.  To the contrary, the evidence as

a whole shows that IntelliQuick acted willfully, without good faith, and without objectively

reasonable grounds for its actions.  IntelliQuick's continued refusal to at least begin

tracking its drivers' hours after this court ruled that its drivers are employees is further

evidence of IntelliQuick's willfulness and bad faith.

**5.    Whether IntelliQuick's Independent Contractor Agreements Are Substantively Unconscionable**

Plaintiffs' fourth cause of action seeks a declaratory judgment that states, among

other things, that "[a]ny Independent Contractor Owner/Operator Agreement [("ICA")]

that any Plaintiffs or Class Members was coerced to sign is unconscionable and

unenforceable."[234]  They now seek summary judgment on this claim.

A contract is substantively unconscionable, and therefore unenforceable, if its

terms are fundamentally unfair.[235]  A court may refuse to enforce a contract under this

doctrine if, for example, its terms are "so one-sided as to oppress or unfairly surprise an

innocent party," if there is "an overall imbalance in the obligations and rights imposed by

---

[233]Doc. 452-1 at 52.

[234]Doc. 187 at 40 ¶ 262.

[235]*Clark v. Renaissance W., LLC*, 307 P.3d 77, 79 (Ariz. Ct. App. 2013).

-50-

the bargain," or if there exists a "significant cost-price disparity."[236]  "[T]he determination of unconscionability is to be made by the court as a matter of law" after the parties are "given an opportunity to present evidence of [the contract's] commercial setting, purpose, and effect to aid the court in making the determination."[237]

Plaintiffs here argue that IntelliQuick's ICAs are substantively unconscionable because they are "oppressively one-sided and imbalanced compared to the benefits provided to" IntelliQuick.[238]  Plaintiffs essentially argue that the purpose and effect of these contracts is to allow IntelliQuick to evade federal and state labor laws and other responsibilities it would otherwise owe its employees.[239]  They pinpoint numerous substantive provisions in the agreement as one-sided.  The court finds that the following six provisions of the ICAs are skewed so heavily in IntelliQuick's favor that they are substantively unconscionable.

First and foremost, the ICAs require drivers to agree that they are independent contractors, not IntelliQuick's employees.[240]  This provision is based on the false premise that IntelliQuick would not exercise any control over the "manner, means[,] or methods of" the drivers' activities.[241]  Although the ICAs do not mention the legal significance of this provision, it is an attempted waiver of wage and hour protections

---

[236]*Id.*

[237]*Maxwell v. Fid. Fin. Servs., Inc.*, 907 P.2d 51, 56 (Ariz. 1995).

[238]Doc. 438 at 26.

[239]*Id.*

[240]*See, e.g.,* doc. 431-3 at 44 ¶ 1.b.

[241]Doc. 431-3 at 49 ¶ 8.a.

and other benefits under state and federal law.  And given the illusory nature of IntelliQuick's promise to treat the drivers as independent contractors, this term—which is foundational to the ICA—is significantly one-sided in IntelliQuick's favor.

Numerous other substantively unconscionable provisions flow from this provision.  The second and third require drivers to forego unemployment insurance[242] and workers' compensation benefits.[243]  IntelliQuick responds by arguing that the "relevant inquiry here is not whether these laws exist, but whether IntelliQuick lacked a good faith basis for not extending coverage to Plaintiffs."[244]  IntelliQuick cites no authority in support of this statement.  Contrary to IntelliQuick's assertion, the relevant inquiry is not into IntelliQuick's subjective intent, but rather into whether these provisions are so objectively one-sided that they are substantively unconscionable.  IntelliQuick identifies no benefit that its employees received in exchange for waiving their right to unemployment insurance and workers' compensation benefits.

Fourth, the ICAs provide that drivers will not be paid until IntelliQuick is paid by the customer,[245] which is a waiver of the drivers' right under Arizona law to be paid "all wages due" on "regular paydays."[246]  In response, IntelliQuick points out that Arizona law allows employers to withhold wages if it has prior written authorization from the

---

[242]*Id.* at 48 ¶ 6.d.

[243]*Id.* at 48 ¶ 6.b.

[244]Doc. 449 at 26.

[245]Doc. 431-3 at 63 ¶ 5.a.

[246]A.R.S. § 23-351(C).

employee to do so,[247] which may be true but does not change the fact that this provision is one-sided in its favor.

Fifth, the ICAs broadly provide that IntelliQuick may deduct from the driver's pay any expense that it is forced to incur on the driver's behalf.[248]  Plaintiffs argue that this is an illegal "kick-back" under federal law.[249]  In response, IntelliQuick notes that deductions for expenses are only illegal "'when such deductions deprive a worker of the federally mandated minimum wage or overtime pay.'"[250] This may be so, but IntelliQuick does not dispute Plaintiffs' assertion that it has no mechanisms in place to ensure that its deductions do not deprive drivers of their required wages.  Thus, the clause gives IntelliQuick the authority to obtain unlawful kickbacks from its drivers, which is a one-sided term in IntelliQuick's favor.

Sixth, the ICAs provide that drivers waive their right to contest their pay if they fail to do so within seven days.[251]  Plaintiffs argue that this waiver violates "the Arizona Employment Protection Act and Arizona wage statutes, which permit actions to be brought within one year, the FLSA and the Arizona Minimum Wage Laws which have 2

---

[247]A.R.S. § 23-352.

[248]Doc. 431-3 at 48 ¶ 5.f.

[249]29 C.F.R. § 531.35 ("The wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer . . . the whole or part of the wage delivered to the employee.").

[250]Doc. 449 at 28 (quoting *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 637 (W.D. Tex. 1999)).

[251]Doc. 431-3 at 47–48 ¶ 5.e.

-53-

and/or 3 year statute of limitations for asserting claims."[252]  IntelliQuick does not respond to this argument, thereby implicitly conceding that this provision is one-sided in its favor.

Through these six provisions, IntelliQuick's employees agree to forfeit their rights under numerous federal and state labor laws in exchange for nothing more than the illusory promise of independence.  These provisions are substantively unconscionable.

**6.      Whether Plaintiffs are entitled to summary judgment on their unlawful deduction claim**

Plaintiffs' Arizona Wage Act claim alleges, in part, that IntelliQuick is violating A.R.S. § 23-352 on account of the deductions it takes from its drivers' paychecks.[253] That statute provides that "[n]o employer may withhold or divert any portion of an employee's wages unless:" (1) the "employer is required or empowered to do so by state or federal law;" (2) the "employer has prior written authorization from the employee;" or (3) "[t]here is a reasonable good faith dispute as to the amount of wages due."[254]  At docket 342 the court certified a class consisting of all drivers who claim that IntelliQuick's standardized payroll deductions (for scanning device fees, secondary insurance fees, uniform laundry fees, and paycheck processing fees) violate this statute.  Plaintiffs now move for summary judgment on this claim, arguing that none of the three statutory exceptions apply.  In response, IntelliQuick argues that the ICAs

---

[252]Doc. 438 at 29.

[253]Doc. 187 at 38.

[254]A.R.S. § 23-352.

contain written authorization from the drivers to deduct these expenses from their paychecks.[255]

In light of the court's ruling that these authorizations are unconscionable to the extent they contain no safeguards to ensure that the deductions do not deprive the drivers of their required wages, the question becomes one of remedy.  According to the Restatement, "[i]f a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."[256]  Plaintiffs' argument that the entire contract should be declared unenforceable due to its numerous unconscionable terms is unpersuasive.  The court finds that the better remedy here is to limit application of the unconscionable aspect of the ICA's deduction clause in order to avoid an unconscionable result.  Thus, the court will enforce IntelliQuick's contractual right to take deductions from drivers' paychecks unless the particular deduction would violate the driver's right to minimum wage or overtime pay.  Plaintiffs' motion for summary judgment on this claim will be denied.

## V.  CONCLUSION

Based on the preceding discussion, the motion at docket 428 is GRANTED IN PART AND DENIED IN PART as follows: judgment will be entered in favor of Felicia

---

[255]Doc. 449 at 24.

[256]Restatement (Second) of Contracts § 208 (1981).

Tavison and Steven Anastase on Plaintiffs' FLSA claim.  In all other respects the motion is DENIED.

The motion at docket 430 is DENIED.

The motion at docket 432 is GRANTED IN PART AND DENIED IN PART as follows: Robert W. Crandall is precluded from opining on the average duration of the drivers' stops; precluded from using average hours over multiple weeks to estimate IntelliQuick's overtime liability; precluded from opining that some drivers employed other drivers; and precluded from opining that IntelliQuick's liability for its payroll deductions hinges on whether those deductions "were built into" the drivers' pay rates.  In all other respects the motion is DENIED.

The motion at docket 438 is GRANTED IN PART AND DENIED IN PART as follows: Keith Spizzirri is individually liable for IntelliQuick's FLSA violations; IntelliQuick's FLSA violations were willful under § 255; IntelliQuick is liable for liquidated damages; and six provisions of IntelliQuick's Independent Contractor Owners/Operator Agreement are substantively unconscionable.  In all other respects the motion is DENIED.

DATED this7th day of January 2018.


/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT